Michael A. Dias, SBN 183705
Steven E. Alfieris, SBN 220634
DIAS LAW FIRM, INC.
502 West Grangeville Boulevard
Hanford, California 93230
Telephone: (559) 585-7330
Facsimile: (559) 585-7335
E-Mail: michael@diaslaw.com
       steven@diaslaw.com

Attorneys for Plaintiff
FRANK MENDONSA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK MENDONSA, an individual, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR:** |
| v. | 1. **NEGLIGENCE;** |
| LAND O'LAKES, INC., a Minnesota corporation; LAND O'LAKES INSURANCE SOLUTIONS, LLC, a Minnesota limited liability company; BUYPOINT SERVICES CO., LLC, a Minnesota limited liability company; ADAM CARDWELL, an individual; COREY RAMSDEN SCOTT fka COREY RAMSDEN, an individual; and DOES 1 to 50, inclusive, | 2. **PROFESSIONAL NEGLIGENCE;** 3. **BREACH OF FIDUCIARY DUTY;** 4. **INTENTIONAL MISREPRESENTATION;** 5. **NEGLIGENT MISREPRESENTATION; and** 6. **UNFAIR BUSINESS PRACTICE (Cal. Bus. & Prof. Code §§ 17200 et seq.)** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff Frank Mendonsa, an individual, alleges as follows:

**INTRODUCTION**

1.     Plaintiff brings this action against Land O'Lakes, Inc. ("LOL"), Land O'Lakes Insurance Solutions, LLC ("LOLIS"), BuyPoint Services Co., LLC ("BuyPoint"), Adam Cardwell ("Cardwell"), and Corey Ramsden Scott fka Corey Ramsden ("Ramsden") for their negligent acts and/or omissions with respect to the time-sensitive nature of an application for the purchase of a dairy revenue protection insurance policy and their subsequent false representations and actions that a valid and binding policy was in place, which resulted in damages to Plaintiff when it was later determined that

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

Complaint for Damages

1

his policy was invalid. Plaintiff had paid the premium for the first quarter of 2020, which was accepted, and claimed a loss for same for which he received an indemnity payment that was applied toward his premium for the second quarter of 2020. Unfortunately, Plaintiff's loss in the second quarter of 2020 was substantial, and his claim was subject to a review of his policy. Plaintiff's damages were both foreseeable and preventable had it been properly ascertained that an application for the insurance policy was executed by Plaintiff and timely submitted by Defendants, who hold themselves out as having the requisite knowledge regarding such insurance matters.

## **PARTIES**

2.    Plaintiff Frank Mendonsa (hereinafter "Plaintiff") is a natural person who is, and at all times relevant to this claim was, a resident of the City and County of Tulare in the State of California. Plaintiff is the owner of FM Jerseys, a dairy that is located in the City of Tipton, County of Tulare, State of California.

3.    Plaintiff is informed and believes, and thereon alleges, that Defendant Land O'Lakes, Inc. (hereinafter "LOL") is incorporated under the laws of the State of Minnesota, and has its principal place of business in the State of Minnesota. Plaintiff is further informed and believes, and thereon alleges, that LOL is a member-owned cooperative that, among other things, purchases milk from its dairy-farmer members and uses that milk to produce butter and other dairy products. LOL has a facility located in the County of Tulare where Plaintiff ships the milk from his dairy operation.

4.    Plaintiff is informed and believes, and thereon alleges, that Defendant Land O'Lakes Insurance Solutions, LLC (hereinafter "LOLIS") is a limited liability company with its principal place of business in the State of Minnesota and is wholly owned by BuyPoint. Plaintiff is further informed and believes, and thereon alleges, that LOLIS, among other things, helps LOL dairy farmer members purchase dairy revenue protection insurance policies from insurance companies that participate in the federal crop insurance program administered by the United States Department of Agriculture. Plaintiff is further informed and believes, and thereon alleges, that LOLIS acts as an

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alllens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

agent for ProAg, which issues dairy protection insurance policies, and assists ProAg find dairy farmers to purchase such policies.

5.    Plaintiff is informed and believes, and thereon alleges, that Defendant BuyPoint Services Co., LLC (hereinafter "BuyPoint") is a limited liability company with its principal place of business in the State of Minnesota.  Plaintiff is further informed and believes, and thereon alleges, that BuyPoint is wholly owned by Land O'Lakes ("LOL") and was formed by same to provide insurance services to its members.

6.    Plaintiff is informed and believes, and thereon alleges, that Defendant Adam Cardwell (hereinafter "Cardwell") is an individual who, at all times relevant, was residing in the State of Minnesota.  Plaintiff is further informed and believes, and thereon alleges, that at all times relevant Cardwell was an employee of LOL as a Senior Risk Specialist that performed work for LOLIS and facilitated the application process and purchase of a dairy revenue protection insurance policy through ProAg for Plaintiff, which policy was determined to be invalid.

7.    Plaintiff is informed and believes, and thereon alleges, that Defendant Corey Ramsden Scott fka Corey Ramsden (hereinafter "Ramsden") is an individual who, at all times relevant, was residing in the State of Minnesota.  Plaintiff is further informed and believes, and thereon alleges, that at all times relevant Ramsden was an employee of LOL as a Senior Manager of the Dairy Member Risk and Business Advisory Services that performed work for LOLIS and facilitated the application process and purchase of a dairy revenue protection insurance policy through ProAg for Plaintiff. (BuyPoint, LOL, LOLIS, Cardwell, and Ramsden are sometimes collectively referred to herein as "Defendants".)

8.    Each of the Defendants, their employees and/or agents, participated in the events alleged herein and, to the extent that they did not personally participate, they authorized acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiff.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkins
Ella R. Fioresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

1  | Each acted in concert with each other, and the events alleged herein caused damage
2  | to Plaintiff.

3  | 9.    Plaintiff is informed and believes, and thereon alleges, that at all times
4  | relevant herein each of the Defendant Does 1-50, inclusive, were responsible in some
5  | manner for the occurrences and injuries alleged in this complaint.  Their names and
6  | capacities are presently unknown to Plaintiff and, on this basis, Plaintiff sues these
7  | defendants by fictitious names.  Plaintiff will amend the Complaint to substitute the true
8  | names and capacities of the Doe defendants when ascertained.

9  | **JURISDICTION AND VENUE**

10 | 10.    This Court has jurisdiction under 28 U.S.C. § 1332 based on diversity of
11 | citizenship between Plaintiff and Defendants, and because the amount of controversy
12 | exceeds $75,000.00.  This Court has supplemental jurisdiction over all state law claims
13 | under 28 U.S.C. § 1367, and under principles of pendent jurisdiction.

14 | 11.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C.
15 | § 1391(b)(2) because the events giving rise to this complaint occurred in this District.

16 | **STATEMENT OF FACTS**

17 | 12.    On November 26, 2019, at 5:06 p.m., Cardwell sent a Producers
18 | Agricultural Insurance Co. ("ProAg") application form for FM Jerseys to Plaintiff via
19 | DocuSign, which had first been executed by Cardwell.  A screen print from ProAg dated
20 | October 21, 2020, indicates that Plaintiff signed the application on November 26, 2019.
21 | (A copy of the aforementioned screenshot is attached hereto as **Exhibit A**.)  That night,
22 | at 9:39 p.m., Cardwell sent a text message to Plaintiff informing him that the application
23 | was "complete."  (A copy of the aforementioned text message is attached hereto as
24 | **Exhibit B**.)

25 | 13.    On December 10, 2019, Plaintiff received a ProAg application signature
26 | reminder from Milk Producers Online via DocuSign.  It is important to note here that
27 | Plaintiff has no special knowledge or expertise in crop insurance, which is why he
28 | sought the advice and assistance of Defendants.  In fact, Plaintiff had never utilized

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hecker
Steven E. Atkins
Ella R. Floresca
David M. Lango
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

DocuSign prior to this time.  At this time, Plaintiff believed that his application was complete based on the previous representation by Cardwell on November 26, 2019, via text message.

14.    On December 10, 2019, ProAg Underwriter Grady Stehr emailed Ramsden and Cardwell that the Employer Identification Number (EIN) and name for FM Jerseys' policy did not match the IRS (Internal Revenue Service) records on policy #500271, which was the policy number ProAg had issued to Plaintiff in December 2019.  On December 12, 2019, Cardwell sent an email to Grady Stehr requesting a call with him in order to address the EIN issue.  (A copy of the aforementioned email is attached hereto as **Exhibit C**.)  On that same day, Cardwell contacted Plaintiff via text message and informed him that the Tax ID number for "FM Ranch name doesn't jive." In a subsequent text to Plaintiff later that same day, Cardwell informed Plaintiff that "Floors elevated.  You can endorse even as we sort through the tax ID stuff.  We are ready".  (A copy of the aforementioned text messages from Cardwell to Plaintiff are attached hereto as **Exhibit D**.)  In reliance on Cardwell's representation that his application was complete, on December 12, 2019, Plaintiff executed the ProAg Endorsement Agreement to purchase a DRP (Dairy Revenue Protection) policy for milk to be produced by FM Jerseys during each quarter of the year 2020 via DocuSign.  (A copy of the ProAg Endorsement Agreement is attached hereto as **Exhibit E**.)

15.    At 9:54 p.m. on the evening of December 12, 2019, Ramsden sent an email to ProAg Underwriter Grady Stehr and ProAg Minnesota Account Representative Sharelle Burg, which was copied to Cardwell, that attached the endorsements for FM Jersey Ranch and explained that there were "issues" with the DocuSign documents. On December 13, 2019, at 8:36 a.m., Grady Stehr emailed Ramsden and Sharelle Burg, copying Cardwell, wherein he stated that "attached is an endorsement showing what I have keyed.  I merged in one of your signature pages, so if this is acceptable to you I will attach the policy."  Thereafter, at 9:38 a.m., Corey responded to all of the aforementioned persons stating, "This is great Grady- THANK YOU for your help in

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alferis
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

securing this one!" (Emphasis in original.)  Later that morning, at 11:44 a.m., Grady Stehr again emailed Ramsden and Sharelle Burg, copying Cardwell, wherein he sent the approved Schedule of Insurance ("SOI") as a .pdf file and indicated in his message that "this morning's endorsements have been approved! Sorry for cutting it so close." (A copy of the aforementioned email chain is attached hereto as **Exhibit F**.)

16. On December 13, 2019, Plaintiff received an SOI from ProAg that showed that DRP policies were in place and effective as of December 12, 2019, and that the information was binding.  The SOI shows the net premiums of the DRP policies for the first, second, third, and fourth quarters of 2020 totaled $167,968.00, which premiums were scheduled to be paid after the end of each respective quarter in specific amounts. (A copy of the SOI is attached hereto as **Exhibit G**.)

17. Plaintiff was unaware that the ProAg application was time-sensitive and had to be signed by December 15, 2019, pursuant to Federal Crop Insurance regulations.  He relied on the expertise and representations of the Defendants to guide and/or direct him in such matters in light of their apparent knowledge and expertise and had **not** been told that the sales period end date for the coverage sought was December 15, 2019.  Interestingly, on December 30, 2019, an application for opening an account with the insurance program was sent to Plaintiff via DocuSign **after** it was discovered that it had not been signed by Plaintiff by December 15, 2019.  As such, on December 31, 2019, Plaintiff signed and executed the ProAg application.  (A copy of the fully executed ProAg application is attached hereto as **Exhibit H**.)

18. At no time thereafter was Plaintiff informed by any of the Defendants that there was a problem with the documentation or that anyone objected to the policy on any grounds.  In fact, the conduct of the parties demonstrates that the policy was in full force and effect prior to December 15, 2019.  In addition to the SOI, which indicated that the polices were in place and effective, Plaintiff performed his obligation pursuant to the DRP policy by paying the premiums for the first quarter of 2020, which was accepted by ProAg.  (A copy of the DRP Policy is attached hereto as **Exhibit I**.)  Milk

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atheris
Eta R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

prices fluctuated during the first quarter of 2020 and, as a result, Plaintiff was owed an indemnity payment of $13,898.00.

19.    On April 25, 2020, Plaintiff received a letter from ProAg notifying him that his policy "may have had a loss" and enclosed a Notice of Probable Loss / Milk Production Worksheet for Plaintiff to complete within sixty (60) days.  The worksheet provided an election for Plaintiff to either receive the indemnity or have it applied to the premium for the second quarter.  (Copies of the aforementioned letter from ProAg and the worksheet are collectively attached hereto as **Exhibit J**.)  Cardwell had been copied the aforementioned letter and worksheet from ProAg and completed the worksheet on behalf of Plaintiff.

20.    On June 5, 2020, an email from Curt Clanton, a Lead Claims Processing Auditor for ProAg, acknowledged receipt of the worksheet and indicated that copies of the milk marketings for the first quarter of 2020 as well as other documentation was needed by June 25, 2020.  As such, on that same day, Plaintiff provided additional information to Curt Clanton via email. However, on June 10, 2020, a subsequent email from Curt Clanton acknowledged receipt of the daily milk totals report for the first quarter of 2020, but requested further information of corresponding statements from the milk purchaser for the months of January 2020, February 2020, and March 2020.  On June 18, 2020, Curt Clanton sent a follow up email to Plaintiff regarding his request for additional supporting documentation for the first quarter of 2020, expressly stating that the requested documents must be received by June 25, 2020.  Cardwell was copied on these emails.  (A copy of the aforementioned email chain is attached hereto as **Exhibit K**.)

21.    On June 19, 2020, Plaintiff submitted the additional documentation that had been requested to Cardwell.  Based upon an email that Plaintiff received from Cardwell later that same day indicating that ProAg was "processing the claim", Plaintiff is informed and believes, and thereon alleges, that upon receipt of the additional documentation, Cardwell forwarded same to ProAg.  (A copy of the June 19, 2020,

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Aitkens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

emails are attached hereto as **Exhibit L**.)  Consequently, the first quarter indemnity payment in favor of Plaintiff in the amount of $13,898.00 was approved and applied to Plaintiff's second quarter 2020 premium of $30,099.00.

22.    In the second quarter of 2020, milk prices dropped significantly.  As such, Plaintiff's losses for the second quarter were considerably more substantial than they had been in the first quarter of 2020.  On July 22, 2020, Plaintiff received a letter from ProAg that his policy "may have had a loss", which had enclosed a Notice of Probable Loss / Milk Production Worksheet that showed an estimated indemnity payment due to Plaintiff in the amount of $433,178.00.  (Copies of the aforementioned letter from ProAg to Plaintiff and the accompanying worksheet are collectively attached hereto as **Exhibit M**.)  Plaintiff supplied the information required to complete the worksheet, which Plaintiff subsequently emailed to ProAg.

23.    On July 28, 2020, in an email from Grady Stehr to Cardwell, Grady Stehr unambiguously admits that he had "dropped the ball on this one pretty bad…still no app has been attached, compliance needs on ASAP.. [sic] looks like the claim is going to be big. So we'll need the TIN matching paperwork completed too."  (A copy of the aforementioned email is attached hereto as **Exhibit N**.)  It is apparent that this email was in reference to Plaintiff's policy application executed on December 31, 2019, as well as the tax ID issue.  In an effort to correct the EIN/TIN "Named Insured Misreported" issue, on July 28, 2020, Cardwell completed a ProAg form entitled "Agent Checklist for TIN Matching", which was signed by Plaintiff and Cardwell and submitted thereafter to ProAg.  (A copy of the aforementioned form is attached hereto as **Exhibit O**.)

24.    On July 30, 2020, Cardwell sent an email to Grady Stehr wherein he makes some interesting assertions.  Specifically, Cardwell writes, in pertinent part, the following:

> …I want to follow up on getting a resolution in a timely fashion. We have a lot at stake with this as I mentioned. [¶] I appreciate the insured's accountability here and do not want to undermine the importance of signatures on

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

documents and timing thereof, but as we both agreed, we do not see evidence of fraud, waste, or abuse and the policy was created with good faith and intent by all parties. [¶] A lot has happened since the insured purchased the initial endorsement on December 12th, 2019. Approved purchase endorsements were made through 2020 with signatures by the insured on all of those detail lines, indemnity notifications have been distributed for both Q1 & Q2, and the policy rolled into 2021 leading to a Q1 2021 purchase and additional Q4 2020 volume. It took until July, 29th to discover. [¶] I believe this is an errors and omissions situation due to this buyer of insurance being unsophisticated. I understand compliance would have caught this as you mentioned and hope my integrity in request the phone discussion about it and illustrating what happened bears some weight. I know and I both want to do the right thing here and we left it at seeing what you can research as this will become out of yours and my collective hands....

(A copy of the aforementioned email from Cardwell to Grady Stehr dated July 30, 2020, is attached hereto as **Exhibit P**.)

25.    Pursuant to the Livestock Price Reinsurance Agreement (the "LPRA"), Approved Insurance Providers ("AIPs") are required to conduct reviews when DRP losses are or have exceeded $200,000.00 in the *aggregate* of the previous five (5) quarters.  (Copies of the Informational Memorandum: Com-19-001 dated April 12, 2019, and the 2019 LPRA Appendix IV are attached hereto as **Exhibit Q** and **Exhibit R**, respectively.)  In light of this requirement, on August 14, 2020, Deanna Cameron, a Compliance Lead Review Officer with ProAg, sent an email to Plaintiff regarding her "high dollar review" on his policy and requested "verifiable documentation" for Plaintiff's tax ID.  In that email, the only issue identified by Deanna Cameron was with regard to Plaintiff's tax ID number.  (A copy of the aforementioned email from Deanna Cameron to Plaintiff dated August 14, 2020, is attached hereto as **Exhibit S**.)  However, at no time was Plaintiff made aware of the LPRA requirement to review losses of $200,000.00 or more as the DRP policy that was issued to Plaintiff contained no notice of such review.

///

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hecker
Steven E. Atkins
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

26.    On September 9, 2020, in a letter from Vikki Blettner, the National Underwriting Manager for ProAg, to Plaintiff, ProAg denied Plaintiff's claim for indemnity for two (2) reasons: (1) the named insured (Plaintiff's dairy, FM Jerseys) was misreported on the application as a corporation, and that ProAg was unable to verify it was an active corporation during the verification process, and (2) the application was not timely signed.  (A copy of the aforementioned denial letter is attached hereto as **Exhibit T**.)

27.    Despite having received a letter denying coverage of their claim under the DRP policy, on October 20, 2020, Plaintiff received a letter from the ProAg Claims Processing Department indicating that his policy "may have had a loss" and enclosed a "Notice of Probable Loss / Milk Production Worksheet" to FM Jerseys for the third quarter of 2020.  The Probable Indemnity indicated was $251,655.00.  (Copies of the letter from ProAg and the accompanying worksheet are collectively attached hereto as **Exhibit U**.)

**CLAIMS FOR RELIEF**

**<u>FIRST CLAIM FOR RELIEF</u>**

**Negligence (Against All Defendants and DOES 1 to 50)**

28.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 26, above, as if fully set forth herein.

**A.    <u>Defendant Cardwell</u>**

29.    At all times relevant herein, Plaintiff was a dairy-farmer member of LOL, who sought assistance and guidance to purchase a dairy revenue protection policy from Cardwell as Plaintiff had no knowledge or expertise regarding crop insurance and Plaintiff was informed and believes, and thereon alleges, that Cardwell had such knowledge.

30.    At all times relevant herein, Cardwell acted negligently, carelessly, recklessly, and/or unlawfully by: (1) failing to ensure that said application was executed by Plaintiff; (2) informing Plaintiff that his ProAg application was complete on November

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alferís
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

26, 2019, before ascertaining the completeness of same; and (3) representing to Plaintiff that he was ready to endorse.

31.    At all times relevant herein, Cardwell knew or should have known that Plaintiff had no knowledge of crop insurance and that by failing to submit to ProAg an accurate application executed by Plaintiff by the December 15, 2019, deadline that Plaintiff's policy would not be valid.  Further, Cardwell knew or should have known that given Plaintiff's lack of knowledge of crop insurance and DocuSign, Plaintiff would rely on his representations regarding the policy, execute the endorsements, and pay the premium.  As such, it was reasonably foreseeable that Plaintiff would rely on Cardwell's representations that his application was complete and took no further action as to the application on or before the application deadline of December 15, 2019.

32.    As a direct and proximate cause of the negligence of Cardwell, Plaintiff reasonably believed that he had a valid and binding policy in place and, as such, paid the premium for the first quarter of 2020.

33.    As a further direct and proximate cause of the negligence of Cardwell, on August 14, 2020, Plaintiff's claim for indemnity for the second quarter of 2020 was denied upon the determination that he did not have a valid policy, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

34.    As a further direct and proximate cause of the negligence of Cardwell, Plaintiff was hurt and injured in his health, strength, and activity, sustaining injury to his nervous system and person, all of which injuries have caused, and continue to cause, Plaintiff great mental, physical, emotional, and nervous pain and suffering.  As a result of these injuries, Plaintiff has suffered general damages.

## B.    Defendant Ramsden

35.    At all times relevant herein, Ramsden acted negligently, carelessly, recklessly, and/or unlawfully by failing to review Plaintiff's application despite having received notice on December 10, 2019, from Grady Stehr, a ProAg Underwriter, that

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atilleris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

the name for FM Jerseys' policy did not match the IRS records on the policy that ProAg had issued to Plaintiff.

36.    At all times relevant herein, Ramsden knew or should have known that incorrect and/or incomplete information on an application for crop insurance could affect the validity of a policy.  Furthermore, it was reasonably foreseeable that an incomplete application for a dairy revenue protection insurance policy would be invalid if it was not timely executed by the deadline of December 15, 2019.

37.    As a direct and proximate cause of the negligence of Ramsden, Plaintiff reasonably believed that he had a valid and binding policy in place and, as such, paid the premium for the first quarter of 2020.

38.    As a further direct and proximate cause of the negligence of Ramsden, on August 14, 2020, Plaintiff's claim for indemnity for the second quarter of 2020 was denied upon the determination that he did not have a valid policy, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

39.    As a further direct and proximate cause of the negligence of Ramsden, Plaintiff was hurt and injured in his health, strength, and activity, sustaining injury to his nervous system and person, all of which injuries have caused, and continue to cause, Plaintiff great mental, physical, emotional, and nervous pain and suffering.  As a result of these injuries, Plaintiff has suffered general damages.

## C.    Defendant LOL, LOLIS, and BuyPoint

40.    Plaintiff alleges, that at all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees acted negligently, carelessly, recklessly, and/or unlawfully in the course and scope of his/her employment by failing to provide adequate insurance services to Plaintiff, a member, despite knowing that he specifically desired to purchase a dairy revenue protection insurance policy and failing to provide him with a valid and binding policy.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atleris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

41.     At all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees knew or should have known that an application for a dairy revenue protection insurance policy was time sensitive and had a deadline of December 15, 2019, and that failure to timely submit a fully executed application could result in an invalid policy.  It was reasonably foreseeable that such an application would come under review in the event of a claimed loss of $200,000.00 or greater resulting in a denial of the claim and a determination that the policy is not valid.

42.     As a direct and proximate cause of the negligence of LOL, LOLIS, and BuyPoint agents and/or employees, Plaintiff's application was submitted to ProAg without ascertaining that it had been executed by both the agent and Plaintiff.

43.     As a further direct and proximate cause of the negligence of LOL, LOLIS, and BuyPoint agents and/or employees, Plaintiff's policy was determined to not be valid and binding as his application had not been timely executed by the deadline of December 15, 2019.

44.     As a further direct and proximate cause of the negligence of LOL, LOLIS, and BuyPoint agents and/or employees, Plaintiff's claim for indemnity for the second quarter of 2020 was denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

45.     As a further direct and proximate cause of the negligence of Cardwell, Plaintiff was hurt and injured in his health, strength, and activity, sustaining injury to his nervous system and person, all of which injuries have caused, and continue to cause, Plaintiff great mental, physical, emotional, and nervous pain and suffering.  As a result of these injuries, Plaintiff has suffered general damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

## <u>SECOND CLAIM FOR RELIEF</u>

### Professional Negligence (Against All Defendants, and DOES 1 to 50)

46.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 45, above, as if fully set forth herein.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

## A.   <u>Defendant Cardwell</u>

47.   At all times relevant herein, Plaintiff was a dairy-farmer member of LOL, who sought assistance and guidance to purchase a dairy revenue protection policy from Cardwell as Plaintiff had no knowledge or expertise regarding crop insurance. Cardwell represented and held himself out as a Senior Risk Specialist with the knowledge to facilitate Plaintiff's procurement of crop insurance and, particularly, a dairy revenue protection insurance policy, which policies are highly regulated and are a specialized area of insurance that requires specific training.

48.   At all times relevant herein, Cardwell acted negligently, carelessly, recklessly, and/or unlawfully by: (1) failing to accurately complete Plaintiff's application for a dairy revenue protection insurance policy; (2) failing to submit a complete and executed application to ProAg by the December 15, 2019, deadline; (3) informing Plaintiff that the application for a dairy revenue protection insurance policy was time sensitive and was required to be submitted to ProAg by December 15, 2019; (4) failing to inform Plaintiff that losses under a dairy revenue protection insurance policy that are or have exceeded $200,000.00 in the aggregate of the previous five (5) quarters are subject to review by an AIP pursuant to the LPRA; and (5) failing to inform Plaintiff of the issues with his policy regarding his untimely execution of the application and the tax identification number.

49.   At all times relevant herein, Cardwell knew or should have known, that the dairy revenue protection policy that Plaintiff wanted to procure would be invalid if ProAg did not receive an application executed by Plaintiff by the December 15, 2019, deadline.   Plaintiff further alleges, that at all times relevant herein, Cardwell knew or should have known that Plaintiff's policy was subject to a high-dollar review if his losses are or exceeded $200,000.00 as such language was not included in Plaintiff's policy and Plaintiff had no special knowledge or expertise regarding such policies.   The consequence of such failures by Cardwell were clearly foreseeable to Cardwell, who

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkins
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

has held himself out as knowledgeable as to dairy revenue protection insurance policies.

50.    As a direct and proximate cause of the negligence of Cardwell, Plaintiff's application to ProAg was not timely executed by December 15, 2019.

51.    As a further direct and proximate cause of the negligence of Cardwell, Plaintiff was never informed that there were any issues with his policy.

52.    As a further direct and proximate cause of the negligence of Cardwell, Plaintiff's application was determined to be invalid after his substantial second quarter loss in 2020 subjected his policy to review.

53.    As a further direct and proximate cause of the negligence of Cardwell, Plaintiff's claim for indemnity for the second quarter of 2020 was denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

54.    As a further direct and proximate cause of the negligence of Cardwell, Plaintiff was hurt and injured in his health, strength, and activity, sustaining injury to his nervous system and person, all of which injuries have caused, and continue to cause, Plaintiff great mental, physical, emotional, and nervous pain and suffering.  As a result of these injuries, Plaintiff has suffered general damages.

**B.    Defendant Ramsden**

55.    Plaintiff alleges, that at all times relevant herein, Ramsden represented and held herself out as a Senior Manager of the Dairy Member Risk and Business Advisory Services with the knowledge to facilitate Plaintiff's procurement of crop insurance and, particularly, a diary revenue protection insurance policy, which policies are highly regulated and are a specialized area of insurance that requires specific training.

56.    At all times relevant herein, Ramsden acted negligently, carelessly, recklessly, and/or unlawfully by: (1) holding herself out as a professional conducting routine business, facilitating the procurement of crop insurance, and her knowledge

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkins
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

with respect to dairy revenue protection insurance policies; and (2) her conduct in moving forward with Plaintiff's endorsements despite knowing that there were issues with his application.

57.    At all times relevant herein, Ramsden knew or should have known, that the dairy revenue protection policy that Plaintiff wanted to procure would be invalid if the application was not timely executed by the deadline of December 15, 2019, and, further, that such issue would be discovered if there was a high-dollar review of the policy.  Plaintiff was never informed that there were any issues with his application. The consequence of such conduct by Ramsden was clearly foreseeable, who held herself out as a person with knowledge of the procurement of dairy revenue protection insurance policies.

58.    As a direct and proximate cause of the negligence of Ramsden, Plaintiff's application to ProAg was not timely executed by December 15, 2019.

59.    As a further direct and proximate cause of the negligence of Ramsden, Plaintiff was never informed that there were any issues with his policy.

60.    As a further direct and proximate cause of the negligence of Ramsden, Plaintiff's application was determined to be invalid after his substantial second quarter loss in 2020 subjected his policy to review.

61.    As a further direct and proximate cause of the negligence of Ramsden, Plaintiff's claim for indemnity for the second quarter of 2020 was denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

62.    As a further direct and proximate cause of the negligence of Cardwell, Plaintiff was hurt and injured in his health, strength, and activity, sustaining injury to his nervous system and person, all of which injuries have caused, and continue to cause, Plaintiff great mental, physical, emotional, and nervous pain and suffering.  As a result of these injuries, Plaintiff has suffered general damages.

////

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Aifieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

### C. Defendants LOL, LOLIS, and BuyPoint

63. Plaintiff alleges, that at all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees held themselves out as providing insurance services to LOL members and helped members purchase dairy revenue protection insurance policies from insurance companies that participate in the federal crop insurance program administered by the United States Department of Agriculture.

64. At all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees acted negligently, carelessly, recklessly, and/or unlawfully by failing to provide adequate insurance services to Plaintiff, a member, who specifically sought to procure a dairy revenue protection insurance policy for his dairy operation. LOL, LOLIS, and BuyPoint agents and/or employees acted negligently, carelessly, recklessly, and/or unlawfully in procuring a policy for Plaintiff that was ultimately determined to be invalid.

65. At all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees knew or should have know that their failure to procure a valid dairy revenue protection policy for Plaintiff would result in the denial of any claim that Plaintiff made for a loss. Such a result is reasonably foreseeable as dairy revenue protection policies are highly regulated.

66. As a direct and proximate cause of the negligence of LOL, LOLIS, and BuyPoint agents and/or employees, Plaintiff did not have a valid policy.

67. As a further direct and proximate cause of the negligence of LOL, LOLIS, and BuyPoint agents and/or employees, Plaintiff's loss claim for the second quarter of 2020 was denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

68. As a further direct and proximate cause of the negligence of LOL, LOLIS, and BuyPoint agents and/or employees, Plaintiff was hurt and injured in his health, strength, and activity, sustaining injury to his nervous system and person, all of which injuries have caused, and continue to cause, Plaintiff great mental, physical, emotional,

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

1  and nervous pain and suffering.  As a result of these injuries, Plaintiff has suffered

2  general damages.

3  WHEREFORE, Plaintiff prays for relief as set forth below.

4  ### THIRD CLAIM FOR RELIEF

5  **Breach of Fiduciary Duty (Against All Defendants, and DOES 1 to 50)**

6  69.    Plaintiff hereby re-alleges and incorporates by reference each and every

7  allegation contained in Paragraphs 1 through 68, above, as if fully set forth herein.

8  70.    Defendants, and each of them, were in a fiduciary relationship with

9  Plaintiff by and through their relationship as insurer and insured.  Additionally, such

10  fiduciary relationship between Defendants, and each of them, existed with Plaintiff upon

11  Plaintiff's payment of the premiums for the first quarter of 2020, which had been

12  accepted.  As such, Defendants, and each of them, had a duty to act in the highest

13  good faith to Plaintiff and not obtain any advantage by misrepresenting or concealment.

14  Such relationship caused Plaintiff to repose trust and confidence in Defendants in

15  connection with Plaintiff's desire to procure a dairy revenue protection insurance policy.

16  Defendants, and each of them, voluntarily accepted a fiduciary role with respect to

17  Plaintiff, including the duty to act with the utmost good faith, loyalty, and in the best

18  interests of Plaintiff.

19  71.    Defendants, and each of them, acted on Plaintiff's behalf in purportedly

20  securing and procuring a dairy revenue protection insurance policy for Plaintiff.

21  72.    Defendants, and each of them, breached their fiduciary duty of good faith

22  to Plaintiff when they misrepresented that they had the specialized knowledge in the

23  area of agricultural insurance policies.

24  73.    In addition, Defendants, and each of them, breached their fiduciary duty

25  of good faith when they affirmatively represented to Plaintiff that he had provided them

26  with all the information necessary for coverage and had a valid policy and that he had

27  coverage for the first quarter of 2020, despite knowing that there was an issue

28  regarding his tax identification number and business name.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Altieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

74.    As a direct and proximate cause of the breach by Defendants, and each of them, Plaintiff's policy was determined to be invalid.

75.    As a further direct and proximate cause of the breach by Defendants, and each of them, Plaintiff's claim for loss in the second quarter of 2020 was denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

76.    The conduct of Defendants, and each of them, was a substantial factor in causing harm to Plaintiff.

WHEREFORE, Plaintiff prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF

**Intentional Misrepresentation (Against All Defendants, and DOES 1 to 50)**

77.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 76, above, as if fully set forth herein.

### A.    Defendant Cardwell

78.    Plaintiff alleges that on or about November 26, 2019, Cardwell represented to Plaintiff via text message that his ProAg application was "complete." Thereafter, on December 12, 2019, Cardwell sent subsequent text messages to Plaintiff first informing him that the tax identification number for "FM Ranch name doesn't jive" and then that Plaintiff could endorse as the tax identification issue was sorted out.

79.    Plaintiff alleges that the representations made by Cardwell were in fact false.  The true facts were that Plaintiff's ProAg application was not "complete" as the application was not executed by Plaintiff by the deadline of December 15, 2019, and there was an issue regarding Plaintiff's tax identification number.  The true facts were that at the time Cardwell made such representation to Plaintiff, Cardwell had knowledge of the deadline to submit an executed application to ProAg and failed to disclose same to Plaintiff.  Further, the true facts were that Cardwell failed to ascertain the completeness of Plaintiff's application before it was submitted to ProAg.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atfiens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

80.    Plaintiff alleges that when Cardwell made these representations, he knew them to be false and made said representations with the intent to deceive and defraud and induce Plaintiff to act in reliance on said representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

81.    Plaintiff, at the time that the representations were made by Cardwell, and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Cardwell's representations and believed them to be true.    In reliance on said representations by Cardwell, Plaintiff was induced to believe that his application was complete based on Cardwell's representation on November 26, 2019.    Further, in reliance on said representation as well as Cardwell's subsequent representation that Plaintiff could endorse, Plaintiff executed the ProAg Endorsement Agreement to purchase a dairy revenue protection insurance policy for milk to be produced by FM Jerseys during each quarter of the year 2020 via DocuSign.    Had Plaintiff known the actual facts, he would have executed the ProAg application via DocuSign upon his receipt of a reminder from Milk Producers Online on December 10, 2019.    Plaintiff's reliance on Cardwell's representations were justified because Cardwell held himself out as a Senior Risk Specialist and as having knowledge of dairy revenue protection insurance policies and the procurement of same.    As Plaintiff had no knowledge or expertise in this area and was unfamiliar with DocuSign, it was reasonable for him to rely on Cardwell, who purportedly had the requisite knowledge and experience.

82.    As a direct and proximate result of the fraudulent conduct of Cardwell as herein alleged, Plaintiff's ProAg application was not timely executed by the December 15, 2019, deadline and his policy and was determined to be invalid.

83.    As a further direct and proximate result of the fraudulent conduct of Cardwell as herein alleged, upon the determination that Plaintiff's policy was invalid, his claim for the substantial losses he incurred for the second quarter of 2020 were denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

84.    The    aforementioned    conduct    of    Cardwell    was    an    intentional misrepresentation known to him with the intent of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

### B.    Defendant Ramsden

85.    Plaintiff alleges that on or about December 13, 2019, Plaintiff was included in an exchange of emails between Grady Stehr, an underwriter for ProAg, and Ramsden.    The initial email from Mr. Stehr attached an endorsement wherein he merged in one of the signature pages and sought Ramsden's approval before he attached the policy.  In response thereto, Ramsden approved of the endorsement and the merged signature and expressly thanked Mr. Stehr for his help in "securing this one."

86.    The representation made by Ramsden was in fact false.  The true fact was that at that point, a ProAg application executed by Plaintiff had not been submitted to ProAg.  As such, the endorsements were not acceptable as Plaintiff did not yet have a policy.

87.    Plaintiff alleges that when Ramsden made this representation, she knew it to be false and made such representation with the intent to deceive and defraud and induce Plaintiff to act in reliance on said representation in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

88.    Plaintiff, at the time that Ramsden made such representation, and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of the representation made by Ramsden and believed it to be true.  In reliance on Ramsden's representation, Plaintiff was induced to and did believe that he had a valid policy and his endorsements had been approved.  Had Plaintiff known the actual facts, he would have executed the ProAg application via DocuSign upon his receipt of a reminder from Milk Producers Online on December 10, 2019.  Plaintiff's reliance on Ramsden's

Dias Law Firm, Inc.
Michael A. Dias
Jonelle M. Montgomery
Sarah M. Hacker
Steven E. Atlleris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

representation was justified because Ramsden held herself out as the Senior Manager of the Dairy Member Risk and Business Advisory Services and as having knowledge of dairy revenue protection insurance policies and the procurement of same as her approval for the endorsements was sought by Grady Stehr. As Plaintiff had no knowledge or expertise in this area, it was reasonable for him to rely on Ramsden, who purportedly had the requisite knowledge and experience.

89. As a direct and proximate result of the fraudulent conduct of Ramsden as herein alleged, Plaintiff's ProAg application was not timely executed by the December 15, 2019, deadline and his policy and was determined to be invalid.

90. As a further direct and proximate result of the fraudulent conduct of Ramsden as herein alleged, upon the determination that Plaintiff's policy was invalid, his claim for the substantial losses he incurred for the second quarter of 2020 were denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

91. The aforementioned conduct of Ramsden was an intentional misrepresentation known to him with the intent of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

### C. **Defendants LOL, LOLIS, and BuyPoint**

92. Plaintiff alleges that, at all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees represented by their conduct that they possessed the specialized knowledge and expertise to assist Plaintiff in procuring a dairy revenue protection insurance policy for his dairy operation. Misrepresentations may be implied by conduct. *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567. LOL, LOLIS, and BuyPoint agents and/or employees completed Plaintiff's information on the ProAg application and subsequently represented to him that his application was "complete". Thereafter, Plaintiff was included on an email that demonstrated his

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

endorsements had been approved.  The Schedule of Insurance that was later received by Plaintiff showed that his policy was in place as of December 12, 2019, and was binding.

93.    Plaintiff alleges that such represents by LOL, LOLIS, and BuyPoint agents and/or employees were in fact false.  The true facts were that LOL, LOLIS, and BuyPoint agents and/or employees did not have the knowledge to assist Plaintiff in procuring a policy and that Plaintiff did not have a valid policy despite as his application had not been timely executed by the December 15, 2019, deadline.  Despite their purported knowledge as to such insurance matters, Plaintiff's signature was sought **after** the deadline.

94.    Plaintiff alleges that when such representations were made by LOL, LOLIS, and BuyPoint agents and/or employees, they knew them to be false and made said representations with the intent to deceive and defraud and induce Plaintiff to act in reliance on said representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

95.    Plaintiff, at the time that the representations were made by LOL, LOLIS, and BuyPoint agents and/or employees, and at the time that Plaintiff took the actions herein alleged, was ignorant of the falsity of their representations and believed them to be true.  In reliance on said representations, Plaintiff was induced to believe that his application was complete.  Additionally, in reliance on said representations, Plaintiff was induced to and did refrain from seeking a dairy revenue insurance policy from another company.  If Plaintiff had known the actual facts, he would have executed the ProAg application via DocuSign upon his receipt of a reminder from Milk Producers Online on December 10, 2019 or sought out other companies who offered dairy revenue protection insurance policies.  Plaintiff's reliance on the representations of LOL, LOLIS, and BuyPoint agents and/or employees was justified they held themselves out as professionals with the requisite knowledge and experience to procure a dairy revenue protection insurance policy.

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkins
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

96.    As a direct and proximate result of the fraudulent conduct of LOL, LOLIS, and BuyPoint agents and employees as herein alleged, Plaintiff believed he had a valid and binding policy.

97.    As a further direct and proximate result of the fraudulent conduct of LOL, LOLIS, and BuyPoint agents and employees as herein alleged, Plaintiff's ProAg application was not timely executed by the December 15, 2019, deadline and his policy and was determined to be invalid.

98.    As a further direct and proximate result of the fraudulent conduct of LOL, LOLIS, and BuyPoint agents and/or employees as herein alleged, upon the determination that Plaintiff's policy was invalid, his claim for the substantial losses he incurred for the second quarter of 2020 were denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

99.    The aforementioned conduct of LOL, LOLIS, and BuyPoint agents and/or employees was an intentional misrepresentation known to him with the intent of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### Negligent Misrepresentation (Against All Defendants, and DOES 1 to 50)

100.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 99, above, as if fully set forth herein.

### A.    Defendant Cardwell

101.    Plaintiff alleges that on or about November 26, 2019, Cardwell represented to Plaintiff via text message that his ProAg application was "complete." Thereafter, on December 12, 2019, Cardwell sent subsequent text messages to Plaintiff

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkins
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

first informing him that the tax identification number for "FM Ranch name doesn't jive" and then that Plaintiff could endorse as the tax identification issue was sorted out.

102.   Plaintiff alleges that the representations made by Cardwell were in fact false.   The true facts were that Plaintiff's ProAg application was not "complete" as the application was not executed by Plaintiff by the deadline of December 15, 2019, and there was an issue regarding Plaintiff's tax identification number.   The true facts were that at the time Cardwell made such representation to Plaintiff, Cardwell had knowledge of the deadline to submit an executed application to ProAg and failed to disclose same to Plaintiff.   Further, the true facts were that Cardwell failed to ascertain the completeness of Plaintiff's application before it was submitted to ProAg.

103.   Plaintiff alleges that when Cardwell made these representations, he knew them to be false and made said representations with the intent to deceive and defraud and induce Plaintiff to rely upon said representations and to act as described hereinbelow.

104.   When Cardwell made these representations, he had no reasonable ground for believing them to be true in that Cardwell was aware of issues with Plaintiff's application as it was not signed and the tax identification number did not match with Plaintiff's business name.   Cardwell knew that Plaintiff had to execute and submit an application to ProAg by December 15, 2019, which was the sales period end date for the dairy revenue protection insurance policy sought by Plaintiff for the year 2020, before a policy could be created and the endorsements thereafter.

105.   Cardwell made such representations with the intention of inducing Plaintiff to act in reliance on same in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

106.   Plaintiff, at the time that the representations were made by Cardwell, and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Cardwell's representations and believed them to be true.   In reliance on said representations by Cardwell, Plaintiff was induced to believe that his application was

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkiens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

complete based on Cardwell's representation on November 26, 2019. Further, in reliance on said representation as well as Cardwell's subsequent representation that Plaintiff could endorse, Plaintiff executed the ProAg Endorsement Agreement to purchase a dairy revenue protection insurance policy for milk to be produced by FM Jerseys during each quarter of the year 2020 via DocuSign. Had Plaintiff known the actual facts, he would have executed the ProAg application via DocuSign upon his receipt of a reminder from Milk Producers Online on December 10, 2019. Plaintiff's reliance on Cardwell's representations were justified because Cardwell held himself out as a Senior Risk Specialist and as having knowledge of dairy revenue protection insurance policies and the procurement of same. As Plaintiff had no knowledge or expertise in this area, it was reasonable for him to rely on Cardwell, who purportedly had the requisite knowledge and experience.

107.    As a direct and proximate result of the fraudulent conduct of Cardwell as herein alleged, Plaintiff's ProAg application was not timely executed by the December 15, 2019, deadline and his policy and was determined to be invalid.

108.    As a further direct and proximate result of the fraudulent conduct of Cardwell as herein alleged, upon the determination that Plaintiff's policy was invalid, his claim for the substantial losses he incurred for the second quarter of 2020 were denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

109.    The aforementioned conduct of Cardwell was an intentional misrepresentation known to him with the intent of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

**B.    Defendant Ramsden**

110.    Plaintiff alleges that on or about December 13, 2019, Plaintiff was included in an exchange of emails between Grady Stehr, an underwriter for ProAg, and

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alferis
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

1  Ramsden.  The initial email from Mr. Stehr attached an endorsement wherein he
2  merged in one of the signature pages and sought Ramsden's approval before he
3  attached the policy.  In response thereto, Ramsden approved of the endorsement and
4  expressly thanked Mr. Stehr for his help in "securing this one."

5       111.  The representation made by Ramsden was in fact false.  The true fact
6  was that at that point, a ProAg application executed by Plaintiff had not been submitted
7  to ProAg.  As such, the endorsements were not acceptable as Plaintiff did not yet have
8  a policy.

9       112.  Plaintiff alleges that when Ramsden made this representation, she knew it
10  to be false and made such representation with the intent to deceive and defraud and
11  induce Plaintiff to rely upon said representations and to act as described hereinbelow.

12       113.  When Ramsden made this representation, she had no reasonable ground
13  for believing it to be true in that Ramsden was aware of issues with Plaintiff's application
14  as it was not signed, and the tax identification number did not match with Plaintiff's
15  business name.  As the Senior Manager of the Dairy Member Risk and Business
16  Advisory Services, Ramsden knew that Plaintiff had to execute and submit an
17  application to ProAg by December 15, 2019, which was the sales period end date for
18  the dairy revenue protection insurance policy sought by Plaintiff for the year 2020,
19  before a policy could be created and the endorsements thereafter.

20       114.  Ramsden made such representations with the intention of inducing
21  Plaintiff to act in reliance on same in the manner hereafter alleged, or with the
22  expectation that Plaintiff would so act.

23       115.  Plaintiff, at the time that Ramsden made such representation, and at the
24  time Plaintiff took the actions herein alleged, was ignorant of the falsity of the
25  representation made by Ramsden and believed it to be true.  In reliance on Ramsden's
26  representation, Plaintiff was induced to and did believe that he had a valid policy and
27  his endorsements had been approved.  Had Plaintiff known the actual facts, he would
28  have executed the ProAg application via DocuSign upon his receipt of a reminder from

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atliens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

Milk Producers Online on December 10, 2019.   Plaintiff's reliance on Ramsden's representation was justified because Ramsden held herself out as the Senior Manager of the Dairy Member Risk and Business Advisory Services and as having knowledge of dairy revenue protection insurance policies and the procurement of same as her approval for the endorsements was sought by Grady Stehr.   As Plaintiff had no knowledge or expertise in this area, it was reasonable for him to rely on Ramsden, who purportedly had the requisite knowledge and experience.

116.   As a direct and proximate result of the fraudulent conduct of Ramsden as herein alleged, Plaintiff's ProAg application was not timely executed by the December 15, 2019, deadline and his policy and was determined to be invalid.

117.   As a further direct and proximate result of the fraudulent conduct of Ramsden as herein alleged, upon the determination that Plaintiff's policy was invalid, his claim for the substantial losses he incurred for the second quarter of 2020 were denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

118.   The aforementioned conduct of Ramsden was an intentional misrepresentation known to him with the intent of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

**C.   Defendants LOL, LOLIS, and BuyPoint**

119.   Plaintiff alleges that, at all times relevant herein, LOL, LOLIS, and BuyPoint agents and/or employees represented by their conduct that they possessed the specialized knowledge and expertise to assist Plaintiff in procuring a dairy revenue protection insurance policy for his dairy operation.   Misrepresentations may be implied by conduct.   *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567.   LOL, LOLIS, and BuyPoint agents and/or employees completed Plaintiff's information on the ProAg application and subsequently represented to him that his application was

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

"complete".    Thereafter, Plaintiff was included on an email that demonstrated his endorsements had been approved.  The Schedule of Insurance that was later received by Plaintiff showed that his policy was in place as of December 12, 2019, and was binding.

120.    Plaintiff alleges that such representations by LOL, LOLIS, and BuyPoint agents and/or employees were in fact false.  The true facts were that LOL, LOLIS, and BuyPoint agents and/or employees did not have the knowledge to assist Plaintiff in procuring a policy and that Plaintiff did not have a valid policy despite as his application had not been timely executed by the December 15, 2019, deadline.  Despite their purported knowledge as to such insurance matters, Plaintiff's signature was sought **after** the deadline.

121.    Plaintiff alleges that when such representations were made by LOL, LOLIS, and BuyPoint agents and/or employees, they knew had no reasonable ground to believe them to be true in that Plaintiff's application had issues with the tax identification number and had not been signed by Plaintiff.  Despite the obvious issues with the tax identification number and Plaintiff's business name, LOL, LOLIS, and BuyPoint agents and/or employees moved forward with the endorsements whereupon Plaintiff was sent an SOI that confirmed that he had a valid and binding policy.

122.    LOL, LOLIS, and BuyPoint agents and/or employees made such representations with the intention of inducing Plaintiff to act in reliance same in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

123.    Plaintiff, at the time that the representations were made by LOL, LOLIS, and BuyPoint agents and/or employees, and at the time that Plaintiff took the actions herein alleged, was ignorant of the falsity of their representations and believed them to be true.  In reliance on said representations, Plaintiff was induced to believe that his application was complete.  Additionally, in reliance on said representations, Plaintiff was induced to and did refrain from seeking a dairy revenue insurance policy from another company.  If Plaintiff had known the actual facts, he would have executed the

Dias Law Firm, Inc.
Michael A. Dias
Janette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

ProAg application via DocuSign upon his receipt of a reminder from Milk Producers Online on December 10, 2019 or sought out other companies who offered dairy revenue protection insurance policies. Plaintiff's reliance on the representations of LOL, LOLIS, and BuyPoint agents and/or employees was justified they held themselves out as professionals with the requisite knowledge and experience to procure a dairy revenue protection insurance policy.

124. As a direct and proximate result of the fraudulent conduct of LOL, LOLIS, and BuyPoint agents and employees as herein alleged, Plaintiff believed he had a valid and binding policy.

125. As a further direct and proximate result of the fraudulent conduct of LOL, LOLIS, and BuyPoint agents and employees as herein alleged, Plaintiff's ProAg application was not timely executed by the December 15, 2019, deadline and his policy and was determined to be invalid.

126. As a further direct and proximate result of the fraudulent conduct of LOL, LOLIS, and BuyPoint agents and/or employees as herein alleged, upon the determination that Plaintiff's policy was invalid, his claim for the substantial losses he incurred for the second quarter of 2020 were denied, and Plaintiff did not have coverage for the remainder of the quarters for the year of 2020, all to Plaintiff's damage in the sum of $896,766.00.

127. The aforementioned conduct of LOL, LOLIS, and BuyPoint agents and/or employees was an intentional misrepresentation known to him with the intent of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

///

///

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

### SIXTH CLAIM FOR RELIEF

**Unfair Business Practice – Cal. Bus. & Prof. Code §§ 17200, *et seq*. (Against All Defendants, and DOES 1 to 50)**

128.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 127, above, as if fully set forth herein.

**A.    Defendant Cardwell**

129.    The Unfair Competition Law defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code §§ 17200 *et seq*.

130.    Cardwell violated California Business and Professions Code § 17200 *et seq*. by holding himself out as a person with the requisite knowledge in procuring a dairy revenue protection insurance policy and misrepresenting that Plaintiff's ProAg application was complete.

131.    By engaging in the above-described conduct, Cardwell has committed one or more acts of unfair competition within the meaning of California Business and Professions §§ 17200 *et seq*.

132.    Cardwell's conduct as described herein has deceived and/or is likely to deceive members of the public.  Cardwell held himself out to Plaintiff as a Senior Risk Specialist and as having knowledge in procuring a dairy revenue protection insurance policy which was sought by Plaintiff.  At the time that Plaintiff was procuring said policy, he did not have the knowledge or expertise regarding crop insurance, which is the reason he sought the assistance and guidance of Cardwell and relied on his purported knowledge and expertise in procuring the policy.

133.    The conduct of Cardwell is unlawful because it was unscrupulous and substantially injurious.

134.    Plaintiff procured a dairy revenue protection insurance policy to protect his dairy operation.

///

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfiers
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

135. Plaintiff paid the premiums for the first quarter having relied upon the representation made by Cardwell that his application was complete and his receipt of an SOI confirming that his policy was in place and binding as of December 12, 2019. Plaintiff's application was not signed; however, Cardwell never informed Plaintiff that this was an issue prior to the December 15, 2019, deadline. As a result thereof, Plaintiff subsequently lost money when, in the second quarter of 2020, he suffered a substantial loss. His claim for indemnity was denied after a high dollar review of Plaintiff's policy showed that Plaintiff's ProAg application had not been executed by the December 15, 2019, deadline, and it was determined that his policy was invalid. Consequently, Plaintiff did not have coverage for the remaining quarters of the year 2020 and, as such, any claims for losses he had for those quarters were not covered.

136. As direct and proximate result of Cardwell's conduct, Plaintiff has lost money in the sum of $896,766.00.

**B.**   **Defendant Ramsden**

137. The Unfair Competition Law defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

138. Ramsden violated California Business and Professions Code § 17200 *et seq.* by holding himself out as a Senior Manager of the Dairy Member Risk and Business Advisory Services and as a person with the requisite knowledge in procuring a dairy revenue protection insurance policy and approving the endorsements despite the fact that Plaintiff's ProAg application had issues involving the tax identification number and the timeliness of his execution.

139. By engaging in the above-described conduct, Ramsden has committed one or more acts of unfair competition within the meaning of California Business and Professions Code §§ 17200 *et seq.*

140. Ramsden's conduct as described herein has deceived and/or is likely to deceive members of the public. Ramsden held herself out to Plaintiff as having

Diaz Law Firm, Inc.
Michael A. Diaz
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Atkins
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

knowledge in procuring a dairy revenue protection insurance policy which was sought by Plaintiff. At the time that Plaintiff was procuring said policy, he did not have the knowledge or expertise regarding crop insurance, which is the reason the assistance and guidance of Ramsden was necessary, and that Plaintiff relied on her purported knowledge and expertise in procuring the policy.

141. The act and practice of Ramsden is unlawful because it was unscrupulous and substantially injurious.

142. Plaintiff desired to procure a dairy revenue protection insurance policy to protect his dairy operation for the year 2020.

143. Plaintiff paid the premiums for the first quarter having relied upon the representation made by Ramsden that his endorsements were approved, which was confirmed upon Plaintiff's subsequent receipt of an SOI that indicated his policy was in place and binding as of December 12, 2019. Plaintiff's application had issues with the tax identification number and the timeliness of Plaintiff's signature; however, Ramsden never informed Plaintiff that this was an issue prior to the December 15, 2019, deadline. As a result thereof, Plaintiff subsequently lost money when, in the second quarter of 2020, he suffered a substantial loss. His claim for indemnity was denied after a high dollar review of Plaintiff's policy showed that Plaintiff's ProAg application had not been executed by the December 15, 2019, deadline, and it was determined that his policy was invalid. Consequently, Plaintiff did not have coverage for the remaining quarters of the year 2020 and, as such, any claims for losses he had for those quarters were not covered.

144. As direct and proximate result of Ramsden's conduct, Plaintiff has lost money in the sum of $896,766.00.

C. **Defendants LOL, LOLIS, and BuyPoint**

145. The Unfair Competition Law defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Attlena
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

146.   LOL, LOLIS, and BuyPoint agents and/or employees violated California Business and Professions Code §§ 17200 *et seq.* by holding themselves out as having the requisite knowledge in procuring a dairy revenue protection insurance policy, misrepresenting that Plaintiff's ProAg application was complete, and representing that Plaintiff's policy was valid and binding.

147.   By engaging in the above-described conduct, LOL, LOLIS, and BuyPoint agents and/or employees have committed one or more acts of unfair competition within the meaning of California Business and Professions §§ 17200 *et seq.*

148.   The conduct of LOL, LOLIS, and BuyPoint agents and/or employees as described herein has deceived and/or is likely to deceive members of the public.  They held themselves out to Plaintiff as having knowledge in procuring a dairy revenue protection insurance policy, which was sought by Plaintiff.  At the time that Plaintiff was procuring said policy, he did not have the knowledge or expertise regarding crop insurance, which is the reason he sought the assistance and guidance of LOL, LOLIS, and BuyPoint agents and/or employees and relied on their purported knowledge and expertise in procuring the policy.

149.   The conduct of LOL, LOLIS, and BuyPoint agents and/or employees is unlawful because it was unscrupulous and substantially injurious.

150.   Plaintiff procured a dairy revenue protection insurance policy to protect his dairy operation.  Plaintiff paid the premiums for the first quarter having relied upon the representation made by LOL, LOLIS, and BuyPoint agents and/or employees that his application was complete and his receipt of an SOI confirming that his policy was in place and binding as of December 12, 2019.  Plaintiff's application was not signed; however, Plaintiff was never informed that this was an issue prior to the December 15, 2019, deadline.   In fact, the conduct of LOL, LOLIS, and BuyPoint agents and/or employees demonstrated that he had a policy as Plaintiff submitted a claim for losses in the first quarter of 2020, which had been approved and the indemnity payment applied to Plaintiff's premium for the second quarter of 2020.  Plaintiff suffered substantial

Dias Law Firm, Inc.
Michael A. Dias
Jonelle M. Montgomery
Sarah M. Hacker
Steven E. Aitkens
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

losses in the second quarter, which triggered a high dollar review of his policy that showed that his application had not been timely signed. Plaintiff's claim for his second quarter losses was denied and his policy was determined to be invalid. Consequently, Plaintiff did not have coverage for the remaining quarters of the year 2020 and, as such, any claims for losses he had for those quarters were not covered.

151. As direct and proximate result of Cardwell's conduct, Plaintiff has lost money in the sum of $896,766.00.

WHEREFORE, Plaintiff prays for relief as set forth below.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.    For compensatory damages in the sum of $896,766.00;

B.    For general damages in an amount to be proven at trial;

C.    For punitive and exemplary damages in an amount to be determined at trial;

D.    For pre-judgment interest on any damages;

E.    For attorney fees and costs authorized by Business and Professions Code §§ 17200 *et al.*; and

F.    For such other and further relief as this court deems just and proper.

Dated: June **14**, 2022

Respectfully submitted,

DIAS LAW FIRM, INC.

Michael A. Dias, Esq.
Steven E. Alfieris, Esq.
Attorneys for Plaintiff
FRANK MENDONSA

Dias Law Firm, Inc.
Michael A. Dias
Jonette M. Montgomery
Sarah M. Hacker
Steven E. Alfieris
Ella R. Floresca
David M. Lange
Dustin J. Moses
Jimmy J. Rodriguez
Of Counsel
Alicia D. Wrest
Of Counsel

# EXHIBIT A

FM Jerseys Screen Prints 10/21/2020



PROAG000011

FM Jerseys Screen Prints 10/21/2020



PROAG000012

# EXHIBIT B

**New iMessage**          Cancel

To: Frank Mendonsa

Tue, Nov 26, 4:50 PM

Corey Ramsden  >

Hi Frank. I'm in a bit of a crowded and loud spot. I just saw you called. What can I do for you?

Have a few questions

Tue, Nov 26, 9:59 PM

I've been thinking since our last conversation, many frames bowled, and maybe 1 or 4 beers. The application is complete, we can slow down on the endorsement and run some more scenarios involving more split percentages of Class III & IV and not so extreme one way or the other. That way you more comfortable & confident in what we do. If you're mind is made up already that's cool, but otherwise, that sound good?

  iMessage 

LOL000141
PROAG000206

# EXHIBIT C

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Stehr, Grady <gstehr@proag.com> |
| **Sent:** | Tuesday, August 25, 2020 2:49 PM |
| **To:** | Cardwell, Adam |
| **Subject:** | FW: [EXTERNAL] FM Jerseys |
| **Attachments:** | 11517_SSN-TIN Matching Agent Packet.pdf |

Grady

*ProAg® is an equal opportunity provider.*

**From:** Stehr, Grady
**Sent:** Thursday, December 12, 2019 11:51 AM
**To:** Cardwell, Adam <ARCardwell@landolakes.com>
**Subject:** RE: [EXTERNAL] FM Jerseys

Grady

*ProAg® is an equal opportunity provider.*

**From:** Cardwell, Adam <ARCardwell@landolakes.com>
**Sent:** Thursday, December 12, 2019 10:18 AM
**To:** Ramsden, Corey <CARamsden@landolakes.com>; Stehr, Grady <gstehr@proag.com>
**Cc:** Burg, Sharelle <SBURG@PROAG.COM>
**Subject:** Re: [EXTERNAL] FM Jerseys

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Grady,
What is your direct line? Reckon a quick call with you & their book keeper can solve this. You have some time this morning?

AC

Get Outlook for iOS

**From:** Ramsden, Corey <CARamsden@landolakes.com>
**Sent:** Thursday, December 12, 2019 7:35:32 AM
**To:** Stehr, Grady <gstehr@proag.com>; Cardwell, Adam <ARCardwell@landolakes.com>
**Cc:** Burg, Sharelle <SBURG@PROAG.COM>
**Subject:** RE: [EXTERNAL] FM Jerseys

Let's double check the Tax ID number being used. Grady it should be:
77 0204386

1

LOL000114
PROAG000179

# EXHIBIT D

11:01

New MMS                    Cancel

To: Adam Cardwell

iMessage
Thu, Dec 12, 9:17 AM

Frank, the FM Ranch name still didn't jive. Maybe a typo in the number. Want to connect me with Brittany, then she & I can have a quick call with Pro Ag and hammer it out?

  Text Message 

11:01

**New MMS**    Cancel

To: Adam Cardwell

connect me with Brittany, then she & I can have a quick call with Pro Ag and hammer it out?

559 752 4727

Text Message
Thu, Dec 12, 1:59 PM

**Land O'Lakes DRP & Market**

     Text Message 

11:02

**New MMS**  Cancel

To: Adam Cardwell



iMessage

Where are we at

On my way to the airport

When I get there, I can send new quotes

Okay Are we ready to go

Text Message

11:02

New MMS                    Cancel

To: Adam Cardwell

Floors elevated.
You can endorse
even as we sort
through the tax ID
stuff. We are
ready



I'll email the
quotes, then call
with some other
details. Between
60 and 90 min

  Text Message 

# EXHIBIT E

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 356-3038
Print Date: 12/13/2019

# Dairy Revenue Protection (DRP) Quarterly Coverage Endorsement

**PRO AG**

| Insured's Name, Mailing and / or Street Address and Other Contact Information | Agency Name and Agent Contact Information | Crop Year | Policy Number |
|---|---|---|---|
| FM Jerseys<br>16777 South I Dr<br>Tulare, CA 93274<br><br>Phone: (559) 804-4607 Office<br>Email: frankmendonsa@gmail.com<br>ID Type and Number: EIN XX-XXX4386<br>Person Type: Corporation | LAND O'LAKES INSURANCE SOLUTIONS LLC (273545-00)<br>ADAM CARDWELL (10525)<br>4001 LEXINGTON AVE<br>ARDEN HILLS, MN 55126<br><br>Phone: (651) 262-3545 Agency  (651) 253-8912 Agent<br>Email: ARCARDWELL@LANDOLAKES.COM | 2020 | 06-987-5000271 |
| | | **State** California (06) | |
| | | **County** Tulare (107) | |
| | | **Effective Date** 12/12/2019 | |

**Spouse's Name:** NONE
**Spouse's ID Type and Number:**

**Name of Other Person(s) Sharing in the Crop**

**Signature Authorization(s):** NONE

| Crop | Plan |
|---|---|
| Milk (0830) | DRP (83) |

| Quarterly Insurance Period (Practice) | Pricing Option (Type) / Declared Share | Class Pricing Option Details — Exp. Class III Price per cwt | Declared Class III Weighting Factor | Exp. Class IV Price per cwt | Declared Class IV Weighting Factor | Component Pricing Option Details — Exp. Butterfat Value (Price) per cwt | Declared Butterfat Test | Exp. Protein Price per Pound | Declared Protein Test | Exp. Other Solids Price per Pound | Other Solids Test | Coverage Level | Protection Factor | Declared Covered Milk Production (Enter in Pounds) | Exp. Milk Production Per Cow | Liability | Exp. Revenue Guarantee | Estimated Total Premium | Producer Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan - Mar/Yr2 - Qtr1 (802) | Class | 17.7100 | 1.00 | 17.3100 | 0.00 | | | | | | | 95% | 1.50 | 17,000,000 | 6,091 | $4,290,248 | $2,860,165 | $30,099 | $30,099 |
| | 100% | | | | | | | | | | | | | | | | | | |
| Apr - Jun/Yr2 - Qtr2 (803) | Class | 17.0600 | 0.50 | 17.8100 | 0.50 | | | | | | | 95% | 1.50 | 10,000,000 | 5,999 | $2,484,488 | $1,656,325 | $31,010 | $31,010 |
| | 100% | | | | | | | | | | | | | | | | | | |
| Jul - Sep/Yr2 - Qtr3 (804) | Class | 17.4600 | 0.25 | 18.1600 | 0.75 | | | | | | | 95% | 1.50 | 10,000,000 | 5,650 | $2,563,575 | $1,709,050 | $47,536 | $47,536 |
| | 100% | | | | | | | | | | | | | | | | | | |
| Oct - Dec/Yr2 - Qtr4 (805) | Class | 17.4200 | 0.25 | 18.2000 | 0.75 | | | | | | | 95% | 1.50 | 10,000,000 | 5,718 | $2,565,713 | $1,710,475 | $59,323 | $59,323 |
| | 100% | | | | | | | | | | | | | | | | | | |

**Remarks:**

**Legend:**
BFR = Beginning Farmer / Rancher          Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the Insured.

936 (Rev. 01-2019)          See Last Pages of Dairy Revenue Protection Quarterly Coverage Endorsement for Required Statements          Page 1 of 3

LOL000037
PROAG000102

# PRO AG

# Dairy Revenue Protection (DRP) Quarterly Coverage Endorsement

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 374-2836
Print Date: 12/19/2019

| Insured's Name | Agency and Agent Name | Crop Year | Policy Number |
|---|---|---|---|
| FM Jerseys | LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00)<br>ADAM CARDWELL (10525) | 2020 | 06-987-5000271 |

## Collection of Information And Data (Privacy Act) Statement
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on the documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### Non-Discrimination Statement

In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

To File a Program Complaint – If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

Persons with Disabilities – Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

### Producers Ag Insurance Group Privacy Notice

The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant beneficial interest owners (Customers). We collect nonpublic personal information about Customers from information we receive from them such as information provided on applications or other forms, which may include name, address and social security numbers and from third parties such as consumer reporting agency. To serve our Customers and to service our business our employees have access to Customers personal information in the course of doing their jobs and we may share or disclose non-public personal information about the Customers to affiliates within the ProAg Group or with non affiliated third parties with whom we have a contractual relationship such as agencies within the United States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions without our offering to the Customer the opportunity to 'opt-out' or 'opt-in' as required by law.

938 (Rev. 01-2019)

Page 2 of 3

LOL000038
PROAG000103

DocuSign Envelope ID: 48EEB5C7F-6CD7-4B85-869A-C7B135BFF2E6

# PROAG®

Producers Ag Insurance Group®, 2025 South Hughes, Suite 200, Amarillo, TX 79109

# DAIRY REVENUE PROTECTION QUARTERLY COVERAGE ENDORSEMENT

Policy No. 06-987-5000271    Crop Year 2020    Date 12/12/19    Page _____ of _____

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIP's contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

## NON-DISCRIMINATION STATEMENT

**Non-Discrimination Statement:**
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income is derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

**To File a Program Complaint:**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

**Persons with Disabilities:**
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

## PRODUCERS AG INSURANCE GROUP PRIVACY NOTICE

The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant beneficial interest owners (Customers). We collect non-public personal information about Customers from information we receive from them such as information provided on applications or other forms, which may include name, address and social security numbers and from third parties such as a consumer reporting agency. To serve our Customers and to provide our business our business our employees have access to Customers personal information in the course of doing their jobs and we may share or disclose non-public personal information about the Customers to affiliates within the ProAg Group or with non affiliated third parties with whom we have a contractual relationship such as agencies within the United States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions with out our offering to the Customer the opportunity to "opt-out" or to "opt-in" as required by law.

## CERTIFICATION STATEMENT

I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. §1006 and §1014; 7 U.S.C. §1506; 31 U.S.C. §3729, §3730 and any other applicable federal statutes).

| | | | |
|---|---|---|---|
| FM Jerseys | DocuSigned by: [signature] | 12/12/2019 \| 7:46 | Robert Cardwell | [signature] | 12/12/2019 \| 7:4 |
| Insured's Printed Name | Insured's Signature | Date | Agent's Printed Name | Agent's Signature | Date |

Insured's Printed Name    Insured's Signature    Date    Agent's Printed Name    Agent's Signature    Date

0M17655
Agent Code Number

Version 2.1
Updated: August 12, 2019

The insurance products offered by Producers Ag Insurance Group® d/b/a ProAg® may not be a complete list of all products offered and may not be offered in all states. ProAg prohibits discrimination on the basis of race, color, national origin, sex, religion, disability, political beliefs, and marital or familial status.

© 2020, ProAg, All rights reserved.
PROAG-11779

# EXHIBIT F

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Stehr, Grady <gstehr@proag.com> |
| **Sent:** | Friday, December 13, 2019 11:44 AM |
| **To:** | Ramsden, Corey; Burg, Sharelle |
| **Cc:** | Cardwell, Adam |
| **Subject:** | RE: [EXTERNAL] RE: Please find attached endorsement |
| **Attachments:** | FM Jersey SOI Approved.pdf |

This morning's endorsements have been approved! Sorry for cutting it so close.

**GRADY STEHR**
Underwriter, ProAg
7950 Main Street North, Suite 230
Maple Grove, MN  55369
Office: (800) 366-2767 ext. 4167
www.ProAg.com

*ProAg® is an equal opportunity provider.*

**From:** Ramsden, Corey <CARamsden@landolakes.com>
**Sent:** Friday, December 13, 2019 8:38 AM
**To:** Stehr, Grady <gstehr@proag.com>; Burg, Sharelle <SBURG@PROAG.COM>
**Cc:** Cardwell, Adam <ARCardwell@landolakes.com>
**Subject:** RE: [EXTERNAL] RE: Please find attached endorsement

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This is great Grady- THANK YOU for your help in securing this one!

**Corey Ramsden Scott| Sr. Manager-Dairy Member Risk and Business Advisory Services| Land O'Lakes Inc.**
P 651.375.7347 | C 651.262.3545 | F 651.243.8320 | Caramsden@landolakes.com

**FEEDING HUMAN PROGRESS**
landolakesinc.com | LinkedIn | Facebook | Twitter | Instagram

**From:** Stehr, Grady <gstehr@proag.com>
**Sent:** Friday, December 13, 2019 8:36 AM
**To:** Ramsden, Corey <CARamsden@landolakes.com>; Burg, Sharelle <SBURG@PROAG.COM>
**Cc:** Cardwell, Adam <ARCardwell@landolakes.com>
**Subject:** [EXTERNAL] RE: Please find attached endorsement

Corey and Adam, attached is an endorsement showing what I have keyed. I merged in one of your signature pages, so if this is acceptable to you I will attach to the policy.

Sorry again for the confusion on the dates, Corey!

**GRADY STEHR**
Underwriter, ProAg
7950 Main Street North, Suite 230
Maple Grove, MN  55369
Office: (800) 366-2767 ext. 4167

1

LOL000263
PROAG000328

www.ProAg.com

*ProAg® is an equal opportunity provider.*

**From:** Ramsden, Corey <CARamsden@landolakes.com>
**Sent:** Thursday, December 12, 2019 9:54 PM
**To:** Stehr, Grady <gstehr@proag.com>; Burg, Sharelle <SBURG@PROAG.COM>
**Cc:** Cardwell, Adam <ARCardwell@landolakes.com>
**Subject:** Please find attached endorsement
**Importance:** High

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Grady and Sharelle, please find attached endorsement for FM Jersey Ranch. The docusign volumes got a bit muddled so I did add notes to the PDF to give clarity and will also forward an email direct from the producer for confirmation. Please call myself or Adam (651) 253-8912 ASAP in the AM if there is an issue with completing this. Thank you!

**Corey Ramsden Scott| Sr. Manager-Dairy Member Risk and Business Advisory Services| Land O'Lakes Inc.**
P 651.375.7347 | C 651.262.3545 | F 651.243.8320 | Caramsden@landolakes.com

**FEEDING HUMAN PROGRESS**
landolakesinc.com | LinkedIn | Facebook | Twitter | Instagram

This message may contain confidential material from Land O'Lakes, Inc. (or its subsidiary) for the sole use of the intended recipient(s) and may not be reviewed, disclosed, copied, distributed or used by anyone other than the intended recipient(s). If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

Warning: This email originated from outside of Land O'Lakes. DO NOT click on links or open attachments unless you recognize the sender and know the content is safe.

This message may contain confidential material from Land O'Lakes, Inc. (or its subsidiary) for the sole use of the intended recipient(s) and may not be reviewed, disclosed, copied, distributed or used by anyone other than the intended recipient(s). If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

**LOL000264**
**PROAG000329**

# EXHIBIT G

# PRO AG

## Dairy Revenue Protection (DRP) Schedule of Insurance

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (866) 305-3038
Print Date: 12/13/2019

**Insured's Name, Mailing and / or Street Address and Other Contact Information**

F.M. Jerseys
16777 South I Dr
Tulare, CA 93274

Phone: (559) 804-4607 Office
Email: frmmendonsa@gmail.com
ID Type and Number:  EIN XX-XXX4396
**Person Type:** Corporation
**Spouse's Name:**  NONE
**Spouse's ID Type and Number:**
**Signature Authorization(s):** NONE

**Agency Name and Agent Contact Information**

LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00)
ADAM CARDWELL (10525)
4001 LEXINGTON AVE
ARDEN HILLS, MN 55126

Phone: (651) 262-3545 Agency   (651) 253-8912 Agent
Email:  ARCARDWELL@LANDOLAKES.COM

| Effective Crop Year | Policy Number |
|---|---|
| 2020 | 06-987-5000271 |
| | **State** |
| | California (06) |

THIS IS NOT A BILL. The information contained on this schedule is considered binding. Any errors or discrepancies must be reported to your agent immediately. All revisions are subject to company approval.

**Assignment of Indemnity:** NONE

| Livestock Summary | | |
|---|---|---|
| County | Commodity | Plan of Insurance |
| Tulare (107) | Milk (0830) | DRP (83) |

**Livestock Information**

| Effective Date / Date Issued | Practice Months and Year (Practice (QIP)) | Type / Pricing Option | Coverage Level | Protection Factor | Declared Covered Milk Production | Declared Share | Expected Rev. Guarantee | Expected Rev. Guarantee / CWT | Liability | Subsidy A & O | Insured's Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/12/2019 | Jan - Mar/Yr2 - Qtr1 (802) | Class | 95% | 1.50 | 17,000,000 | 100% | $2,860,165 | $16.82 | $4,290,248 | $0 $6,681.98 | $30,099 |
| 12/12/2019 | Apr - Jun/Yr2 - Qtr2 (803) | Class | 95% | 1.50 | 10,000,000 | 100% | $1,656,325 | $16.56 | $2,484,488 | $0 $6,884.22 | $31,010 |
| 12/12/2019 | Jul - Sep/Yr2 - Qtr3 (804) | Class | 95% | 1.50 | 10,000,000 | 100% | $1,709,050 | $17.09 | $2,563,575 | $0 $10,552.99 | $47,536 |
| 12/12/2019 | Oct - Dec/Yr2 - Qtr4 (805) | Class | 95% | 1.50 | 10,000,000 | 100% | $1,710,475 | $17.10 | $2,565,713 | $0 $13,169.71 | $59,323 |

**Premium Summary**

| County - Commodity | Effective Date | Gross Premium | Subsidy Amount | A & O # | Producer's Premium | Net Premium |
|---|---|---|---|---|---|---|
| Tulare - Milk | 12/12/2019 | $167,968.00 | $0.00 | $37,288.90 | $167,968.00 | $167,968.00 |

# A & O Note:  This amount may increase by 1.15 percent of net book premium (except for area plans of insurance) if the loss ratio in the State exceeds 1.20 or may otherwise change if required by the Standard Reinsurance Agreement. However, the amount of premium you are required to pay will not change. FCIC has paid an Administrative and Operating expense subsidy on your behalf in the amount of $37,288.90.

BFR = Beginning Farmer Rancher        QIP = Quarterly Insurance Period

DRP SOI (Rev. 11-2019)

Page 1 of 2

LOL000265
PROAG000330

# PROAG

## Dairy Revenue Protection (DRP) Schedule of Insurance

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (866) 366-3038
Print Date: 12/13/2019

| Insured's Name | | Agency and Agent Name | | Effective Crop Year | Policy Number |
|---|---|---|---|---|---|
| FM Jerseys | | LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00) ADAM CARDWELL (10525) | | 2020 | 06-987-5000271 |

**SBI Information**

| Name | Complete Address | Telephone Number | ID Type and Number | Person Type |
|---|---|---|---|---|
| Frank Mendonsa | 16777 South I Dr Tulare, CA 93274 | (559) 804-4607 | SSN XXX-XX-5183 | Individuals |
| Marchelle Mendonsa | 16777 South I Dr Tulare, CA 93274 | (559) 804-4607 | SSN XXX-XX-5345 | Individuals |

BFR = Beginning Farmer Rancher     QIP = Quarterly Insurance Period

DRP SOI (Rev. 11-2019)

Page 2 of 2

LOL000266
PROAG000331

# EXHIBIT H

DocuSign Envelope ID: FF92F035-C2A5-4C68-AE37-0B6C9181DCC

**ProAg**

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 366-3038
Print Date: 11/26/2019

## MPCI Application / Change / Transfer / Cancel Form

| Applicant / Insured's Name, Mailing and / or Street Address and Other Contact Information | Agency Name and Agent Contact Information | Crop Year | Policy Number |
|---|---|---|---|
| FM Jerseys<br>16777 South I Dr<br>Tulare, CA 93274 | LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00)<br>ADAM CARDWELL (10525)<br>4001 LEXINGTON AVE<br>ARDEN HILLS, MN 55126 | 2020 | 06-887-5000271 |
| | | | State |
| Phone: (559) 804-4607 Office<br>Email: frankmendonsa@gmail.com<br>ID Type and Number: EIN XX-XXX4386<br>Person Type: Corporation | Phone: (651) 262-3545 Agency  (651) 253-8912 Agent<br>Email: ARCARDWELL@LANDOLAKES.COM | | California (05) |
| Signature Authorization(s)**: NONE | State of Incorporation (applicable to LLCs and Corporations only):<br>California | | |

Type of Policy:
☐ New   ☐ Add Crop to Policy   ☐ Policy Changes
☐ Transfer   ☐ Cancellation   ☐ Reinstate

I am a limited resource farmer:   ☐ Yes  ☒ No
Is applicant at least 18 years old?   ☒ Yes  ☐ No
Is applicant insuring the tenant's share?   ☐ Yes  ☐ No
Is applicant insuring the landlord's share?   ☐ Yes  ☐ No

SBI Information - List spouse, if applicable, and all other persons or entities with a substantial beneficial interest in you as defined in the applicable policy provisions (include landlords or tenants insured under the applicant). If none, state NONE. See SSN / EIN Reporting Form for additional space.

| Name | Complete Address | Phone | ID Type and Number | Person Type | |
|---|---|---|---|---|---|
| Frank Mendonsa | 16777 South I Dr<br>Tulare, CA 93274 | (559) 804-4607 | SSN XXX-XX-5183 | Individuals | ☐ Yes  ☐ No   I request insurance coverage for my share of the Category B crops (except forage production) specified below with a designated county in all added counties where the crops are insurable. |
| Marchelle Mendonsa | 16777 South I Dr<br>Tulare, CA 93274 | (559) 804-4607 | SSN XXX-XX-5345 | Individuals | ☐ Yes  ☐ No   I request insurance coverage for my share of the Category B crops (except forage production) specified below with a designated county in all added counties within the state where the crops are insurable. If your designated plan of insurance, level of coverage, or price is not available in the added county, coverage will be provided through the Catastrophic Risk Protection Endorsement, if the crop is insurable in the actuarial documents for an added county. |
| | | | ☐ SSN  ☐ EIN  ☐ RAN | | |

## Crop Information

| Policy^<br>(N = New,<br>C = Change,<br>T = Transfer,<br>X = Cancel) | County (Code) | Des.<br>Cty<br>(Y) | Crop (Code) | New<br>Prod.<br>(Cat B<br>Only) | VIP * | Intended<br>Acres | Plan | Coverage<br>Level | % of Price,<br>Proj. Price,<br>Amt. of Ins.<br>or Prot.<br>Factor | APH* | Options,<br>Elections or<br>Endorsements | Effective<br>Crop Year | Type / Practice | Hail Plan and $/Acre (for Approved States only)* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tulare (107) | | Milk (0830) | | | | DRP (83) | | | | | 2020 | | |

Remarks:

Other Changes: (as indicated above)
☐ Add or remove SBI
☐ Add / change / correct insured's authorized representative
☐ Change / correct mailing / street address

☐ Correct SBI's identification number^
☐ Correct insured's identification number^
☐ Correct spelling of insured's name

☐ Correct spelling of SBI's name
☐ Add or remove "added county" election
☐ Other (Explain in Remarks)

Reasons for Cancellation:
☐ Insured's Request
☐ Death, Incompetence or Dissolution

☐ Mutual Consent
☐ Other (Explain in Remarks)

Legend:  ^ If correcting an insured's or SBI's identification number, provide previous insured's or previous SBI's identification number. LLI = Landlord / Tenant.
BFR = Beginning Farmer / Rancher   • Added Price Election (APE) - The Established Price will apply unless an additional price is published and selected.
* VIP = Vertically Integrated Producer   ** A completed Power of Attorney form must be submitted with the initial application.

See Last Pages of MPCI Application / Change / Transfer / Cancel Form for Required Statements

759 (Rev. 08-2017)

Page 1 of 4

LOL000393
PROAG000458

DocuSign Envelope ID: FF32F035-C2A5-4C56-AE37-0B6C9181DDCC

## PROAG/



2025 S. Hughes Street
Amarillo, TX 79109
Phone: (806) 336-2767
Fax: (888) 306-2038
Print Date: 11/26/2019

# MPCI Application / Change / Transfer / Cancel Form

| Applicant / Insured's Name | Agency and Agent Name | Crop Year | Policy Number |
|---|---|---|---|
| FM Jerseys | LAND O'LAKES INSURANCE SOLUTIONS LLC (27354S-00)<br>ADAM CARDWELL (10525) | 2020 | 06-987-5000271 |

**Conditions of Acceptance** – This application is accepted and insurance attaches in accordance with the policy unless: (1) The Federal Crop Insurance Corporation determines that, in accordance with the regulations, the risk is excessive; (2) any material fact is omitted, concealed or misrepresented in this application; or in the submission of this application; (3) you have failed to provide complete and accurate information required by this application; or (4) the answer to any of the following questions is "yes." An answer of "yes" to these questions does not automatically result in rejection of the application. For example, if you answer "yes" to question (a) but your debt was discharged in bankruptcy, the application would not be rejected.

☐ Yes ☐ No   (a) Are you now indebted and the debt is delinquent for insurance coverage under the Federal Crop Insurance Act?
☐ Yes ☐ No   (b) Have you in the last two years been convicted under federal or state law of planting, cultivating, growing, producing, harvesting or storing a controlled substance?
☐ Yes ☐ No   (c) Have you ever had insurance coverage under the authority of the Federal Crop Insurance Act terminated for violation of the terms of the contract or regulation, or for failure to pay your delinquent debt?
☐ Yes ☐ No   (d) Are you disqualified or debarred under the authority of the Federal Crop Insurance Act, the regulations of the Federal Crop Insurance Corporation, or the United States Department of Agriculture?
☐ Yes ☐ No   (e) Have you ever entered into an agreement with the Federal Crop Insurance Corporation or with the Department of Justice that you would refrain from participating in programs under the authority of the Federal Crop Insurance Act and that Agreement is still effective?
☐ Yes ☐ No   (f) Do you have Else insurance on any of the above crop(s)?

I understand that if coverage for any crop is currently terminated or would have subsequently terminated for indebtedness had this application been filed after the termination date, no coverage can be provided and I am ineligible for any benefits under the Federal Crop Insurance Act until the cause for termination is corrected. We will notify you of rejection by depositing notification in the United States mail, postage paid, to the applicant's address. Unless rejected or the sales closing date has passed at the time you signed this application, insurance shall be in effect for the crop(s) and crop years specified and shall continue for each succeeding crop year, unless otherwise specified in the policy, until cancelled, terminated or voided. The insurance contract, which includes the accepted application, is defined in the regulation published at 7 CFR Chapter IV. No terms or condition of the contract shall be waived or changed unless such waiver or change is expressly allowed by the contract and is in writing.

**Policy Cancellation Information** – To be completed only if cancelling insurance coverage without transferring to another Approved Insurance Provider (AIP):
I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this form. I understand that if this form is not executed on or before the cancellation date for any crop listed, the cancellation of insurance on such crop(s) will become effective until the following crop year.

| AIP Authorized Representative's Printed Name | AIP Authorized Representative's Signature | Date |
|---|---|---|

**Policy Transfer Information** – To be completed only if transferring previous policy and transferring the experience and insurance coverage from another Approved Insurance Provider (AIP):
I hereby request cancellation of my crop insurance policy with (Coding AIP Name and Policy Number) _____ and insurance coverage from another Approved Insurance Provider. I understand that if this form is not executed on or before the established cancellation date for any crop listed, the cancellation of insurance on such crop(s) will become effective until the following crop year.

| Crop(s) to be Cancelled and Transferred | Crop Year of Crops Being Cancelled and Transferred |
|---|---|

I hereby authorize and direct the (Coding AIP Name) _____ shown above to furnish any information relative to my insurance policy to Producers Ag Insurance Group, Inc.
I understand that if coverage for any crop(s) is now terminated or would have subsequently terminated for delinquent debt had this transfer not occurred, no coverage can be provided by Producers Ag Insurance Group, Inc.
By execution of this form, and my request to Insure such crop(s) is the applicant for the crop(s) and crop year specified above unless this form is not executed on or before the established cancellation date for any of the crop(s) shown, in which case insurance will be provided for such crop(s) for the following crop year.

| Name of Assuming Agent | Assuming Agent's Address, City, State and Zip |
|---|---|

| Printed Name of AIP Representative Authorized to Accept Applications | Signature of AIP Representative Authorized to Accept Applications | Date of Acceptance | AIP Code |
|---|---|---|---|

759 (Rev. 08-2017)                    See Last Pages of MPCI Application / Change / Transfer / Cancel Form for Required Statements                    Page 2 of 4

LOL000394
PROAG000459

DocuSign Envelope ID: FF32F035-C2A5-4C56-AE37-086C91B1DCC

**PROAG**

# MPCI Application / Change / Transfer / Cancel Form

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 335-3638
Print Date: 11/26/2019

| Applicant / Insured's Name | Agency and Agent Name | Crop Year | Policy Number |
|---|---|---|---|
| FM Jerseys | LAND O' LAKES INSURANCE SOLUTIONS LLC (27354S-00)<br>ADAM CARDWELL (10525) | 2020 | 06-987-5000271 |

## Anti-Rebating Certification

**Applicant / Insured Statement**

I certify, for the crop year indicated, that I have not directly or indirectly received, accepted, or been paid, offered, promised, or given any benefit, including money, goods, or services for which payment is usually made, rebate, discount, abatement, credit, or reduction of premium, or any other valuable consideration, as an inducement to procure insurance or in exchange for purchasing this insurance policy after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(e)(9)(B) and 508(c)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(e)(9)(B) and 1508(c)(3)). I understand that a false certification or failure to completely and accurately report any information on this form may subject me, and any person with a substantial beneficial interest in me, to sanctions, including but not limited to, criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 U.S.C. §1515(h)) and all other applicable federal statutes.

**Agent Statement**

I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(e)(9)(B) and 508(c)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(e)(9)(B) and 1508(c)(3)). I understand that a false certification or failure to completely and accurately report any information may subject me, and all agencies / companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes.

759 (Rev. 08-2017)

Page 3 of 4

DocuSign Envelope ID: FF32F035-C2A5-4C56-AE37-0B6C91B1DCC

**PRO AG**

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 356-3038
Print Date: 11/26/2019

## MPCI Application / Change / Transfer / Cancel Form

| Applicant / Insured's Name | Agency and Agent Name | Crop Year | Policy Number |
|---|---|---|---|
| FM Jerseys | LAND O' LAKES INSURANCE SOLUTIONS LLC (27354S-00)<br>ADAM CARDWELL (10525) | 2020 | 06-887-5000271 |

### Collection of Information and Data (Privacy Act) Statement
(Agent, Loss Adjusters and Policyholders)

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on the documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agents, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### Non-Discrimination Statement

In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

To file a Program Complaint - If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

Persons with Disabilities - Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

### Producers Ag Insurance Group Privacy Notice

The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant beneficial interest owners (Customers). We collect nonpublic personal information about Customers from information we receive from them such as information provided on applications or other forms, which may include name, address and social security numbers and from third parties such as consumer reporting agency. To serve our Customers and to service our business our employees have access to Customers personal information in the course of doing their jobs and we may share or disclose non-public personal information about the Customers to affiliates within the ProAg Group or with non affiliated third parties with whom we have a contractual relationship such as agencies within the United States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions without our offering to the Customer the opportunity to 'opt-out' or 'opt-in' as required by law.

### Certification Statement

I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal and civil penalties (18 U.S.C. §1006 and §1014; 7 U.S.C. §1506; 31 U.S.C. §3729, §3730 and any other applicable federal statutes).

### Hall Binder

No coverage is in effect until the earlier of 12:01 a.m. on the date following the date of postal postmark of the envelope in which the signed completed application is mailed to the company or five (2) hours from the time the completed application is electronically received in the appropriate processing office. Completed applications faxed or otherwise electronically transmitted will become effective 2 hours from the time and date of submission to the company. However, if any acre of crop described in this application is damaged by any peril prior to the effective hour of insurance, no insurance shall be in effect and within 72 hours after such damage you shall give us written notice and shall be entitled to return premium on such acreage. This binder may be cancelled by us by written notice to you in accordance with the policy provisions.

### Fraud Statement (CA)

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

| Applicant / Insured's Printed Name | | Applicant / Insured's Signature | | Date |
|---|---|---|---|---|
| FM Jerseys | | [signature] | | 12/31/2019 | 1:44 PM PST |

| Agent's Printed Name | Code | Agent's Signature | | Date |
|---|---|---|---|---|
| ADAM CARDWELL | 10525 | Adam Cardwell<br>5ED3B929D5FC4DD... | | 11/26/2019 | 5:06 PM PST |

759 (Rev. 08-2017)

Page 4 of 4

LOL000396<br>PROAG000461

# EXHIBIT I

20-DRP

## DAIRY REVENUE PROTECTION INSURANCE POLICY

Throughout the policy, "you" and "your" refer to the named insured shown on the Summary of Coverage and "we", "us", and "our" refer to the insurance company providing insurance. Unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the singular form of the word includes the plural.

This policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the authority of sections 508(h) and 523(b) of the Federal Crop Insurance Act, as amended (7 U.S.C. §§ 1508(h) and 1523(b)). The provisions of the policy may not be waived or varied in any way by any crop insurance agent of the Company. Neither we, our employees, contractor, FCIC nor the Risk Management Agency has the authority to revise, amend, or otherwise alter this policy. In the event we cannot pay your loss, FCIC will become your insurer and your claim will be settled and paid by FCIC in accordance with the provisions of this Policy. No state insurance guarantee fund will be liable to pay your loss.

> Agreement to Insure: In return for the payment of the premium, and subject to all the provisions of this policy, we agree to provide the insurance as stated in this policy. If a conflict exists among the policy provisions, the order of priority is as follows: (1) the Special Provisions, (2) the actuarial documents, (3) the Dairy Revenue Protection-Commodity Exchange Endorsement (DRP-CEE); and (4) these Basic Provisions, with (1) controlling (2), etc.

### BASIC PROVISIONS
### TERMS AND CONDITIONS

1. **Definitions**

**Act** - The Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

**Actual butterfat price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Actual butterfat test** - The amount of butterfat determined in accordance with section 7(e).

**Actual class III milk price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Actual class IV milk price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Actual class pricing milk revenue** - The value determined by summing the actual class III milk price, $P^{III}$, multiplied by the declared class price weighting factor, W, and the actual class IV milk price, $P^{IV}$, multiplied by one minus the declared class price weighting factor, 1-W; then multiplying that sum by the covered milk production, Q, times the yield adjustment factor, Y, divided by 100. That is, ($P^{III}$ × W + $P^{IV}$ × (1 - W)) × Q × Y ÷ 100.

**Actual component pricing milk revenue** - The value determined by summing the actual butterfat price, $P^B$, multiplied by the final butterfat test, $Q^B$, the actual protein price, $P^P$, multiplied by the final protein test, $Q^P$, the actual other solids price, $P^{OS}$, multiplied by the other solids test, $Q^{OS}$; then multiplying that sum by the covered milk production, Q, times the yield adjustment factor, Y, divided by 100. That is, ($P^B$ × $Q^B$ + $P^P$ × $Q^P$ + $P^{OS}$ × $Q^{OS}$) × Q × Y ÷ 100

**Actual milk production per cow** - The pounds determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Actual milk revenue** - The milk revenue calculated for the quarterly insurance period used for determining indemnities under this policy.

(a) If you elect the class pricing option for the pricing method election, then actual milk revenue equals the actual class pricing milk revenue.

(b) If you elect the component pricing option for the pricing method election, then actual milk revenue equals the actual component pricing milk revenue.

**Actual other solids price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Actual protein price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Actual protein test** - The amount of protein determined in accordance with section 7(e).

**Actual share** - The percentage interest in the insured milk at the time of sale unless the actual share is greater than the declared share, then your actual share will equal to your declared share.

**Actuarial documents** - The information for the crop year which is available for public inspection in your agent's office and published on RMA's website which shows available crop insurance policies, coverage levels, information needed to determine amounts of insurance, prices, premium adjustment percentages, practices, particular types of the insurable crop, and other related information regarding crop insurance in the state.

**20-DRP**

**AMS** - Agricultural Marketing Service of the USDA or a successor agency.

**Application** - The form required to be completed by you, containing all the information required in section 2, and accepted by us before insurance coverage will commence. Only one application is required per state and all the milk produced within a state is covered under this policy. A separate application is required to insure milk produced in another state

**Assignment of indemnity** - A transfer of policy rights, made on our form, and effective when approved in writing by us in accordance with section 13

**Beginning farmer or rancher** - An individual who has not actively operated and managed a farm or ranch in any state, with an insurable interest in a crop or livestock as an owner-operator, landlord, tenant, or sharecropper for more than five crop years, as determined in accordance with FCIC procedures. Any crop year's insurable interest may, at your election, be excluded if earned while under the age of 18, while in full-time military service of the United States, or while in post-secondary education, in accordance with FCIC procedures. A person other than an individual may be eligible for beginning farmer or rancher benefits if there is at least one individual substantial beneficial interest holder and all individual substantial beneficial interest holders qualify as a beginning farmer or rancher

**Business Day** – Monday through Friday unless the CME Dairy markets are closed for a scheduled holiday In the case the CME Dairy markets are closed for a scheduled holiday the next business day will be based on the next day the CME Dairy markets reopens for trades.

**Cancellation date** - The calendar date specified in the actuarial documents on which coverage will automatically renew unless canceled in writing by either you or us or terminated in accordance with the policy terms.

**Class pricing option** - A pricing method election made by you If you elect this pricing option your coverage and indemnities will be determined using the class III and class IV milk prices.

**CME group** - The Chicago Mercantile Exchange Group.

**Component pricing option** - A pricing method election made by you. If you elect this option, your coverage and indemnities will be determined using component milk prices for butterfat, protein, and other solids

**Contract change date** - The calendar date contained in the actuarial documents, by which changes to the policy, if any, will be made available in accordance with section 20 of these Basic Provisions.

**County** - Any county, parish, or other political subdivision of a state shown on your accepted application where the milk storage tank of your dairy operation is physically located If your dairy operation spans multiple counties within the state, then the application county will be the county elected by the insured as indicated on the application.

**Coverage** - The insurance provided by this policy against insured loss of revenue as shown on the summary of coverage.

**Coverage level** - The coverage level percentage chosen by you, used to determine the revenue guarantee

**Covered milk production** - The amount of Grade A milk production determined in accordance with section 7(d).

**Crop year** - The twelve-month period, beginning July 1 and ending the following June 30, which is designated by the calendar year in which it ends.

**Dairy operation** - A business commercially producing and marketing milk, produced from cows, as a single unit located in the United States. The dairy operation to be insured must be contained within one pooled production region.

**Days** - Calendar days.

**Declared butterfat test** - The pounds of milkfat contained in 100 pounds of your milk, as declared by you in accordance with section 3(c)(1)(A).

**Declared class price weighting factor** - A percentage value, chosen by you, to be used for determining the expected class pricing milk revenue.

**Declared covered milk production** - The pounds of Grade A milk production chosen by you to insure for that quarter under each quarterly coverage endorsement.

**Declared protein test** - The pounds of milk protein contained in 100 pounds of your milk, as declared by you in accordance with section 3(c)(1)(ii)(B).

**Declared share** - The percentage interest in the insured milk as an owner at the time insurance attaches and indicated on the quarterly coverage endorsement.

**Delinquent debt** - Has the same meaning as the term defined in 7 CFR part 400, subpart U

**DRP-CEE** - The Dairy Revenue Protection Commodity Exchange Endorsement applicable for the crop year.

**Effective date** - The date coverage begins, as shown in the quarterly coverage endorsement. The effective date will always be the date the prices were published on the RMA website corresponding to your purchase date

**End of quarterly insurance period, date of** - The date the insurance coverage provided by the quarterly coverage endorsement ceases.

**Expected butterfat price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents

**Expected class III milk price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Expected class IV milk price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents

DLF034

**20-DRP**

**Expected class pricing milk revenue** - The value determined by summing the expected class III milk price, $E(P^{III})$, multiplied by the declared class price weighting factor, W, the expected class IV milk price, $E(P^{IV})$, multiplied by one minus the declared class price weighting factor, 1-W; then multiplying that sum by the declared covered milk production, Q, divided by 100. That is, $(E(P^{III}) \times W + E(P^{IV}) \times (1 - W)) \times Q \div 100$.

**Expected component pricing milk revenue** - The value determined by summing the expected butterfat price, $E(P^B)$, multiplied by the declared butterfat test, $Q^B$, the expected protein price, $E(P^P)$, multiplied by the declared protein test, $Q^P$, and the expected other solids price, $E(P^{OS})$, multiplied by the other solids test, $Q^{OS}$; then multiplying that sum by the declared covered milk production, Q; divided by 100. That is, $(E(P^B) \times Q^B + E(P^P) \times Q^P + E(P^{OS}) \times Q^{OS}) \times Q \div 100$.

**Expected milk production per cow** - The pounds determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Expected other solids price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Expected protein price** - The price determined in accordance with the DRP-CEE as shown in the actuarial documents.

**Expected revenue guarantee** - The milk revenue calculated for the quarterly insurance period used for determining coverage under this policy, calculated as:

(a) If you elect the class pricing option, then expected revenue guarantee equals the expected class pricing milk revenue times your coverage level.

(b) If you elect the component pricing option, then expected revenue guarantee equals the expected component pricing milk revenue times your coverage level.

**FCIC** - The Federal Crop Insurance Corporation, a wholly owned government corporation and agency within USDA.

**Final butterfat test** - The amount of butterfat determined in accordance with section 7(e).

**Final class pricing milk revenue** - The value determined by summing the expected class III milk price, $E(P^{III})$, multiplied by the declared class price weighting factor, W, the expected class IV milk price, $E(P^{IV})$, multiplied by one minus the declared class price weighting factor, 1-W; then multiplying that sum by the covered milk production, Q; divided by 100. That is, $(E(P^{III}) \times W + E(P^{IV}) \times (1 - W)) \times Q \div 100$.

**Final component pricing milk revenue** - The value determined by summing the expected butterfat price, $E(P^B)$, multiplied by the final butterfat test, $Q^B$, the expected protein price, $E(P^P)$, multiplied by the final protein test, $Q^P$, and the expected other solids price, $E(P^{OS})$, multiplied by the other solids test, $Q^{OS}$; then multiplying that sum by the covered milk production, Q; divided by 100. That is, $(E(P^B) \times Q^B + E(P^P) \times Q^P + E(P^{OS}) \times Q^{OS}) \times Q \div 100$.

**Final protein test** - The amount of protein determined in accordance with section 7(e).

**Final revenue guarantee** - The milk revenue calculated for the quarterly insurance period for determining indemnities under this policy, calculated as:

(a) If you elect the class pricing option, then the final revenue guarantee equals the final class pricing milk revenue times your coverage level.

(b) If you elect the component pricing option, then the final revenue guarantee equals the final component pricing milk revenue times your coverage level.

**Insured** - The named person as shown on the application accepted by us. This term does not extend to any other person having a share or interest in the animals, such as a partnership, landlord, or any other person unless also specifically indicated on the application as the insured.

**Liability** - The maximum amount payable under this policy for any given quarterly coverage endorsement. The liability equals the expected revenue guarantee x declared share x protection factor.

**Limit movement** - The maximum price change based on the CME group current daily price limit for milk or dairy commodity futures.

**Limited resource farmer or rancher** - Has the same meaning as the term defined by USDA at https://lrftool.sc.egov.usda.gov/LRP_Definition.aspx or successor website.

**Milk** – Grade A milk produced from any species of domesticated mammal of the family Bovidae commonly grown for production of dairy products, also referred to as dairy cows.

**Milk marketings** - The total amount of milk sold by the insured dairy operation during the quarterly insurance period and for which the dairy operation has proof of sale.

**Milk marketing records** - The supporting documents that provide the information required in section 3(d).

**Milk production worksheet** - A report submitted by you on our form showing for each month your milk marketings and, if applicable, the butterfat test and protein test during the months insured under this policy for the applicable quarterly coverage endorsements in accordance with section 3(d).

**NASS** - National Agricultural Statistics Service of the USDA.

**Notice of probable loss** - Our notice to you of a probable loss on your insured milk.

**Offset**- The act of deducting one amount from another amount.

**Other solids test** - The pounds of other milk solids contained in 100 pounds of your milk, fixed at 5.7 pounds.

**Person** - An individual, partnership, association, corporation, estate, trust, or other legal entity, and wherever applicable, a State or a political subdivision

DLF035

**20-DRP**

or agency of a State. "Person" does not include the United States Government or any agency thereof.

**Policy** - The agreement between you and us to insure an agricultural commodity consisting of the accepted application, these provisions, the Special Provisions, the DRP-CEE, the quarterly coverage endorsement, the actuarial documents for the insured commodity and the applicable regulations published in 7 CFR chapter IV.

**Pooled production region(s)** - The states within a region, as specified in the DRP-CEE.

**Premium** - The amount you owe us for coverage based on the liability during the quarter in accordance with section 5.

**Premium billing date** - The earliest date upon which you will be billed for the quarterly insurance period selected on your quarterly coverage endorsement. The premium billing date is contained in the actuarial documents.

**Protection factor** - A numeric value chosen by you for each type and practice in accordance with section 3(c)(6)(i).

**Quarter** - A three-month time period designated in the actuarial documents.

**Quarterly coverage endorsement** - An endorsement to the policy necessary to provide coverage that includes information about the quarterly insurance period and coverage options.

**Quarterly insurance period** - The three-month period, corresponding to up to five of the eight quarters for which coverage is available under the quarterly coverage endorsement, designated in the summary of coverage to which this policy is applicable. For example: from July 1 to September 15 the practices 801 – 805 are available, from September 16 – December 16 the practices 802 – 806 are available and June 16 – June 30 the practices 805 – 808 are available. See the actuarial documents for additional detail on insurable quarterly insurance periods.

**RMA** - Risk Management Agency, an agency within USDA.

**RMA's website** - A website hosted by RMA and located at http://www.rma.usda.gov/ or a successor website.

**Sales closing date** - The sales closing date is each day, in the specified sales timeframe, during which coverage is available for purchase.

**Sales period** - The period of time that begins when the coverage prices and rates are validated and ends at 9:00 AM Central time of the following business day in which you can purchase quarterly endorsements.

**Sales period begin date** - A date contained in the actuarial documents citing the first date coverage for a specific quarterly insurance period becomes available to be offered for the crop year.

**Sales period end date** - A date contained in the actuarial documents citing the last date coverage for a

specified quarterly insurance period will be available to be offered for the crop year.

**Share** - The lesser of your percentage interest in the insured milk as an owner at the time insurance attaches or at the time of sale. Persons who lease or hold some other interest in the milk other than as an owner are not considered to have a share in the milk.

**Special Provisions** - The part of the policy that contains specific provisions of insurance for each insured crop that may vary by geographic area.

**State** - The state shown on your accepted application.

**Substantial beneficial interest** - An interest held by any person of at least ten percent in you (e.g., there are two partnerships that each have a 50 percent interest in you, and each partnership is made up of two individuals, each with a 50 percent share in the partnership. In this case, each individual would be considered to have a 25 percent interest in you, and both the partnerships and the individuals would have a substantial beneficial interest in you. The spouses of the individuals would not be considered to have a substantial beneficial interest unless the spouse was one of the individuals that made up the partnership. However, if each partnership is made up of six individuals with equal interests, then each would only have an 8.33 percent interest in you and although the partnership would still have a substantial beneficial interest in you, the individuals would not for the purposes of reporting in section 2). The spouse of any individual applicant or individual insured will be presumed to have a substantial beneficial interest in the applicant or insured unless the spouses can prove they are legally separated or otherwise legally separate under the applicable State dissolution of marriage laws. Any child of an individual applicant or individual insured will not be considered to have a substantial beneficial interest in the applicant or insured unless the child has a separate legal interest in such person.

**Summary of coverage** - Our statement to you, based upon your quarterly coverage endorsement, specifying the quarterly insurance period, coverage options, liability and the premium.

**Termination date** - The calendar date contained in the actuarial documents upon which your insurance ceases to be in effect because of nonpayment of any amount due us under the policy, including premium.

**USDA** - The United States Department of Agriculture.

**Veteran Farmer or Rancher** An individual who has served in the active military, naval, or air service in the Armed Forces, and was discharged or released under conditions other than dishonorable in the Armed Forces, and has not operated a farm or ranch; has operated a farm or ranch for not more than five years or is a veteran who has first obtained status as a veteran during the most recent five-year period. A person other than an individual may be eligible for veteran farmer or rancher benefits if there is at least one individual substantial beneficial interest holder and

DLF036

20-DRP

all substantial beneficial interest holders qualify as a veteran farmer or rancher, unless the substantial beneficial interest holder is a spouse. A spouse's veteran farmer or rancher status does not impact whether an individual is considered a veteran farmer or rancher

**Void** - When the Policy is considered not to have existed for a crop year.

**Yield adjustment factor** - The factor determined by dividing actual milk production per cow by expected milk production per cow.

2. **Life of Policy, Cancellation, and Termination**
   (a) The application must be completed by you and received by us not later than the sales closing date. If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop.
   (b) Coverage will not be provided if you are ineligible under the policy or under any Federal statute or regulation.
   (c) Coverage will not be provided if your dairy operation is not contained within a pooled production region, or if you do not have a share in the milk to be insured
   (d) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us. In accordance with section 20, FCIC may change the coverage provided from year to year.
   (e) With respect to your application for insurance.
      (1) You must include your social security number (SSN) if you are an individual (if you are an individual applicant operating as a business, you may provide an employer identification number (EIN) but you must also provide your SSN); or
      (2) You must include your EIN if you are a person other than an individual;
      (3) In addition to the requirements of section 2(e)(1) or (2), you must include the following for all persons who have a substantial beneficial interest in you:
         (i) The SSN for individuals; or
         (ii) The EIN for persons other than individuals and the SSNs for all individuals that comprise the person with the EIN if such individuals have a substantial beneficial interest in you;
      (4) You must include:
         (i) Your election of plan of insurance, state; county, the crop 'milk'; and any other

material information required on the application to insure your milk; and
         (ii) All information required in section 2(e)(4)(i) or your application will not be accepted and no coverage will be provided;
      (5) Your application will not be accepted and no insurance will be provided for the year of application if the application does not contain your SSN or EIN. If your application contains an incorrect SSN or EIN for you, your application will be considered not to have been accepted, no insurance will be provided for the year of application and for any subsequent crop years, as applicable, and such policies will be void if:
         (i) Such number is not corrected by you; or
         (ii) You correct the SSN or EIN but:
            (A) You cannot prove that any error was inadvertent (Simply stating the error was inadvertent is not sufficient to prove the error was inadvertent); or
            (B) It is determined that the incorrect number would have allowed you to obtain disproportionate benefits under the crop insurance program, you are determined to be ineligible for insurance or you could avoid an obligation or requirement under any State or Federal law;
      (6) With respect to persons with a substantial beneficial interest in you:
         (i) The coverage for all expected revenue included on your application will be reduced proportionately by the percentage interest in you of persons with a substantial beneficial interest in you (presumed to be 50 percent for spouses of individuals) if the SSNs or EINs of such persons are included on your application, the SSNs or EINs are correct, and the persons with a substantial beneficial interest in you are ineligible for insurance;
         (ii) Your policies for all commodities included on your application, and for all applicable crop years, will be void if the SSN or EIN of any person with a substantial beneficial interest in you is incorrect or is not included on your application and
            (A) Such number is not corrected or provided by you, as applicable;
            (B) You cannot prove that any error or omission was inadvertent (Simply stating the error or omission was inadvertent is not sufficient to prove the error or omission was inadvertent), or
            (C) Even after the correct SSN or EIN is provided by you, it is determined that

DLF037

20-DRP

the incorrect or omitted SSN or EIN would have allowed you to obtain disproportionate benefits under the crop insurance program, the person with a substantial beneficial interest in you is determined to be ineligible for insurance, or you or the person with a substantial beneficial interest in you could avoid an obligation or requirement under any State or Federal law; or

(iii) Except as provided in sections 2(e)(6)(ii)(B) and (C), your policies will not be voided if you subsequently provide the correct SSN or EIN for persons with a substantial beneficial interest in you and the persons are eligible for insurance,

(7) When any of your policies are void under sections 2(e)(5) or (6):

(i) You must repay any indemnity that may have been paid for all applicable commodities and any crop years determined by us;

(ii) Even though the policies are void, you will still be required to pay an amount equal to 20 percent of the premium that you would otherwise be required to pay; and

(iii) If you previously paid premium or administrative fees, any amount in excess of the amount required in section 2(e)(7)(ii) will be returned to you;

(8) Notwithstanding any of the provisions in this section, if you certify to an incorrect SSN or EIN, or receive an indemnity and the SSN or EIN was not correct, you may be subject to civil, criminal or administrative sanctions;

(9) If any of the information regarding persons with a substantial beneficial interest in you changes after the cancellation date for the previous crop year, you must revise your application by the cancellation date for the current crop year to reflect the correct information. However, if such information changed less than 30 days before the cancellation date for the current crop year, you must revise your application by the cancellation date for the next crop year. If you fail to provide the required revisions, the provisions in section 2(e)(6) will apply; and

(10) If you are, or a person with a substantial beneficial interest in you is, not eligible to obtain a SSN or EIN, whichever is required, you must request an assigned number for the purposes of this policy from us:

(i) A number will be provided only if you can demonstrate you are, or a person with a substantial beneficial interest in you is eligible to receive Federal benefits;

(ii) If a number cannot be provided for you in accordance with section 2(e)(10)(i), your application will not be accepted, or

(iii) If a number cannot be provided for any person with a substantial beneficial interest in you in accordance with section 2(e)(10)(i), the amount of coverage for all crops on the application will be reduced proportionately by the percentage interest of such person in you.

(f) After acceptance of the application, you may not cancel this policy for the initial crop year. Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(g) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date in accordance with section 2(l)

(h) Any amount due to us for any policy authorized under the Act will be offset from any indemnity due you for this or any other crop insured with us under the authority of the Act.

(1) Even if your claim has not yet been paid, you must still pay the premium on or before the termination date for you to remain eligible for insurance

(2) If you and we agree, your premium can be offset from any indemnity payment due you, even if it is prior to the billing date of the premium.

(3) If we offset any amount due us from an indemnity owed to you, the date of payment for the purpose of determining whether you have a delinquent debt will be the date that you submit the claim for indemnity in accordance with section 7 (Determining Indemnities).

(i) A delinquent debt for any policy will make you ineligible to obtain crop insurance authorized under the Act for any subsequent crop year and result in termination of all policies in accordance with section 2(i)(2).

(1) With respect to ineligibility:

(i) Ineligibility for crop insurance will be effective on:

(A) The date that a policy was terminated in accordance with section 2(i)(2) for the crop for which you failed to pay premium, an administrative fee, or any related interest owed, as applicable.

(B) The payment due date contained in any notification of indebtedness for any overpaid indemnity if you fail to pay the amount owed, including any related interest owed, as applicable by such due date; or

(C) The termination date for the crop year prior to the crop year in which a

DLF038

**20-DRP**

scheduled payment is due under a written payment agreement if you fail to pay the amount owed by any payment date in any agreement to pay the debt;

(ii) If you are ineligible and a policy has been terminated in accordance with section 2(i)(2), you will not receive any indemnity and such ineligibility and termination of the policy may affect your eligibility for benefits under other USDA programs Any indemnity payment that may be owed for the policy before it has been terminated will remain owed to you, but may be offset in accordance with section 2(h), unless your policy was terminated in accordance with sections 2(i)(2)(i)(A), (B), or (D).

(2) With respect to termination:

(i) Termination will be effective on:

(A) For a policy with unpaid administrative fees or premiums, the termination date immediately subsequent to the billing date for the crop year (For policies which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date  Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity will be owed);

(B) For a policy with other amounts due, the termination date immediately following the date you have a delinquent debt (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity will be owed);

(C) For all other policies that are issued by us under the authority of the Act, the termination date that coincides with the termination date for the policy with the delinquent debt or, if there is no coincidental termination date, the termination date immediately following the date you become ineligible;

(D) For execution of a written payment agreement and failure to make any scheduled payment, the termination date for the crop year prior to the crop year in which you failed to make the scheduled payment (for this purpose only, the crop year will start the day after the termination date and end on the next termination date  e.g., if the termination date is November 30 and you fail to make a payment on November 15, 2019, your policy will terminate on November 30, 2018, for the 2019 crop year); or

(ii) For all policies terminated under sections 2(i)(2)(i)(A), (B), or (D), any indemnities paid subsequent to the termination date must be repaid.

(iii) Once the policy is terminated, it cannot be reinstated for the current crop year unless:

(A) The termination was in error;

(B) The Administrator of the Risk Management Agency, at his or her sole discretion, determines that the following are met:

(1) In accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, you provide documentation that your failure to pay your debt is due to an unforeseen or unavoidable event or an extraordinary weather event that created an impossible situation for you to make timely payment;

(2) You remit full payment of the delinquent debt owed to us or FCIC with your request submitted in accordance with section 2(i)(2)(iii)(B)(3); and

(3) You submit a written request for reinstatement of your policy to us no later than 60 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable

(i) If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

(ii) There is no evidence of fraud or misrepresentation; or

Page 7 of 18

DLF039

**20-DRP**

(C) We determine that, in accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, the following are met:

   (1) You can demonstrate:

      (i) You made timely payment for the amount of premium owed but you inadvertently omitted some small amount, such as the most recent month's interest or a small administrative fee;

      (ii) The amount of the payment that clearly transposed from the amount that was otherwise due (For example, you owed $892 but you paid $829); or

      (iii) You timely made the full payment of the amount owed but the delivery of that payment was delayed, and was postmarked no more than seven calendar days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in a notice to you of an amount due, as applicable.

   (2) You remit full payment of the delinquent debt owed to us; and

   (3) You submit a written request for reinstatement of your policy to us in accordance with 7 CFR part 400, subpart U, and applicable procedures no later than 30 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable, and

   (4) If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

   (5) There is no evidence of fraud or misrepresentation

      (iv) A determination made under:

         (A) Section 2(i)(2)(iii)(B) may only be appealed to the National Appeals Division in accordance with 7 CFR part 11, and

         (B) Section 2(i)(2)(iii)(C) may only be appealed in accordance with section 19.

   (3) To regain eligibility, you must:

      (i) Repay the delinquent debt in full;

      (ii) Execute a written payment agreement, in accordance with 7 CFR part 400, subpart U, and make payments in accordance with the agreement; or

      (iii) Have your debts discharged in bankruptcy

   (4) After you become eligible for crop or livestock insurance, if you want to obtain coverage for your crops or livestock, you must submit a new application on or before the sales closing date for the crop (Since applications for crop insurance cannot be accepted after the sales closing date, if you make any payment after the sales closing date, you cannot apply for insurance until the next available sales closing date).

   (5) For example, for the 2019 crop year, if you purchase Dairy Revenue Protection (DRP), with a termination date of December 31, 2020 and you do not pay the premium or other amounts due for DRP by the termination date, your livestock policies will terminate retroactive to the sales closing date that is immediately subsequent to the sales period for which the premium is delinquent, even if insurance has already attached to a subsequent sales period The ineligibility date would be December 31, 2020. In accordance with section 2 (i)(2)(i)(C), for any other policy issued under the authority of the Federal Crop Insurance Act that does not have the same termination date of December 31, the termination for such other policy will be effective on the termination date following when a policyholder becomes ineligible. For example, a producer purchased a Dairy Revenue Protection quarterly coverage endorsement on December 3, 2018 and did not pay the premium by the premium due date and subsequently purchased a Federal reinsured corn policy on March 15, 2019. The Dairy Revenue Protection policy is terminated December 31, 2020, and the producer is ineligible for any livestock plan of insurance as of the next sales closing date after December 3, 2018. However, the Federal reinsured corn policy would remain in effect for 2020 and would be terminated as of March 15, 2021 if the Dairy Revenue Protection premium remained delinquent. No indemnity will be due for that crop year for either crop. You will not be eligible to apply for crop insurance for any crop until after the amounts owed are paid in full or you file a petition to discharge the debt in bankruptcy.

   (6) If you are determined to be ineligible under section 2(i), persons with a substantial beneficial interest in you may also be ineligible until you become eligible again.

DLF040

**20-DRP**

(j) In cases where there has been a death, disappearance, judicially declared incompetence, or dissolution of any insured person:

  (1) If any married individual insured dies, disappears, or is judicially declared incompetent, the named insured on the policy will automatically convert to the name of the spouse if:

    (i) The spouse was included on the policy as having a substantial beneficial interest in the named insured; and

    (ii) The spouse has a share of the crop.

  (2) The provisions in section 2(j)(3) will be applicable if:

    (i) Any partner, member, shareholder, etc., of an insured entity dies, disappears, or is judicially declared incompetent, and such event automatically dissolves the entity; or

    (ii) An individual, whose estate is left to a beneficiary other than a spouse or left to the spouse and the criteria in section 2(j)(1) are not met, dies, disappears, or is judicially declared incompetent

  (3) If section 2(j)(2) applies and the death, disappearance, or judicially declared incompetence occurred:

    (i) More than 30 days before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

    (ii) Thirty days or less before the cancellation date, or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period.

      (A) A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

      (B) Any indemnity will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium

  (4) If any insured entity is dissolved for reasons other than death, disappearance, or judicially declared incompetence:

    (i) Before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

    (ii) On or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

      (A) A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

      (B) Any indemnity will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

  (5) If section 2(j)(2) or (4) applies, a remaining member of the insured person or the beneficiary is required to report to us the death, disappearance, judicial incompetence, or other event that causes dissolution not later than the next cancellation date, except if section 2(j)(3)(ii) applies, notice must be provided by the cancellation date for the next crop year. If notice is not provided timely, the provisions of section 2(j)(2) or (4) will apply retroactive to the date such notice should have been provided and any payments made after the date the policy should have been canceled must be returned.

(k) We may cancel your policy if no premium is earned for three consecutive years.

(l) The cancellation date is June 30 for the policy.

(m) Any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign. You are still responsible for the accuracy of all information provided on your behalf and may be subject to any applicable consequences, if any information has been misreported

**3. Insurance Coverage**

(a) Insurance coverage consists of your liability and premium for the quarterly insurance period, as shown on your summary of coverage.

(b) A quarterly coverage endorsement must be submitted on our form within the sales period for each quarterly insurance period in which you desire coverage. There can be multiple quarterly coverage endorsements for the same quarterly insurance period but they cannot cover the same milk

20-DRP

(c) The quarterly coverage endorsement must include the following information, as applicable:
  (1) You must choose either the class pricing option or the component pricing option.
    (i) If you choose the class pricing option, you must include the following information:
      (A) Declared class III price weighting factor between 0 percent and 100 percent, in 5 percentage point increments; and
      (B) Default class IV price weighting factor, which is 1.00 minus declared class III price weighting factor.
    (ii) If you choose the component pricing option, you must include the following information:
      (A) The declared butterfat test elected by you can be no less than 3.25 pounds and no more than 5 pounds, in 0.05 pound increments.
      (B) The declared protein test elected by you can be no less than 2.75 pounds and no more than 4 pounds, in 0.05 pound increments.;
  (2) Your selected quarterly insurance period;
  (3) Your declared covered milk production;
  (4) Your coverage level (You must choose a coverage level between 80 and 95 percent, in increments of five percentage points, and you may choose a different coverage level for each type and practice indicated on the quarterly coverage endorsement);
  (5) Your declared share at time coverage begins (You must provide the name(s) of other persons sharing in the insured milk if applicable); and
  (6) Your selected protection factor (You must choose a protection factor between 1.00 and 1.5 in 0.05 increments and you may choose a different protection factor for each type and practice indicated on the quarterly coverage endorsement).
(d) Your milk production worksheet is due in the event of loss in accordance with section 7(b).
  (1) The milk production worksheet must be accompanied by milk marketing records corresponding to the quarter insured from the insured dairy operation's milk cooperative or milk handler that provides records of the actual milk deliveries and, if applicable, the component levels in the milk sold.
  (2) The milk marketing records shall show:
    (i) The name, address, Grade A identifier assigned by a duly constituted regulatory agency, and payroll number or similar identifier of the producer.

    (ii) The daily and total pounds, and the month and dates such milk was received from that producer; and
    (iii) If the component price option elected, the total pounds of butterfat and protein contained in the producer's milk.
(e) No indemnity will be due you, but you will still be responsible for any premiums owed, if we find that your milk production worksheet:
  (1) Is not supported by written verifiable records to support the information provided in section 3(d), or
  (2) Fails to accurately report milk marketings or other material information.
(f) Coverage can be purchased at any time during the sales period.
(g) Sales of Dairy Revenue Protection will be suspended for the next sales period if unforeseen and extraordinary events occur that interfere with the effective functioning of the milk commodity markets or milk production reports, as determined by RMA.
(h) In the event of a limit movement of any milk futures expiring during the insured period, sales of Dairy Revenue Protection will be suspended.
(i) Sales of Dairy Revenue Protection will be suspended on the calendar days on which USDA releases the Milk Production report, the Cold Storage report, or the Dairy Products report, as well as any other days that for any reason Dairy Revenue Protection offer prices are not published in the actuarial documents.

4. **Causes of Loss**
This policy provides insurance only for the difference between the final revenue guarantee and actual milk revenue times your actual share and protection factor, caused by natural occurrences in market prices and yields in your pooled production region. This policy does not insure against the death or other loss or destruction of your dairy cattle, or against any other loss or damage of any kind whatsoever.

5. **Premium**
(a) The premium is earned and payable at the time coverage begins. You will be billed for the premium not earlier than the premium billing date specified in the actuarial documents.
(b) The premium is shown on your summary of coverage.
(c) The premium will be based on the information you provide on your application and quarterly coverage endorsement.
(d) The premium will be based on your declared share. Premium will not be reduced if your declared share is greater than your actual share.
(e) If you qualify as a beginning farmer or rancher; or veteran farmer or rancher, your premium subsidy will be ten percentage points greater than the premium subsidy that you would otherwise receive.

DLF042

20-DRP

unless otherwise specified in the Special Provisions;

(f) You will be ineligible for any premium subsidy paid on your behalf by FCIC for any policy issued by us if:

(1) USDA determines you have committed a violation of the highly erodible land conservation or wetland conservation provisions of 7 CFR part 12 as amended by the Agricultural Act of 2014; or

(2) You have not filed form AD-1026 with FSA for the reinsurance year by the premium billing date.

(i) Notwithstanding section 5(e)(2), you may be eligible for premium subsidy without having a timely filed form AD-1026:

(A) For the initial reinsurance year if you certify by the premium billing date for your policy that you meet the qualifications as outlined in FCIC approved procedures for producers who are new to farming, new to crop insurance, a new entity, or have not previously been required to file form AD-1026; or

(B) If FSA approves relief for failure to timely file due to circumstances beyond your control or failure to timely provide adequate information to complete the form AD-1026 in accordance with the provisions contained in 7 CFR part 12.

(ii) To be eligible for premium subsidy paid on your behalf by FCIC, it is your responsibility to assure you meet all the requirements for:

(A) Compliance with the conservation provisions specified in section 5(e)(1) of this section; and

(B) Filing form AD-1026, to be properly identified as in compliance with the conservation provisions specified in section 5(e)(1) of this section.

(g) Premium owed by you will be offset from an indemnity due you. The date of payment for the purpose of determining whether you have a delinquent debt will be the date that you submit the claim for indemnity

**6.  Quarterly Insurance Period**

(a) Coverage begins on your declared covered milk production on the first day of the quarterly insurance period of the insured quarter as shown on your summary of coverage.

(b) Coverage ends on your declared covered milk production on the end of insurance date for the quarterly insurance period as shown in the actuarial documents

**7.  Determining Indemnities**

(a) In the case of a payable loss on insured milk, we will send you a notice of probable loss approximately ten days after all Dairy Revenue Protection data applicable for the quarterly insurance period are released.

(b) In order to receive an indemnity, you must submit a claim to us on our form and include all required documents, including the milk production worksheet, within sixty days (60) days following the date the notice of probable loss is issued.

(c) In the event of loss covered by this policy, we will settle your claim by subtracting the actual milk revenue from the final revenue guarantee, and then multiplying by the protection factor multiplied by your actual share. If the result is greater than zero, an indemnity will be paid to you in this amount.

(d) Your covered milk production is the amount of milk marketings you declare on your quarterly coverage endorsements but if you do not actually produce the covered milk production declared:

(i) If your milk marketings for the quarterly insurance period are at or above 85 percent of the declared covered milk production summed over all quarterly coverage endorsements for the quarterly insurance period, then your covered milk production equals your declared covered milk production, even if your milk marketings are lower than the declared covered milk production; or

(ii) If your milk marketings during the quarterly insurance period are less than 85 percent of the declared covered milk production summed over all quarterly coverage endorsements for the quarterly insurance period, then your total covered milk production for this quarterly insurance period shall equal your milk marketings divided by 85 percent.

(A) For example, two separate quarterly coverage endorsements are purchased at different points in time for a single quarterly insurance period, endorsement A has 1,500,000 pounds of declared covered milk production and endorsement B has 500,000 pounds of declared covered milk production for a total of 2,000,000 pounds The milk marketings are 1,200,000 pounds of milk for the quarter. The total covered milk production for all quarterly coverage endorsements shall be 1,200,000 pounds divided by .85 which equals 1,411,765 pounds.

(B) The covered milk production for each quarterly coverage endorsement will be determined by total covered milk production multiplied by declared covered milk production divided by total declared covered milk production.

Page 11 of 18

20-DRP

(C) For example, endorsement A, 1,411,765 pounds total covered milk production multiplied by (1,500,000 divided by 2,000,000) equals 1,058,824 pounds covered milk production for this endorsement.

(D) Endorsement B, 1,411,765 pounds total covered milk production multiplied by (500,000 divided by 2,000,000) equals 352,941 pounds covered milk production for this endorsement.

(E) Premium will be due in accordance with section 5, which uses your declared covered milk production, and your premium will not be reduced as a result of any recalculations in the covered milk production calculations of section 7(d)

(e) If you elected the component pricing option, your coverage is based on your declared butterfat test and protein tests. However, to receive your full coverage your average actual butterfat test and average actual protein test component levels for milk sold during the quarterly insurance period as indicated on your milk production worksheet must not be less than 90 percent of the declared butterfat test or declared protein test. The final butterfat test and final protein test used to calculate the final component pricing milk revenue and the actual component pricing milk revenue for indemnity calculation purposes is determined as follows:

(i) If either actual component test is less than 90 percent, then, as applicable, the final butterfat test and/or final protein test will be the actual determined test value percent divided by .90. For example, if the declared butterfat test is 5.00 pounds, the policy holder's average butterfat test during the quarter must equal or exceed 4.50 pounds. If the actual butterfat test is 3.80 pounds, the final butterfat test will be 4.22 pounds.

(ii) For either actual component test that is at least 90 percent of the declared, then, as applicable, the final butterfat test and/or final protein test will equal the declared butterfat test or declared protein test. For example, if the declared protein test is 4.00 pounds, and the policy holder's average actual protein test during the quarter is 3.80 pounds, the final protein test will be 4.00 pounds.

(iii) Premium will be due in accordance with section 5 and the component calculations of section 7(e) will not result in a premium refund

(f) If you qualify for an indemnity under the terms and conditions of this policy, the indemnity payment shall be made within thirty (30) days following receipt by us of the properly executed claim form

(g) In the event that NASS does not publish information needed to determine state milk per cow or other information needed in your pooled production region, then the values for the actual milk production per cow will be set equal to the expected milk production per cow.

(h) Indemnities will be calculated using the same USDA pricing methodologies, yield formulas and factors in effect at the time the coverage was established.

8. **Conformity to Food Security Act**

Although your violation of a number of federal statutes, including the Act, may cause cancellation or termination of the policy or may cause the policy to become void, you should be specifically aware that your policy will be canceled if you are determined to be ineligible to receive benefits under the Act due to violation of the controlled substance provisions (title XVII) of the Food Security Act of 1985 (Pub. L. 99-198) and the regulations published at 7 CFR part 400, subpart F. We will recover any and all monies paid to you or received by you during your period of ineligibility and your premium will be refunded, less a reasonable amount for expenses and handling not to exceed 20 percent of the total premium.

9. **Amounts Due Us**

(a) Interest will accrue at the rate of 1.25 percent simple interest per calendar month on any unpaid amount owed to us or on any unpaid administrative fees owed to FCIC.

(1) For the purpose of premium amounts owed to us or administrative fees owed to FCIC, interest will start to accrue on the first day of the month following the issuance of the notice by us, provided that a minimum of 30 days have passed from the premium billing date specified in the actuarial documents.

(2) We will collect any unpaid amounts owed to us and any interest owed thereon, and, prior to the termination date, we will collect any administrative fees and interest owed thereon to FCIC.

(3) After the termination date, FCIC will collect any unpaid administrative fees and any interest owed thereon for any catastrophic risk protection policy and will collect any unpaid administrative fees and any interest owed thereon for additional coverage policies

(b) For the purpose of any other amounts due us, such as repayment of indemnities found not to have been earned, interest will start to accrue on the date that notice is issued to you for the collection of the unearned amount.

(1) Amounts found due under this paragraph will not be charged interest if payment is made within 30 days of issuance of the notice by us.

(2) The amount will be considered delinquent if

Page 12 of 18

20-DRP

not paid within 30 days of the date the notice is issued by us.

(c) All amounts paid will be applied first to expenses of collection (see subsection (d) of this section), if any, second to the reduction of accrued interest, and then to the reduction of the principal balance

(d) If we determine that it is necessary to contract with a collection agency or to employ an attorney to assist in collection, you agree to pay all of the expenses of collection.

(e) The portion of the amounts owed by you for a policy authorized under the Act that are owed to FCIC may be collected in part through administrative offset from payments you receive from United States government agencies in accordance with 31 U.S.C. chapter 37. Such amounts include all administrative fees, and the share of the overpaid indemnities and premiums retained by FCIC plus any interest owed thereon

**10. Payment and Interest Limitations**

We will pay simple interest computed on the net indemnity ultimately found to be due by us or by a final judgment of a court of competent jurisdiction, from and including the 61st day after the date you sign, date, and submit to us the properly completed claim on our form. Interest will be paid only if the reason for our failure to timely pay is NOT due to your failure to provide information or other material necessary for the computation or payment of the indemnity. The interest rate will be that established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) and published in the Federal Register semiannually on or about January 1 and July 1 of each year, and may vary with each publication.

**11. Concealment, Misrepresentation or Fraud**

(a) If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:
   (1) This policy will be voided, and
   (2) You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

(b) Even though the policy is void, you will still be required to pay 20 percent of the premium that you would otherwise be required to pay to offset costs incurred by us in the service of this policy. If previously paid, the balance of the premium will be returned

(c) Voidance of this policy will result in you having to reimburse all indemnities paid for the crop year in which the voidance was effective.

(d) Voidance will be effective on the first day of the quarterly insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years

(e) If you willfully and intentionally provide false or inaccurate information to us or FCIC or you fail

to comply with a requirement of FCIC, in accordance with 7 CFR part 400, subpart R, FCIC may impose on you:

(1) A civil fine for each violation in an amount not to exceed the greater of:
   (i) The amount of the pecuniary gain obtained as a result of the false or inaccurate information provided or the noncompliance with a requirement of FCIC; or
   (ii) $10,000; and

(2) A disqualification for a period of up to 5 years from receiving any monetary or non-monetary benefit provided under each of the following:
   (i) Any crop insurance policy offered under the Act;
   (ii) The Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7333 et seq.);
   (iii) The Agricultural Act of 1949 (7 U.S.C. 1421 et seq.);
   (iv) The Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.);
   (v) The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.);
   (vi) Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 et seq.);
   (vii) The Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.); and
   (viii) Any federal law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in the prices of agricultural commodities.

**12. Transfer of Coverage and Right to Indemnity**

If you transfer any of the ownership interest in your milk during the crop year, you may transfer your coverage rights, if the transferee is eligible for crop or livestock insurance.

(a) We will not be liable for any more than the liability determined in accordance with your policy that existed before the transfer occurred.

(b) The transfer of coverage rights must be on our form and will not be effective until approved by us in writing.

(c) Both you and the transferee are jointly and severally liable for the payment of the premium.

(d) The transferee has all rights and responsibilities under this policy consistent with the transferee's interest.

(e) If the transferee is not eligible for insurance under this policy for any reason, and the transfer occurs before the final 30 days of the quarterly insurance period, then the transferred portion of the coverage will be terminated and no premium for that portion will be refunded

**13. Assignment of Indemnity**

(a) You may assign your right to an indemnity for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary

DLF045

**20-DRP**

obligation. You may be required to provide proof of the debt or other pecuniary obligation before we will accept the assignment of indemnity.

(b) All assignments must be on our form and must be provided to us. Each assignment form may contain more than one creditor or other person to whom you have a financial debt or other pecuniary obligation.

(c) Unless you have provided us with a properly executed assignment of indemnity, we will not make any payment to a lienholder or other person to whom you have a financial debt or other pecuniary obligation even if you may have a lien or other assignment recorded elsewhere. Under no circumstances will we be liable:

   (1) To any lienholder or other person to whom you have a financial debt or other pecuniary obligation where you have failed to include such lienholder or person on a properly executed assignment of indemnity provided to us; or

   (2) To pay to all lienholders or other persons to whom you have a financial debt or other pecuniary obligation any amount greater than the total amount of indemnity owed under the policy.

(d) If we have received the properly executed assignment of indemnity form:

   (1) Only one payment will be issued jointly in the names of all assignees and you; and

   (2) Any assignee will have the right to submit all loss notices and forms as required by the policy.

(e) If you have suffered a loss from an insurable cause and fail to file a claim for indemnity within the period specified in section 7(b), the assignee may submit the claim for indemnity not later than 15 days after the period for filing a claim has expired. We will honor the terms of the assignment only if we can accurately determine the amount of the claim. However, no action will lie against us for failure to do so.

**14. Descriptive Headings**

The descriptive headings of the various policy provisions are formulated for convenience only and are not intended to affect the construction or meaning of any of the policy provisions.

**15. Notices**

(a) All notices required to be given by you must be in writing and received by the insurance agent identified in your application within the designated time unless otherwise provided by the notice requirement.

   (1) Notices required to be given immediately may be by telephone or in person and confirmed in writing.

   (2) Time of the notice will be determined by the time of our receipt of the written notice. If the

date by which you are required to submit a report or notice falls on Saturday, Sunday, or a federal holiday, or if your agent's office is, for any reason, not open for business on the date you are required to submit such notice or report, such notice or report must be submitted on the next business day.

(b) All policy provisions, notices and communications required to be sent by us to you will be provided by electronic means, unless we do not have the ability to transmit such information to you by electronic means; or you elect to receive a paper copy of such information.

**16. Applicability of State and Local Statutes**

If the provisions of this policy conflict with statutes of the state or locality in which this policy is issued, the policy provisions will prevail. State and local laws and regulations in conflict with federal statutes or regulations do not apply to this policy.

**17. Other Insurance**

Nothing in this section prevents you from obtaining other insurance not authorized under the Act. However, unless specifically required by policy provisions, you must not obtain any other livestock insurance issued under the authority of the Act on the insured milk. If you cannot demonstrate that you did not intend to have more than one policy or endorsement in effect, you may be subject to the consequences authorized under this policy, the Act, or any other applicable statute. If you can demonstrate that you did not intend to have more than one policy in effect (For example, an application to transfer your policy or written notification to an insurance provider that states you want to purchase, or transfer, insurance and you want any other policies for the crop canceled would demonstrate you did not intend to have duplicate policies), and:

(1) Both are for Dairy Revenue Protection policies, the policy with the earliest date of application will be in force and the other policy will be void, unless both policies are with:

   (i) The same insurance provider and the insurance provider agrees otherwise; or

   (ii) Different insurance providers and both insurance providers agree otherwise.

(2) One policy is Dairy Revenue Protection and the other is a livestock policy insuring the same milk for the quarterly insurance period, the policy with the earliest date of endorsement for the quarterly insurance period will be in force and the other endorsement will be void.

**18. Access to Insured Milk and Records, and Record Retention**

(a) We, and any employee of USDA, reserve the right to examine your dairy herd, and all records relating to sale of the milk as often as we reasonably require during the record retention period.

(b) For three years after the end of the quarterly insurance period, you must retain, and provide

Page 14 of 18

20-DRP

upon our request, or the request of any USDA employee, complete records of the purchase, feeding (used to determine capacity only), shipment, sale, or other disposition of all the insured milk.

  (1) You must also provide upon our request, or the request of any USDA employee, separate records showing the same information from any milk not insured.

  (2) We may extend the record retention period beyond three years by notifying you of such extension in writing.

  (3) Your failure to keep and maintain such records will result in no indemnity being due and since the denial of indemnity is based on a breach of the policy for the quarterly insurance period, you will still be required to pay all premiums owed.

(c) Any person designated by us, and any employee of USDA, will, at any time during the record retention period, have access:

  (1) To any records relating to this insurance at any location where such records may be found or maintained; and

  (2) To the farm.

(d) By applying for insurance under the authority of the Act or by continuing insurance for which you previously applied, you authorize us, or any person acting for us, to obtain records relating to the insured milk from any person who may have custody of those records including, but not limited to, packers, banks, shippers, sale barns, terminals, cooperatives, associations, and accountants. You must assist us in obtaining all records that we request from third parties.

**19. Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review.**

(a) If you and we fail to agree on any determination made by us, the disagreement may be resolved through mediation in accordance with section 19(g). If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in sections 19(c) and (f), and unless rules are established by FCIC for this purpose. Any mediator or arbitrator with a familial, financial or other business relationship to you or us, or our agent or loss adjuster, is disqualified from hearing the dispute.

  (1) All disputes involving determinations made by us are subject to mediation or arbitration. However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy

provision or procedure, either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.

    (i) Any interpretation by FCIC will be binding in any mediation or arbitration.

    (ii) Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.

    (iii) An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

  (2) Unless the dispute is resolved through mediation, the arbitrator must provide to you and us a written statement describing the issues in dispute, the factual findings, the determinations and the amount and basis for any award and breakdown by claim for any award. The statement must also include any amounts awarded for interest.

    (i) Failure of the arbitrator to provide such written statement will result in the nullification of all determinations of the arbitrator.

    (ii) All agreements reached through settlement, including those resulting from mediation, must be in writing and contain at a minimum a statement of the issues in dispute and the amount of the settlement.

(b) Regardless of whether mediation is elected:

  (1) The initiation of arbitration proceedings must occur within one year of the date we denied your claim or rendered the determination with which you disagree, whichever is later;

  (2) If you fail to initiate arbitration in accordance with section 19(b)(1) and complete the process, you will not be able to resolve the dispute through judicial review;

  (3) If arbitration has been initiated in accordance with section 19(b)(1) and completed, and judicial review is sought, suit must be filed not later than one year after the date the arbitration decision was rendered; and

  (4) In any suit, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, an interpretation must be obtained from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC. Such interpretation will be binding.

(c) Any decision rendered in arbitration is binding on you and us unless judicial review is sought in accordance with section 19(b)(3). Notwithstanding any provision in the rules of the AAA, you and we

Page 15 of 18

**20-DRP**

have the right to judicial review of any decision rendered in arbitration.

(d) If you disagree with any determination made by FCIC or any claim where FCIC is directly involved in the claims process or directs us in the resolution of the claim, you may obtain an administrative review in accordance with 7 CFR part 400, subpart J (administrative review) or appeal in accordance with 7 CFR part 11 (appeal).

  (1) If you elect to bring suit after completion of any appeal, such suit must be filed against FCIC not later than one year after the date of the decision rendered in such appeal.

  (2) Such suit must be brought in the United States district court for the district in which the insured milk is located.

  (3) Under no circumstances can you recover any attorney fees or other expenses, or any punitive, compensatory or any other damages from FCIC.

(e) In any mediation, arbitration, appeal, administrative review, reconsideration or judicial process, the terms of this policy, the Act, and the regulations published at 7 CFR chapter IV, including the provisions of 7 CFR part 400, subpart P, are binding. Conflicts between this policy and any state or local laws will be resolved in accordance with section 16. If there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control.

(f) To resolve any dispute through mediation, you and we must both:

  (1) Agree to mediate the dispute;

  (2) Agree on a mediator; and

  (3) Be present, or have a designated representative who has authority to settle the case present, at the mediation.

(g) Except as provided in section 19(h), no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy, except for interest awarded in accordance with section 10.

(h) In a judicial review only, you may recover attorney's fees or other expenses, or any punitive, compensatory or any other damages from us only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled. Requests for such a determination should be addressed to the following. USDA/RMA/Deputy Administrator of Compliance/ Stop 0806, 1400 Independence Avenue, SW , Washington, D C 20250-0806

  (i) If FCIC elects to participate in the adjustment of your claim, or modifies, revises or corrects your claim, prior to payment, you may not bring an arbitration, mediation or litigation action against us. You must request administrative review or appeal in accordance with section 19(d).

  (j) Any determination made by FCIC that is a matter of general applicability is not subject to administrative review under 7 CFR part 400, subpart J or appeal under 7 CFR part 11. If you want to seek judicial review of any FCIC determination that is a matter of general applicability, you must request a determination of non-appealability from the Director of the National Appeals Division in accordance with 7 CFR 11.6 before seeking judicial review.

**20. Contract Changes**

(a) We may change the terms of your coverage under this policy from year to year.

(b) Any changes in policy provisions, amounts of insurance, program dates or DRP-CEE, if applicable, can be viewed on RMA's website not later than the contract change date contained in these Provisions (except as allowed herein or as specified in section 3). We may only revise this information after the contract change date to correct clear errors.

(c) You will be provided changes to the Basic Provisions and Special Provisions not later than 30 days prior to the cancellation date. Acceptance of changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

(d) The contract change date is April 30 preceding the cancellation date.

**21. Multiple Government Benefits**

If you are eligible to receive an indemnity under this policy and are also eligible to receive benefits for the same loss under any other USDA program, you may receive benefits under both programs, unless specifically limited by the policy or by law.

**22. Correction of Errors**

(a) In addition to any other corrections allowed in your policy subject to section 22(b), we may correct:

  (1) Within 60 days after the sales closing date, any incorrect information on your application or provided by the sales closing date, including identification numbers for you and any person with a substantial beneficial interest in you, to ensure that the eligibility information is correct and consistent with information reported by you to any USDA agency;

  (2) Within 30 days after the effective date of a quarterly coverage endorsement, information reported to reconcile errors in the information with correct information that has

Page 16 of 18

20-DRP

been determined by any USDA agency;
  (3) Within 30 days of any subsequent correction of data by FSA, erroneous information corrected as a result of verification of information; and
  (4) At any time, any incorrect information if the incorrect information was caused by electronic transmission errors by us or errors made by any agency within USDA in transmitting the information provided by you for purposes of other USDA programs.
(b) Corrections may be made but will not take effect for the current crop year if the correction would allow you to:
  (1) Avoid ineligibility requirements for insurance or obtain a disproportionate benefit under the crop insurance program or any related program administered by the Secretary;
  (2) Obtain, enhance, or increase an insurance guarantee or indemnity if a cause of loss exists or has occurred before any correction has been made, or avoid premium owed if no loss is likely to occur; or
  (3) Avoid an obligation or requirement under any Federal or State law.

23. **Examples**
The following are examples of the calculation of the liability, premium, and indemnity for each of the two options under Dairy Revenue Protection. Your information will likely be different and you should consult the actuarial documents and the policy information. The following facts are for illustration purposes only and apply to each of the examples.

Producer Declarations:

| Declared covered milk production | 1,000,000 pounds |
|---|---|
| State | Wisconsin |
| Declared share | 100% |
| Expected milk production per cow | 6,000 pounds per cow per quarter |
| Coverage level | 95% |
| Protection factor | 1.10 |
| Subsidy rate | 44% |

Example 1: Class pricing option:
Producers Elections/Expected

| Declared class price weighting factor | 50% |
|---|---|
| Expected class III milk price | $18 per hundredweight |
| Expected class IV milk price | $17 per hundredweight |

Actuals

| Actual class III milk price | $15 per hundredweight |
|---|---|
| Actual class IV milk price | $16 per hundredweight |
| Actual milk production per cow | 6,120 pounds per cow per quarter |
| Milk marketings | 900,000 pounds |

**Premium calculation**
Step 1. Determine the liability used to calculate the premium
The liability used to calculate the premium is based on the information provided on your application and quarterly coverage endorsement.
Formula: ((expected class III price x declared class price weighting factor) + (expected class IV price x (1-declared class price weighting factor))) x declared covered milk production ÷ 100 x coverage level x declared share x protection factor
$182,875 = ((($18 x 0.5) + ($17 x (1-0.5))) x 1,000,000 ÷ 100 x 0.95 x 1000 x 1.10

Step 2. Determine the premium
The premium rate is based on the simulated losses under the class pricing option. For this example, the premium rate is $0.024 per dollar of liability.
Gross Premium $4389 = $182,875 x $0.024
Subsidy $1931 = $4389 x .44
Producer premium $2458 = $4389 - $1931

**Indemnity calculation**
Step 1. Determine covered milk production
Determine if total milk marketings are greater than 85% of the declared covered milk production summed over all quarterly coverage endorsements for the applicable quarter. 1,000,000 times 0.85 equals 850,000. 900,000 is greater than 850,000. Covered milk production equals 1,000,000.

Step 2. Calculate the final class pricing milk revenue
Formula: ((expected class III price x declared class price weighting factor) + (expected class IV price x (1-declared class price weighting factor))) x covered milk production ÷ 100
$175,000 = (($18 x 0.5) + ($17 x (1-0.5))) x 1,000,000 ÷ 100

Step 3. Calculate final revenue guarantee for the class pricing option
Formula: final class pricing milk revenue x your coverage level
$166,250 = $175,000 x 0.95

Step 4. Calculate the yield adjustment factor
Formula: Actual milk production per cow ÷ expected milk production per cow
1.02 = 6,120 ÷ 6,000

Step 5. Calculate the class pricing actual milk revenue
Formula: ((actual class III price x declared class price weighting factor) + (actual class IV price x (1-declared class price weighting factor))) x covered milk production x yield adjustment factor ÷ 100
$158,100 = (($15 x 0.5) + ($16 x (1-0.5))) x 1,000,000 x 1.02 ÷ 100

Step 6. Calculate the indemnity on class pricing policy
If the final revenue guarantee is less than the actual milk revenue, then no indemnity is due. If the final revenue guarantee is greater than the actual milk revenue an indemnity is due. In this example– (final

20-DRP

revenue guarantee - actual milk revenue) x actual share x protection factor.
$8,965 = ($166,250 - $158,100) x 1.0000 x 1.10

Example 2: Component pricing option:
Producers Elections/Expected

| Declared butterfat test | 3.85 |
|---|---|
| Expected butterfat price | $2.70 |
| Declared protein test | 3.15 |
| Expected protein price | $1.90 |
| Other solids test | 5.70 |
| Expected other solids price | $0.15 |

Actuals

| Actual butterfat test | 3.85 |
|---|---|
| Actual butterfat price | $2.25 |
| Actual protein test | 3.15 |
| Actual protein price | $1.70 |
| Other solids test | 5.70 |
| Actual other solids price | $0.12 |
| Actual milk production per cow | 6,120 Pounds per cow per quarter) |
| Milk Marketings | 900,000 pounds |

**Premium calculation**
Step 1. Determine the liability used to calculate the premium
The liability used to calculate the premium is based on the information provided on your application and quarterly coverage endorsement.
Formula: ((declared butterfat test x expected butterfat price) + (declared protein test x expected protein price) + (5.70 x expected other solids price)) x declared covered milk production ÷ 100 x your coverage level x declared share x protection factor
$180,106 = ((3.85 x $2.70) + (3.15 x $1.90) + (5.70 x $0.15)) x 1,000,000 ÷ 100 x 0.95 x 1.0000 x 1.10

Step 2. Determine the premium
The premium rate is based on the simulated losses under the component pricing option. For this example, the premium rate is $0.027 per dollar of liability.
Gross Premium $4863 = $180,106 x $0.027
Subsidy $2140 = $4863 x .44
Producer premium $2723 = $4863 - $2140

**Indemnity calculation**
Step 1. Determine covered milk production
Determine if total milk marketings is greater than 85% of the declared covered milk production summed over all quarterly coverage endorsements for the applicable quarter. 1,000,000 times .85 equals 850,000. 900,000 greater than 850,000. Covered milk production equals 1,000,000.

Step 2. Determine if the actual butterfat test and the actual protein test are greater than 90% of the declared component values. Declared butterfat test 3.85, and the lower limit for actual is 3.85 x .90 = 3.47. The actual is greater than 90% of the declared test value so the final butterfat test is 3.85. 90% of the declared protein test 3.15 x .90 = 2.84; the actual test

value is greater than 90% of the declared so the final protein test is 3.15.

Step 3. Calculate the final component pricing milk revenue
Formula: ((final butterfat test x expected butterfat price) + (final protein test x expected protein price) + (5.70 x expected other solids price)) x covered milk production ÷ 100
$172,350 = ((3.85 x $2.70) + (3.15 x $1.90) + (5.70 x $0.15)) x 1,000,000 ÷ 100

Step 4. Calculate final revenue guarantee for the component pricing option
Formula: final component pricing milk revenue x your coverage level.
$163,733 = $172,350 x 0.95

Step 5. Calculate the yield adjustment factor
Formula: Actual milk production per cow ÷ expected milk production per cow
1.02 = 6,120 ÷ 6,000

Step 6. Calculate the actual milk revenue for the component pricing option
Formula: ((final butterfat test x actual butterfat price) + (final protein test x actual protein price) + (5.70 x actual other solids price)) x covered milk production x yield adjustment factor ÷ 100.
$149,955 = ((3.85 x $2.25) + (3.15 x $1.70) + (5.70 x $0.12)) x 1,000,000 x 1.02 ÷ 100

Step 7. Calculate the indemnity on component pricing policy
If the final revenue guarantee is less than the actual milk revenue, then no indemnity is due. If the final revenue guarantee is greater than the actual milk revenue an indemnity is due. In this example– (final revenue guarantee - actual milk revenue) x actual share x protection factor.
$15,156 = ($163,733 - $149,955) x 1.0000 x 1.10

DLF050

# EXHIBIT J



2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (866) 306-3038

FM Jerseys
16777 South I Dr
Tulare, California 93274

April 25, 2020

RE: Dairy Revenue Protection (DRP) Loss Update
DRP Policy Number: 5000271

Dear FM Jerseys:

Producers Ag Insurance Group, Inc is notifying you that your coverage under your 2020 DRP Policy 5000271; Milk - 802 Jan - Mar/Yr2 - Qtr1 - 831 Class Price Option 12-12-2019 has ended. According to our records, your policy may have had a loss.

Enclosed is the Notice of Probable Loss / Milk Production Worksheet. Please complete all necessary sections, sign, and return the completed reports to Producers Ag Insurance Group, Inc within 60 days of receiving this letter.

If you have any questions, please contact your agent.  Thank you for your business and we look forward to serving you in the future.

Sincerely,


CC:    File
       ADAM CARDWELL

**PRO AG**

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 354-2638
Print Date: 04/25/2020

# Dairy Revenue Protection (DRP) Notice of
# Probable Loss and Milk Production Worksheet

| Insured's Name, Mailing and / or Street Address and Other Contact Information | Agency Name and Agent Contact Information | Crop Year | Claim Number | Policy Number |
|---|---|---|---|---|
| FM Jerseys<br>16777 South I Dr<br>Tulare, CA 93274 | LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00)<br>ADAM CARDWELL (10525)<br>4001 LEXINGTON AVE<br>ARDEN HILLS, MN 55126 | 2020 | 30000466 | 06-987-5000271 |
| | | | State | California (06) |
| Phone: (559) 804-4607 Office<br>Email: frankmendonsa@gmail.com<br>ID Type and Number: EIN XX-XXX4388<br>Person Type: Corporation | Phone: (651) 262-3545 Agency  (651) 253-8912 Agent<br>Email: ARCARDWELL@LANDOLAKES.COM | | County | Tulare (107) |
| | | | Date Notice of Probable Loss Issued | 4/25/2020 |
| Spouse's Name:<br>Spouse's ID Type and Number: | Signature Authorization(s)*: NONE | Assignment of Indemnity?<br>Transfer of Right to Indemnity? | ☐ Yes ☐ No<br>☐ Yes ☐ No | |

## Crop Information

| Crop | Plan | Quarterly Insurance Period (Practice) | Pricing Option (Type) | Coverage Level | Declared Milk Production | Yield Adjustment Factor | Expected Milk Production per Cow | Actual Milk Production per Cow |
|---|---|---|---|---|---|---|---|---|
| Milk (0830) | DRP (83) | Jan - Mar/Yr2 - Qtr1 (802) | Class (831) | 95% | 17,000,000 | 1.00 | 6,091 | 6,105 |

## Indemnity Calculation

| Expected Revenue Guarantee | | Actual Milk Revenue | | Total | | Protection Factor | | Declared Share | | Probable Indemnity | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $2,850,165 | - | $2,850,900 | = | $9,265 | x | 1.50 | x | 1.000 | = | $13,898 | |

## Milk Production Worksheet Information

The milk marketing records for the applicable quarter must be submitted with the milk production worksheet which shall show: (1) The name, address, Grade A identifier assigned by a duly constituted regulatory agency, and payroll number or similar identifier of the producer; (2) The daily and total pounds, and the month and dates such milk was received from that producer; and if component pricing option elected, (3) The total pounds of butterfat and protein contained in the producer's milk.

| Declared Butterfat Test | Declared Protein Test | Average Butterfat Test | Average Protein Test |
|---|---|---|---|
| 0.00 | 0.00 | | |

Provide the Effective Date and the Pounds of Covered Milk Production for all Quarterly Coverage Endorsements providing coverage for the quarter with the probable loss.

Provide the total pounds of Milk sold for each month in the quarter and if the Type 832 Component Pricing Option was elected, provide the Total Average Butterfat Test and Average Protein Test.

| Effective Date | Pounds of Covered Milk Production | Month | Pounds of Milk Sold |
|---|---|---|---|
| 12/12/2019 | 17,000,000 | | |
| | | | |
| | | | |
| | | | |
| | | Total | |

BFR =  Beginning Farmer / Rancher    *Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the Insured
839 (Rev. 02-2019)    See Last Page of Dairy Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet of Required Statements

Page 1 of 3

LOL000575
PROAG000640

# Dairy Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 353-3838
Print Date: 04/28/2020

| Insured's Name | Agency and Agent Name | Crop Year | Claim Number | Policy Number |
|---|---|---|---|---|
| FM Jerseys | LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00) ADAM CARDWELL (10525) | 2020 | 30004466 | 06-987-5000271 |

## Collection of Information and Data (Privacy Act) Statement

### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information on the documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### Non-Discrimination Statement

In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

To File a Program Complaint – If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027 -usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C., 20250-9410 or email at program.intake@usda.gov.

Persons with Disabilities – Persons with disabilities who require alternative means of communication (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

## Producers Ag Insurance Group Privacy Notice

The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant interest owners (Customers). We collect nonpublic personal information about Customers from information which we receive from them such as information provided on applications or other forms, which may include name, address and social security numbers and from third parties such as our insurance agent. To serve our Customers and to deliver products and services to them, it is necessary for us to share certain information about our Customers with others. We will share or disclose nonpublic personal information about the Customers to affiliates within the ProAg Group or with non affiliated third parties with whom we have a contractual relationship such as agents, the United States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions without our offering to the Customer the opportunity to "opt-out" or "opt-in" as required by law.

### Certification Statement

I am an agent, employee, or contractor affiliated with Federal crop insurance program?    ☐ Yes    ☐ No

---

BFR = Beginning Farmer / Rancher    *Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the Insured

939 (Rev. 02-2019)    See Last Page of Dairy Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet of Required Statements

Page 2 of 3

LOL000576
PROAG000641

PRO AG

# Dairy Revenue Protection (DRP) Notice of
## Probable Loss and Milk Production Worksheet

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (866) 205-3038
Print Date: 04/25/2020

| Insured's Printed Name | Insured's Signature | Date |
|---|---|---|
| FM Jerseys | | |
| AIP Verifier's Printed Name | AIP Verifier's Signature | Date |

939 (Rev. 02-2019)

This form and all supporting documentation must be returned to the address shown above or via email at ProAgLivestockClaims@proag.com.

Page 3 of 3

LOL000577
PROAG000642



Producers Ag Insurance Group®
2025 South Hughes, Suite 200, Amarillo, TX 79109

# AUTHORIZATION TO OFFSET OUTSTANDING BALANCES

| INSURED NAME: | | CROP YEAR: | POLICY NUMBER: | CLAIM NUMBER: |
|---|---|---|---|---|
| | | | | |

In addition to offsets authorized under the provisions of my policy, I ☐ DO ☐ DO NOT agree to have unbilled premium and/or administrative fee amounts, which are due the Company for any policy authorized under the Federal Crop Insurance Act ("Act"), offset from any indemnity or prevented planting payment due to me for any crop insured with the Company.
**\*Exception: Billed premium will be collected for coverage(s) being indemnified.**

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIP's contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to third parties to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### NON-DISCRIMINATION STATEMENT

**Non-Discrimination Statement:**
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income is derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

**To File a Program Complaint:**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

**Persons with Disabilities:**
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

### PRODUCERS AG INSURANCE GROUP PRIVACY NOTICE

The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant beneficial interest owners (Customers). We collect nonpublic personal information about Customers from information we receive from them such as information provided on applications or other forms, which may include name, address and social security numbers and from third parties such as a consumer reporting agency. To serve our customers and to service our business our employees have access to Customers personal information in the course of doing their jobs and we may share or disclose non-public personal information about the Customers to affiliates within the ProAg Group or with non affiliated third parties with whom we have a contractual relationship such as agencies within the united States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions with out our offering to the Customer the opportunity to "opt-out" or to "opt-in" as required by law.

| | | |
|---|---|---|
| Insured's Printed Name | Insured's Signature | Date |

Version 6.1
Updated: November 16, 2018

The insurance products offered by Producers Ag Insurance Group® d/b/a ProAg® may not be a complete list of all products offered and may not be offered in all states. ProAg prohibits discrimination on the basis of race, color, national origin, sex, religion, disability, political beliefs, or marital or familial status.

© 2019, ProAg, All rights reserved.
PROAG-11153

LOL000578
PROAG000643

# EXHIBIT K

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Clanton, Curt <cclanton@proag.com> |
| **Sent:** | Thursday, June 18, 2020 2:29 PM |
| **To:** | Mendonsa Farms |
| **Cc:** | Cardwell, Adam |
| **Subject:** | [EXTERNAL] FW: 2020 Policy # 5000271 FM Jerseys Claim # 30000466 |

Good afternoon,

I am following up to my previous email request on June 10th, for additional supporting documentation regarding the sold milk for FM Jerseys for January, February and March of 2020. The original supplied documentation provided the daily produced pounds for each month. However, the buyer's name, Grade A identifier and payroll number was not listed on the documentation. Please contact the buyer and request statements for January, February and March of 2020 with this information listed.

The DRP Policy allows up to **60 days** from original notice for the return of requested information. If we do not receive the necessary documentation to process the claim, then the claim will be closed without payment. We must receive the additional requested documents by **Thursday June 25, 2020.**

The information can be emailed directly to me for processing.

Please let me know if you have any questions.

Thank you,

**CURT CLANTON**
Lead Claims Processing Auditor, ProAg
16011 College Blvd., Suite 210
Lenexa, KS 66219
Phone: (800) 366-2767 ext. 4472
Fax: (866) 306-3038
Cell: (913) 205-8833
www.ProAg.com

ProAg® is an equal opportunity provider.

**From:** Clanton, Curt
**Sent:** Wednesday, June 10, 2020 8:42 AM
**To:** Mendonsa Farms <mendonsafarms@gmail.com>
**Subject:** RE: 2020 Policy # 5000271 FM Jerseys Claim # 30000466

Good morning Brittany,

Thank you for the recently submitted daily milk totals report for January, February and March of 2020. Do you have corresponding statements from the milk purchaser for each month that you can send me? The Dairy Revenue Protection policy states that the buyer's name, address, Grade A identifier and payroll number of the producer be listed on the reports provided to the approved insurance provider(AIP).

The information can be scanned and emailed directly to me for processing.

Please let me know if you have any questions.

1

LOL000857
PROAG000922

Thank you,

**CURT CLANTON**
Lead Claims Processing Auditor, ProAg
16011 College Blvd., Suite 210
Lenexa, KS 66219
Phone: (800) 366-2767 ext. 4472
Fax: (866) 306-3038
Cell: (913) 205-8833
www.ProAg.com

ProAg® is an equal opportunity provider.

**From:** Mendonsa Farms <mendonsafarms@gmail.com>
**Sent:** Friday, June 5, 2020 2:12 PM
**To:** Clanton, Curt <cclanton@proag.com>
**Subject:** Fwd: 2020 Policy # 5000271 FM Jerseys Claim # 30000466

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Please see attached documents for FM jersey, let me know if you have any questions or need any additional information.

Brittany Sartuche/ Frank Mendonsa

---------- Forwarded message ----------
**From: Frank Mendonsa** <frankmendonsa@gmail.com>
Date: Fri, Jun 5, 2020 at 6:10 AM
Subject: Fwd: 2020 Policy # 5000271 FM Jerseys Claim # 30000466
To: Mendonsa Farms <mendonsafarms@gmail.com>

---------- Forwarded message ----------
**From: Clanton, Curt** <cclanton@proag.com>
Date: Fri, Jun 5, 2020 at 6:07 AM
Subject: 2020 Policy # 5000271 FM Jerseys Claim # 30000466
To: frankmendonsa@gmail.com <frankmendonsa@gmail.com>
CC: ARCARDWELL@LANDOLAKES.COM <ARCARDWELL@landolakes.com>

Good morning Frank,

I am following up regarding the recently received Dairy Revenue Protection(DRP) Notice of Probable Loss and Milk Production Worksheet. In addition to the signed worksheet, we will need copies of the milk marketings for January, February and March as stated on the original worksheet. The daily and total pounds for each month as well as copies of sales receipts can be scanned and emailed back directly to me for processing. They can also be faxed or mailed to my attention at the mailing address below my email signature. Please note that the supporting documentation must be receive in our office by 6/25/2020.

2

LOL000858
PROAG000923

**Milk Production Worksheet Information**

The milk marketing records for the applicable quarter must be submitted with the milk producti... duly constituted regulatory agency, and payroll number or similar identifier of the producer; (2) producer; and if component pricing option elected, (3) The total pounds of butterfat and protein

Please let me know if you have any questions.

Thank you,

**CURT CLANTON**

Lead Claims Processing Auditor, ProAg

16011 College Blvd., Suite 210

Lenexa, KS 66219

Phone: (800) 366-2767 ext. 4472

Fax: (866) 306-3038

Cell: (913) 205-8833

www.ProAg.com

ProAg® is an equal opportunity provider.

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. ProAg's products are underwritten by Producers Agriculture Insurance Company and Producers Lloyds Insurance Company. For more information about ProAg, please visit http://www.proag.com. This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.
--
Thanks Frank Mendonsa (559)804-4670 Cashcowdairy@clearwire.net
A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. ProAg's products are underwritten by Producers Agriculture Insurance Company and Producers Lloyds Insurance Company. For more information about ProAg, please visit http://www.proag.com. This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you

3

are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

**Warning:** This email originated from outside of Land O'Lakes. **DO NOT** click on links or open attachments unless you recognize the sender and know the content is safe.

4

**LOL000860**
PROAG000925

# EXHIBIT L

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Cardwell, Adam |
| **Sent:** | Friday, June 19, 2020 4:07 PM |
| **To:** | Mendonsa Farms |
| **Subject:** | RE: [EXTERNAL] FM Jersey |

Thank you Brittany.  ProAg is processing the claim.

AC

**From:** Mendonsa Farms <mendonsafarms@gmail.com>
**Sent:** Friday, June 19, 2020 1:20 PM
**To:** Cardwell, Adam <ARCardwell@landolakes.com>
**Subject:** [EXTERNAL] FM Jersey

Good morning Adam please see attached information requested. If you need anything else please let me know. 559-802-8304

Brittany Sartuche/ FM Jersey

Warning: This email originated from outside of Land O'Lakes. DO NOT click on links or open attachments unless you recognize the sender and know the content is safe.

1

LOL000214
PROAG000279

# EXHIBIT M



16011 College Boulevard
Suite 210
Lenexa, KS 66219
T: (800) 366-2767
F: (913) 307-9988

FM Jerseys Dairy
16777 South I Dr
Tulare, CA  93274

July 22, 2020

RE: Dairy Revenue Protection (DRP) Loss Update
DRP Policy Number: 5000271

Dear FM Jerseys Dairy:

Producers Ag Insurance Group, Inc is notifying you that your coverage under your 2020 DRP Policy 5000271; Milk - Apr - Jun/Yr2 - Qtr2 Class Price Option 12/12/2019 has ended. According to our records, your policy may have had a loss.

Enclosed is the Notice of Probable Loss / Milk Production Worksheet. Please complete all necessary sections, sign, and return the completed reports to Producers Ag Insurance Group, Inc within 60 days of receiving this letter. Additional required documentation includes the milk marketing records for each month of the applicable quarter. These records shall show; (1) The name, address, Grade A identifier assigned by a duly constituted regulatory agency, and payroll number or similar identifier of the producer; (2) The daily and total pounds, and the month and dates such milk was received from that producer; and if component pricing was elected, (3) The total pounds of butterfat and protein contained in the producer's milk.

The signed claim paperwork and supporting documentation can be scanned and emailed to proaglivestockclaims@proag.com .  It can also be faxed or mailed to our office.

If you have any questions, please contact your agent. Thank you for your business and we look forward to serving you in the future.

Sincerely,
ProAg Claims Processing Dept.

CC: File
LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00) - ADAM CARDWELL

800.366.2767 | PROAG.COM | @PROAGINS          **GROW WITH CONFIDENCE**



ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

LOL000289
PROAG000354

PRO AG

**Dairy Revenue Protection (DRP) Notice of
Probable Loss and Milk Production Worksheet**

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (806) 385-2767
Fax: (806) 385-3038
Print Date: 07/22/2020

| Insured's Name, Mailing and / or Street Address and Other Contact Information | | | Agency Name and Agent Contact Information | | | Crop Year | Claim Number | Policy Number |
|---|---|---|---|---|---|---|---|---|
| FM Jerseys 16777 South I Dr Tulare, CA 93274 | | | LAND O LAKES INSURANCE SOLUTIONS LLC (273545-00) ADAM CARDWELL (10525) 4001 LEXINGTON AVE ARDEN HILLS, MN 55126 | | | 2020 | 30000762 | 06-987-5000271 |
| | | | | | | | State | |
| | | | | | | | California (06) | |
| Phone: (559) 804-4607 Office Email: fmelmendonsa@gmail.com | | | Phone: (651) 262-3545 Agency (651) 253-8912 Agent Email: ARCARDWELL@LANDOLAKES.COM | | | | County | |
| | | | | | | | Tulare (107) | |
| ID Type and Number: EIN XX-XXX4386 Person Type: Corporation | | | | | | | Date Notice of Probable Loss Issued | |
| | | | | | | | 7/22/2020 | |
| Spouse's Name: Spouse's ID Type and Number: | | | Signature Authorization(s)*: NONE | | | Assignment of Indemnity? ☐ Yes ☐ No | | Actual Milk Production per Cow |
| | | | | | | Transfer of Right to Indemnity? ☐ Yes ☐ No | | |

**Crop Information**

| Crop | Plan | Quarterly Insurance Period (Practice) | Pricing Option (Type) | Coverage Level | | Declared Milk Production | Yield Adjustment Factor | Declared Share | Expected Milk Production per Cow | | Actual Milk Production per Cow |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Milk (0830) | DRP (83) | Apr - JunYr2 - Qtr2 (803) | Class (831) | 95% | x | 10,000,000 | 1.01 | 1.000 | 5,999 | | 6,029 |

**Indemnity Calculation**

| Expected Revenue Guarantee | | Actual Milk Revenue | | Total | | Protection Factor | x | | | Probable Indemnity | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $1,656,325 | - | $1,367,540 | = | $288,785 | x | 1.50 | x | | = | $433,178 | |

**Milk Production Worksheet Information**

The milk marketing records for the applicable quarter must be submitted with the milk production worksheet which shall show: (1) The name, address, Grade A identifier assigned by a duly constituted regulatory agency, and payroll number or similar identifier of the producer; (2) The daily and total pounds, and the month and dates such milk was received from that producer; and if component pricing option elected, (3) The total pounds of butterfat and protein contained in the producer's milk.

| Declared Butterfat Test | | Declared Protein Test | | Average Butterfat Test | | Average Protein Test | |
|---|---|---|---|---|---|---|---|
| 0.00 | | 0.00 | | | | | |

| Provide the Effective Date and the Pounds of Covered Milk Production for all Quarterly Coverage Endorsements providing coverage for the quarter with the probable loss. | | Provide the total pounds of Milk sold for each month in the quarter and if the Type 832 Component Pricing Option was elected, provide the Total Average Butterfat Test and Average Protein Test. | |
|---|---|---|---|
| Effective Date | Pounds of Covered Milk Production | Month | Pounds of Milk Sold |
| | | April | 7,280,355 |
| 12/12/2019 | 10,000,000 | May | 7,496,033 |
| | | June | 7,022,994 |
| | | **Total** | 21,799,382 |

BFR = Beginning Farmer / Rancher    *Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the Insured
939 (Rev. 02-2019)    See Last Page of Diary Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet of Required Statements

Page 1 of 3

LOL000290
PROAG000355

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (806) 398-2767
Fax: (806) 398-3038
Print Date: 07/22/2020

# Dairy Revenue Protection (DRP) Notice of
## Probable Loss and Milk Production Worksheet

| Insured's Name | Agency and Agent Name | Crop Year | Claim Number | Policy Number |
|---|---|---|---|---|
| FM Jerseys | LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00)
ADAM CARDWELL (10525) | 2020 | 30000762 | 06-987-5000271 |

## Collection of Information and Data (Privacy Act) Statement
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on the procedures established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### Non-Discrimination Statement
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

To File a Program Complaint - If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027.pdf, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

Persons with Disabilities - Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Agency by mail directly or by email.

### Producers Ag Insurance Group Privacy Notice
The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant beneficial interest owners (Customers). We collect nonpublic personal information about Customers from information we receive from them such as information provided in applications or other forms, which may include name, address and social security numbers and from third parties such as consumer reporting agency. To serve our Customers and to service our business our employees have access to Customers personal information in the course of doing their jobs and we may share or disclose non-public personal information about the Customers to affiliates within the ProAg Group or with non-affiliated third parties with whom we have a contractual relationship such as agencies within the United States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions without our offering the Customer the opportunity to 'opt-out' or 'opt-in' as required by law.

### Certification Statement

I am an agent, employee, or contractor affiliated with Federal crop insurance program?      ☐ Yes   ☒ No

---

BFR = Beginning Farmer / Rancher     *Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the insured

939 (Rev. 02-2019)     See Last Page of Dairy Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet of Required Statements

Page 2 of 3

LOL000291
PROAG000356

PRO AG

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (806) 356-3038
Print Date: 07/22/2020

## Dairy Revenue Protection (DRP) Notice of
## Probable Loss and Milk Production Worksheet

| Insured's Printed Name | Insured's Signature | Date |
|---|---|---|
| FM Jerseys | | |
| AIP Verifier's Printed Name | AIP Verifier's Signature | Date |

This form and all supporting documentation must be returned to the address shown above or via email at ProAgLivestockClaims@proag.com.

939 (Rev. 02-2019)

Page 3 of 3

LOL000292
PROAG000357

# EXHIBIT N

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Cardwell, Adam |
| **Sent:** | Tuesday, July 28, 2020 1:16 PM |
| **To:** | Stehr, Grady |
| **Subject:** | RE: [EXTERNAL] FW: FM Jerseys |

Does this mean they cannot get paid their indemnity if this is not complete?  If that is the case, this may finally motivate them to complete.

AC

**From:** Stehr, Grady <gstehr@proag.com>
**Sent:** Tuesday, July 28, 2020 1:07 PM
**To:** Cardwell, Adam <ARCardwell@landolakes.com>
**Subject:** [EXTERNAL] FW: FM Jerseys

So I dropped the ball on this one pretty bad..still no app has been attached, compliance needs one ASAP..looks like the claim is going to be big. So we'll need the TIN matching paperwork completed too.

**GRADY STEHR**
Underwriter, ProAg
7950 Main Street North, Suite 230
Maple Grove, MN  55369
Office: (800) 366-2767 ext. 4167
www.ProAg.com

*ProAg® is an equal opportunity provider.*

**From:** Stehr, Grady
**Sent:** Tuesday, December 10, 2019 2:31 PM
**To:** Ramsden, Corey <CARamsden@landolakes.com>; arcardwell@landolakes.com
**Cc:** Burg, Sharelle <SBURG@PROAG.COM>
**Subject:** FM Jerseys

Good afternoon Corey and Adam,

It appears that the EIN and name do not match IRS records on policy 5000271. There is not an app attached for me to verify if everything is keyed correctly, could you do so please? It could be a missed period or transposed number, let me know what you think, thanks!

**GRADY STEHR**
Underwriter, ProAg
7950 Main Street North, Suite 230
Maple Grove, MN  55369
Office: (800) 366-2767 ext. 4167
www.ProAg.com

*ProAg® is an equal opportunity provider.*

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. ProAg's products are underwritten by

1

LOL000384
PROAG000449

Producers Agriculture Insurance Company and Producers Lloyds Insurance Company. For more information about ProAg, please visit http://www.proag.com. This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

Warning: This email originated from outside of Land O'Lakes. DO NOT click on links or open attachments unless you recognize the sender and know the content is safe.

2

LOL000385
PROAG000450

# EXHIBIT O

DocuSign Envelope ID: 381872AC-B1F4-41CB-B824-905EC83CC775

**PRO AG**

**AGENT CHECKLIST FOR TIN MATCHING**

Producers Ag Insurance Group®, 2025 South Hughes, Suite 200, Amarillo, TX 79109

Date 7/28/20    Page ____ of ____

[X] INSURED    [ ] SBI

| INSURED'S OR SBI'S NAME: | AGENCY: | AGENCY CODE: |
|---|---|---|
| FM Jerseys | Land O'Lakes Insurance Solutions | 273545 |

| STREET AND/OR MAILING ADDRESS: | ADDRESS: |
|---|---|
| 16777 South I Drive | 4001 Lexington Avenue North |

| CITY: | STATE: | ZIP CODE: | CITY: | STATE: | ZIP CODE: |
|---|---|---|---|---|---|
| Tulare | CA | 93274 | Arden Hills | MN | 55126 |

| INSURED'S OR SBI'S TELEPHONE NUMBER: | CELL: | TELEPHONE: |
|---|---|---|
| | 559-804-4607 | 651-253-8912 |

| IDENTIFICATION NUMBER: | IDENTIFICATION NUMBER TYPE: | PERSON TYPE: | INSURED'S OR SBI'S AUTHORIZED REPRESTATIVE: |
|---|---|---|---|
| | | | |

| POLICY NUMBER(S): | DATE OF IRS RETURNED ERROR FILE: | IRS ERROR CODE: |
|---|---|---|
| 06-987-5000271 | 7/23/20 | 3-Name/TIN combo doesn't match IRS record |

| | | In regards to the Primary Grower, is the name on the policy shown exactly as it is on the Insured's tax forms for which income from harvested production or Notice of Loss payments (PP, Revenue Losses, etc.) is received? If not, please provide the name exactly as shown on those tax forms: |
|---|---|---|
| [ ] | YES | |
| [X] | NO | Frank D. Mendonsa |
| [ ] | N/A | |

| | | In regards to the Primary Grower, is the Identification Number and Identification Number Type on the policy exactly the same as it is on the Insured's tax forms for which income from harvested production or Notice of Loss payments (PP, Revenue Losses, etc.) is received? If not, please provide the Identification Number and Identification Number Type as reported on those tax forms: |
|---|---|---|
| [ ] | YES | |
| [X] | NO | Social Security Number 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 |
| [ ] | N/A | |

| | | In regards to the SBI of the Primary Grower, is the name on the policy shown exactly as it is on the Insured's tax forms for which income from harvested production or Notice of Loss payments (PP, Revenue Losses, etc.) is received? If not, please provide the name exactly as shown on those tax forms: |
|---|---|---|
| [ ] | YES | |
| [ ] | NO | |
| [ ] | N/A | |

| | | In regards to the SBI of the Primary Grower, is the Identification Number and Identification Number Type on the policy exactly the same as it is on the Insured's tax forms for which income from harvested production or Notice of Loss payments (PP, Revenue Losses, etc.) is received? If not, please provide the Identification Number and Identification Number Type as reported on those tax forms: |
|---|---|---|
| [ ] | YES | |
| [ ] | NO | |
| [ ] | N/A | |

The IRS verification system shows that information on my policy is reported differently than it is reported on my tax records.

I certify that I have reviewed this information and the corrections above are accurate to the best of my knowledge and by signing this document, I am confirming my Crop Insurance policy should reflect the information as shown above.

| Frank Mendonsa | *Frank Mendonsa* | 7/28/2020 | 2:04 PM PDT |
|---|---|---|---|
| Insured's or SBI's Printed Name | Insured's or SBI's Signature | Date | |

I have provided the insured with the policy and the IRS discrepancy and have verified the above information with the insured's tax forms.

| Adam Cardwell | *Adam Cardwell* | | 7/29/2020 | 4:55 PM PDT |
|---|---|---|---|---|
| Agent's Printed Name | Agent's Signature | Agent Code | Date | |

**Please scan this document into the processing system and email the UW Supervisor in your ProAg Regional Office that the process has been completed.**

See the last page for the Required Statements.

Version 6.0
Updated: August 12, 2019

The insurance products offered by Producers Ag Insurance Group® d/b/a ProAg® may not be a complete list of all products offered and may not be offered in all states. ProAg prohibits discrimination on the basis of race, color, national origin, sex, religion, disability, political beliefs, and marital or familial status.

© 2020, ProAg, All rights reserved.
PROAG-11517

LOL000430
PROAG000495

# EXHIBIT P

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Cardwell, Adam |
| **Sent:** | Thursday, July 30, 2020 5:26 PM |
| **To:** | Stehr, Grady |
| **Subject:** | FM Jersey Policy Situation |
| **Attachments:** | RE: [EXTERNAL] RE: Application Question Multiple Dairies W/Same EIN |

**Importance:** High

Grady,

Per our email chain attached and the subsequent conversation we had yesterday, I want to follow up on getting a resolution in a timely fashion. We have a lot at stake with this as I mentioned.

I appreciate the insured's accountability here and do not want to undermine the importance of signatures on documents and timing thereof, but as we both agreed, we do not see evidence of fraud, waste, or abuse and the policy was created with good faith and intent by all parties.

A lot has happened since the insured purchased the initial endorsements on December 12th, 2019. Approved purchase endorsements were made through 2020 with signatures by the insured on all of those detail lines, indemnity notifications have been distributed for both Q1 & Q2, and the policy rolled into 2021 leading to a Q1 2021 purchase and additional Q4 2020 volume. It took until July, 29th to discover.

I believe this is an errors and omissions situation due to this buyer of insurance being unsophisticated. I understand compliance would have caught this as you mentioned and hope my integrity in requesting the phone discussion about it and illustrating what happened bears some weight. I know you and I both want to do the right thing here and we left it at seeing what you can research as this will become out of yours and my collective hands.

Should the RMA need to be involved and/or any other entity outside of ProAg and Land O'Lakes Insurance Solutions, we would appreciate your support as our AIP in reaching a resolution quickly that hopefully keeps the policy intact. I would be happy to have a meeting about this with you, Diane, & Mark so we can discuss further if necessary.

**Adam Cardwell | Expert Risk Specialist, Member Relations**
Land O'Lakes, Inc., 4001 Lexington Avenue N, Arden Hills, MN  55126
arcardwell@landolakes.com
C: 651-253-8912

**FEEDING HUMAN PROGRESS**
landolakesinc.com | LinkedIn | Facebook | Twitter | Instagram

1

LOL000444
PROAG000509

# EXHIBIT Q

# INFORMATIONAL MEMORANDUM: COM–19–001

**DATE**   April 12, 2019

**TO:**    All Approved Insurance Providers
           All Risk Management Agency Field Offices
           All Other Interested Parties

**FROM:**  Heather Manzano, Deputy Administrator for Compliance    */s/ Heather Manzano*
           *4/12/2019*

**SUBJECT:**  Livestock Price Reinsurance Agreement (LPRA) Appendix IV Reviews

## Background

Approved Insurance Providers (AIPs) are required to conduct reviews of eligible livestock price insurance contracts as described in Appendix IV of the LPRA. These reviews are intended to address suspected anomalies and program integrity concerns, or to assure that a company's internal control processes are operational and effective. The required reviews include Data Mining Reviews, Individual Policy Reviews, Conflict of Interest Reviews, and $200,000 Indemnity Reviews.

The LPRA Appendix IV, Section III(b)(3)(C) requires AIPs to conduct $200,000 Indemnity Reviews on eligible livestock price insurance contracts. The Risk Management Agency (RMA) has received questions regarding the basis for determining whether Dairy Revenue Protection (DRP), Livestock Gross Margin (LGM), and Livestock Risk Protection (LRP) losses have exceeded $200,000. The terms "Inspection", "Eligible livestock price insurance contract" and "Verification" are defined in the LPRA.

## Action

For DRP, $200,000 Indemnity Reviews are required based on the aggregation of all Quarterly Coverage Endorsements (QCE) for a given quarter for the reinsurance year. $200,000 Indemnity Reviews are only required once per producer, per reinsurance year.

For example: A California Grade A dairy producer produces 120 million pounds of milk annually (30 million per quarter). Five QCEs are purchased throughout the year for the October – December quarter for a total of 25 million pounds of milk insured for the quarter with the following indemnities:

- QCE 1 – 5 million pounds - $85,000
- QCE 2 – 5 million pounds - $90,000
- QCE 3 – 5 million pounds – No loss
- QCE 4 – 5 million pounds - $45,000
- QCE 5 – 5 million pounds – No loss

The producer is paid $220,000 in losses for the October – December quarter. The $200,000 Indemnity Review is based on the aggregation of all QCEs for the quarter, therefore, the producer is subject to review.

For LGM, $200,000 Indemnity Reviews are required based upon the aggregate indemnities for an insurance period. LGM Dairy Cattle has 12 insurance periods in which the producer can purchase coverage. $200,000 Indemnity Reviews are only required once per producer, per reinsurance year.

For example: A California dairy producer produces 200,000 hundredweight of milk annually. Coverage is purchased in two insurance periods for a total of 200,000 hundredweight of milk insured with the following indemnities:

- Purchased in December (12/28/2018) with target marketings in:
    - March: 30,000 hundredweight - $10,000
    - April: 30,000 hundredweight -No loss
    - May: 30,000 hundredweight -$10,000
    - June: 30,000 hundredweight -$190,000
- Purchased in March (03/29/2019) with target marketings in:
    - May: 60,000 hundredweight - $ 75,000
    - June: 20,000 hundredweight – No loss

    At the end of the two insurance periods, the producer had indemnities paid for both insurance periods.
    - December Insurance Period - $210,000 Indemnity
    - March Insurance Period - $75,000 Indemnity

- The December insurance period would require a $200,000 Indemnity Review.
- The March insurance period would not require a $200,000 Indemnity Review.
- If the producer had March insurance period indemnities exceeding $200,000 a review would not be required as the producer already had one review conducted during the reinsurance year which was for the December insurance period.

For LRP, $200,000 Indemnity Reviews are required on an endorsement basis. LRP Feeder Cattle insurance allows the producer to protect against price declines in the market value of the feeder cattle. $200,000 Indemnity Reviews are only required once per producer, per reinsurance year.

For example: A Kansas Feeder Cattle producer insures 2,000 head of steers annually.

- Purchases two endorsements that cover 1,000 head each as follows:
    - Endorsement 1 is for 13 weeks – 1,000 head 5.50 cwt @ $175/cwt
    - Endorsement 2 is for 21 weeks – 1,000 head 5.50 cwt @ $170/cwt
- Feeder cattle prices decrease for Endorsement 1 but recover slightly for Endorsement 2
    - Endorsement 1 Indemnity – 1,000 head 5.50 cwt @ $121/cwt

**DLF126**

- - $297,000 Indemnity
  - Endorsement 2 Indemnity – 1,000 head 5.50 cwt @ $158/cwt
    - $66,000 Indemnity
- Endorsement 1 would require a $200,000 Indemnity Review
- Endorsement 2 would not require a $200,000 Indemnity Review
- If the producer had indemnities exceeding $200,000 for Endorsement 2, a review would not be required as the producer already had one review conducted during the reinsurance year which was for Endorsement 1.

The attached LPRA review matrix indicates the applicable reviews and inspection elements. Note that for Inspection Element (4) the reference to "practice" should be substituted with "type" for LGM-Cattle, LGM-Swine, LRP-Fed Cattle, and LRP-Feeder Cattle. AIPs are to use the attached review matrix when determining livestock plan review requirements.

LPRA Conflict of Interest (COI) Reviews for livestock policies will be data mined like policies under the Standard Reinsurance Agreement. RMA will select and provide a list of policies to AIPs for review via HyDRA. RMA will notify AIPs when LPRA policies are included in the COI report.

LPRA Appendix IV Review Requirements

DISPOSAL DATE:

Until modified or rescinded

**DLF127**

# EXHIBIT R

# APPENDIX IV
## QUALITY ASSURANCE AND PROGRAM INTEGRITY

## SECTION I.  GENERAL QUALITY CONTROL PLAN REPORTING REQUIREMENTS

(a)    The Company shall provide the following quality control information with its Plan of Operations, in accordance with section IV(i) of Appendix II.

   (1)    A detailed description of the Company's Quality Control Plan that demonstrates that it meets or exceeds the following internal control elements:

      (A)    Control Environment.  The control environment sets the tone of an organization, influencing the control consciousness of its people. Factors include the integrity; ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the Company's management.

      (B)    Risk Assessment.  A precondition to risk assessment is establishment of objectives that shall be identified in the Quality Control plan.  Risk assessment is the identification and analysis of relevant risks to achieve the stated objectives of the Company's Quality Control plan, and form the basis for determining how the Company will manage risk to the crop insurance program.

      (C)    Control Activities.  The Company shall identify the way the policies and procedures that help ensure management directives are carried out. These controls help ensure that necessary actions are taken to address risks and limit non-compliance.  They include a range of activities as diverse as approvals, authorizations, verification, reconciliation, reviews of operating performance, security of assets and segregation of duties. The Company plan will also include under Control Activities all the required reviews and obligations required by Appendix IV.

      (D)    Information and Communication. The Company's plan shall include how pertinent information is identified, captured and communicated in a form and timeframe that enables the Company and its affiliates to carry out their responsibilities.  Include an explanation of standard reports containing operational, financial and compliance related information that make it possible to run and control the business.

      (E)    Monitoring.  The Company shall articulate the process used to monitor their Quality Control Plan.  The process will assess the quality of the Company's performance during each reinsurance year.  This is accomplished through ongoing monitoring activities, separate

1

**DLF018**

evaluations, or a combination of the two.  The process will also identify how quality control deficiencies are reported up through the chain of command and how the most serious matters are reported to the Company's top management.

(2)    Quality control review information:

    (A)    The name and title of the official in charge of quality control;

    (B)    The types of reviews that will be conducted and the time period when such eligible crop insurance contracts will be selected for each review; and

    (C)    A complete description of the process to be followed by the reviewers for conducting each of the reviews.

(b)    Approval of the quality control information required in subsection (a) provided by the Company in its Plan of Operations is not a determination of the sufficiency of the Company's quality controls.  The sufficiency of the Company's quality controls will be determined through compliance reviews that evaluate the effectiveness of the Quality Control Plan to ensure compliance with this Agreement.

## SECTION II.  TRAINING OF AGENTS, LOSS ADJUSTERS, AND OTHER PERSONNEL

(a)    General Company Responsibilities

(1)    The Company is responsible for establishing a "Training and Performance Evaluation Plan" (TPEP) and submitting the TPEP in the Company's Plan of Operations, in accordance with Appendix II.  Nothing in these requirements precludes the Company from providing training that exceeds these requirements.

(2)    The TPEP shall:

    (A)    State the measurement standards acceptable for:

        (i)    Test proficiency; and

        (ii)    Satisfactory work performance.

    (B)    Describe the internal control measures used to assign work and track, monitor and evaluate work performance against the measurement standards under subparagraph (a)(2)(A);

2

(C)    Describe the additional training and monitoring applicable to any individual who fails to meet the measurement standards specified in subparagraph (a)(2)(A);

(D)    Describe the training curriculum developed from subsections (b) and (c) for;

      (i)    New agents and new loss adjusters;

      (ii)    Experienced agents and experienced loss adjusters;

      (iii)    Agents and loss adjusters with deficient work performance to meet the standards established in subsection (a)(2)(A); and

      (iv)    Employees performing functions relating to sales and service, loss adjustment, and underwriting.

(E)    Describe the individual training for employees, agents, loss adjusters, or other affiliates with respect to specific livestock plans of insurance serviced by such individuals;

(F)    List the names of the individuals responsible for the training under the TPEP;

(G)    Provide a timeline for training all individuals identified in subsection (a)(2)(D) prior to the time the work is performed;

(H)    Describe the Company's plan for taking corrective, follow-up, or remedial actions when additional training does not correct the identified deficiencies.

(I)    Describe the procedure for the Company to maintain, retain, and provide to FCIC upon request:

      (i)    The tracking and evaluations of the historical performance of individuals identified in subsection (a)(2)(D); and

      (ii)    Records of all corrective, follow-up, or remedial actions taken with respect to any individual identified in subparagraph subsection (a)(2)(D).

(J)    Contain a provision to conduct such other training that may be required by FCIC.

DLF020

(3) An annual Training and Performance Evaluation Report (TPER) shall be submitted with the Company's Plan of Operations, in accordance with Appendix II. The annual TPER shall provide:

    (A) An evaluation of each agent and loss adjuster. Such performance evaluation shall include a review of the loss ratios associated with such agent and loss adjuster and the number and type of any errors or omissions related to the compliance with obligations under the Agreement; and

    (B) A report of any remedial actions taken by the Company to correct any error or omission or ensure compliance with the Agreement.

(b) Sales Training Curriculum and Requirements

  (1) The sales training curriculum developed by the Company shall include those eligible livestock price insurance contracts the Company will be selling or servicing in the States identified in the Company's Plan of Operations, in accordance with Appendix II, and include at a minimum (for new agents and employees performing functions relating to sales or service, comprehensive information on all of the following, and for experienced agents and employees performing functions relating to sales or service, comprehensive information on updates or changes in the following), sufficient information to make such persons proficient in:

    (A) The meaning of the terms and conditions of the Basic Policies and applicable livestock plans of insurance and any endorsement thereto, Specific Coverage Endorsements, and any changes thereto;

    (B) All applicable endorsements, Special Provisions and options and any changes thereto;

    (C) The benefits and differences between the applicable plans of insurance specified in subparagraph (A) and their suitability to livestock conditions and operations in the relevant area;

    (D) The actuarial documents and their use;

    (E) The FCIC procedures applicable to the sales and service of eligible livestock price insurance contracts and any changes thereto;

    (F) How to properly fill out and submit all applicable forms, documents, notices and reports;

    (G) The requirements under applicable Federal civil rights statutes and methods to encourage program participation, including, but not limited

DLF021

    to, participation of limited resource, women, minority, and underserved producers or in underserved areas;

(H)    How to recognize anomalies in reported information and common indicators of misrepresentation, fraud, waste or abuse, the process to report such to the Company, and appropriate actions to be taken when anomalies or evidence of misrepresentation, fraud, waste or abuse exist;

(I)    Compliance with applicable laws and regulations governing business conduct and ethics, including, but not limited to, rebating prohibitions, conflicts of interest, and controlled business, etc.; and

(J)    Any other requirements as may be established by FCIC.

(2)    The Company shall ensure the following:

(A)    Any new agent or other person who solicits or otherwise promotes livestock price insurance sales on behalf of the Company shall participate in a structured training program on all of the items listed in paragraph (1) before selling or servicing any eligible livestock price insurance contract.

(B)    Any experienced agent shall annually complete structured training, on updates or changes specifically related to the items listed in paragraph (1), or that are identified by FCIC or the Company where errors or omissions were identified during quality control reviews or processing of the sales related documents.

(C)    All new agents shall pass a basic competency test before they can sell or service an eligible livestock price insurance contract (all test results shall be maintained in accordance with section IV(g) of the Agreement). Basic competency tests shall specifically relate to the items listed in paragraph (1) and determine the proficiency of the person who completed the required training. Additionally, the Company shall review the test results and document follow-up training for any deficiencies identified.

(D)    All agents shall retake and pass the basic competency test (in accordance with the standard established in subsection (a)(2)(A)(i)) every three years.

(E)    If the agent was not employed by or did not contract with the Company in the previous year(s), the Company shall obtain, and make available upon request, documentation that the agent has passed the basic competency test within the past 3 years with another AIP.

DLF022

       (F)      Proficiency is established by passing a written test meeting the standards of the TPEP, and maintaining satisfactory work performance during the respective reinsurance year measured against the measurement standards established under subsection (a)(2)(A).

       (G)      In addition, the agent is considered to maintain satisfactory work performance if the results of reviews to respond to producer complaints, State Departments of Insurance or FCIC inquiries, or other quality control reviews identify no material errors.

(c)     Loss Adjustment Training Curriculum and Requirements

   (1)    The loss adjustment training curriculum developed by the Company shall include those eligible livestock price insurance contracts which the Company will be selling or servicing in the State, as identified by the Company in its Plan of Operations, in accordance with Appendix II, and include at a minimum (for new loss adjusters, or employees performing functions related to loss adjustment, all of the following and for experienced loss adjusters or employees performing functions related to loss adjustment, updates and changes), sufficient information to make such persons proficient in:

       (A)      The items listed in subsections (b)(1)(A), (B), (C), (D), (F), (H), (I), and (J);

       (B)      The FCIC procedures applicable to loss adjustment of eligible livestock price insurance contracts and any changes thereto;

       (C)      How to properly verify the accuracy of the information contained on applicable forms, documents, notices and reports;

       (D)      How to properly determine the amount of production to be used for the purposes of determining losses;

       (E)      The requirements under applicable Federal civil rights statutes; and

       (F)      Any other requirements as may be established by FCIC.

   (2)    The Company shall ensure the following for individuals identified in subsection (c)(1) that adjust or sign any claim for any eligible livestock price insurance contract:

       (A)      Any new loss adjuster shall participate in a structured training program on all of the items listed in paragraph (1) before signing any claim under an eligible livestock price insurance contract.

6

**DLF023**

(B)    Any experienced loss adjuster shall annually complete structured training on updates or changes specifically related to the areas listed in paragraph (1) or that are identified by FCIC or the Company as errors or omissions discovered during quality control reviews or processing of the loss related documents.

(C)    All new loss adjusters shall pass a basic competency test (all test results shall be maintained with each Company in accordance with section IV.(g) of the Agreement) before signing any claim under an eligible livestock price insurance contract. Basic competency tests shall specifically relate to the areas listed in paragraph (1) and determine the proficiency of the persons who completed the required training to accurately and correctly determine the amount of the loss and verify applicable information. Additionally, the Company shall review the test results and document follow-up training initiatives for any deficiency.

(D)    All loss adjusters shall retake and pass the competency test every three years.

(E)    If the loss adjuster was not employed by or did not contract with the Company in the previous year(s), the Company shall obtain, and make available upon request, documentation that the loss adjuster has passed the basic competency test within the past 3 years with another AIP.

(F)    Proficiency is established by passing a written test meeting the standards of the TPEP, and maintaining satisfactory work performance during the respective livestock price year measured against the measurement standards established under subsection (a)(2)(A).

(G)    In addition, the loss adjuster is considered to maintain satisfactory work performance if the results of reviews to respond to producer complaints, State Departments of Insurance or FCIC inquiries, or other quality control reviews identify no material errors.

(d)    Minimum Hours of Training for Agents and Loss Adjusters

    (1)    In order to sell or service any eligible livestock price insurance contract:

        (A)    A new agent or other applicable individuals (including any other individual who solicits or otherwise promotes livestock price insurance sales on behalf of the Company) must participate in a structured training program of at least 3 hours for each livestock plan of insurance sold, on all of the items listed in subsection (b)(1).

        (B)    An experienced agent or other applicable individual must annually complete at least 3 hours of structured training, on updates or changes

DLF024

specifically related to the items listed in subsection (b)(1), or that are identified by FCIC or the Company as deficient during the quality control reviews or processing of the sales related documents.

(C)    All agents and other applicable individuals must pass a basic competency test before they can sell or service an eligible livestock price insurance contract (all testing records, including test results, shall be maintained in accordance with Section IV(g) of the Agreement). Basic competency tests must specifically relate to the items listed in subsection (b)(1) and determine the proficiency of the person who completed the required training to sell and service eligible livestock price insurance contracts. Additionally, the Company must review the test results and document follow-up training initiatives for any area of identified weakness on the part of any one or more individuals.

(D)    All agents and applicable individuals must retake and pass the basic competency test every three years.

(E)    If the agent or other applicable individuals was not employed by or did not contract with the Company in previous years, the Company must obtain and have available upon request, documentation that the agent or other applicable person has passed the basic competency test within the past 3 years with another AIP.

(2)    In order to adjust or sign any claim for any eligible livestock price insurance contract:

(A)    A new loss adjuster or other applicable individual must participate in a structured training program of at least 3 hours for each plan of insurance on all of the items listed in subsection (c)(1).

(B)    An experienced loss adjuster or other applicable individual must annually complete at least 3 hours of structured training, on updates or changes specifically related to the areas listed in subsections (c)(1) or that are identified by FCIC or the Company as deficient during the quality control reviews or processing of the sales related documents.

(C)    All loss adjusters and other applicable individuals must pass a basic competency test (all testing records, including test results shall be maintained in accordance with section IV(g) of the Agreement). Basic competency tests must specifically relate to the areas listed in subsection (c)(1) and determine the proficiency of the persons who completed the required training to accurately and correctly determine the amount of the loss and verify applicable information. Additionally, the Company must review the test results and document follow-up training initiatives for

8

**DLF025**

any area of identified weakness on the part of any one or more new loss adjusters or experienced loss adjusters.

(D)    All loss adjusters and other applicable individuals must retake and pass the competency test every three years.

(E)    The Company must obtain and have available upon request, documentation for any loss adjuster or other applicable persons that has passed the basic competency test within the past 3 years with another AIP to fulfill the requirements of this subsection.

## SECTION III.  QUALITY CONTROL GUIDELINES

(a)    General Company Responsibilities

The Company is responsible for:

(1)    Establishing a system of internal controls to meet all FCIC quality control guidelines included in this Appendix.

(2)    Conducting all quality control reviews using objective and unbiased persons, who were not involved in the sales, supervision of sales, or establishment of the guarantee and did not participate in adjusting the loss for the eligible livestock price insurance contract reviewed.  Quality control reviews shall be independent.

(3)    Conducting an inspection.

(4)    Implementing procedures for timely detection and reporting of suspected misrepresentation, fraud, waste, or abuse by policyholders, employees or affiliates relating to the Federal crop insurance program.

(5)    Notifying FCIC of suspected misrepresentation, fraud, waste or abuse in accordance with section IV of this Appendix and assisting FCIC in subsequent investigations.

(6)    Implementing administrative procedures to resolve and correct errors and omissions identified during an inspection or review.

(7)    Correcting any errors or omissions identified during any inspection or review.

(8)    Maintaining, in accordance with section IV(f) of the Agreement, all documentation related to any inspection or review required by this Appendix.

DLF026

(9)     Establishing a process to respond to complaints by policyholders, the public, or state insurance departments, or referred to the Company by FCIC, documenting the complaint and actions taken by the Company in response, and providing such documentation to FCIC upon request.

(10)    Ensuring that companion eligible livestock price insurance contracts in force for other persons sharing in the livestock price insurance contract are serviced consistently. Any Company procedure for ensuring such consistency shall include a mechanism for seeking an interpretation of policy or procedure from FCIC in the event that the Company and another AIP disagree.

(11)    Taking such actions necessary to correct any non-compliance with the Agreement.

(12)    Preparing and providing to FCIC within 20 business days of completing each review an Electronic Quality Control Review Record (EQCRR) detailing the results of the review in accordance with Appendix III.

(13)    Retaining all documents, in accordance with section IV(f) of the Agreement, obtained in the course of the reviews conducted and all forms completed by the quality control reviewer and providing such documents to FCIC upon request. All review documentation is considered part of the policyholder file.

(14)    Submit an annual Quality Control Report, signed and certified by Company's Chief Financial Officer, or individual with similar responsibilities, by April 30 following the reinsurance year, describing the overall results of the Company's reviews and any corrective actions taken, and confirming the Company has performed sufficient reviews to provide a reasonable assurance that the requirements of the Agreement have been met.

(b)    Review Requirements

The Company is required to identify and conduct the following reviews on a reinsurance-year basis unless otherwise specified herein and report the results to FCIC. A review that meets the criteria for more than one review requirement will count toward all such review requirements.

(1)    Data Mining Reviews. Unless FCIC provides specific review requirements that are to be implemented, the Company shall conduct an inspection of eligible livestock insurance contracts for which anomalies have been identified by FCIC. These reviews will not exceed three percent of eligible livestock insurance contracts for the reinsurance year, unless FCIC provides notice that additional inspections are required to address specific program integrity concerns. These reviews will include, but are not limited to, eligible livestock insurance contracts with anomalous underwriting or loss performance or identified misapplication of policy or FCIC procedures. FCIC will meet with

10

AIPs annually to consult on the types and scope of data mining reviews to be conducted.

(2)    Individual Policy Reviews.  The Company shall conduct inspections or monitoring programs of eligible livestock price insurance contracts, entities, agents, loss adjusters, or affiliates identified by FCIC as may be determined necessary by FCIC to protect program integrity.

(3)    Operational Reviews.  These reviews are intended to ensure that the Company's internal controls are in place, operational, and provide reasonable assurance that the liability and indemnities are properly established in accordance with FCIC procedures.

(A)    Conflict of Interest Reviews: In accordance with section VI of Appendix I, the Company shall, prior to the payment of a claim, conduct an inspection for all eligible livestock price insurance contracts for which a conflict of interest has been disclosed or otherwise been identified as follows:

(i)    A conflict of interest review is mandatory when the person making a disclosure:

(I)    Has a share in livestock insured under any eligible livestock price insurance contract insured by the Company, or

(II)    Has a relative with a substantial beneficial interest in any insurance contract insured by the Company.

(ii)    An AIP discretionary review may be conducted on any disclosure category not included in subparagraph (i) above, as determined by the Company.

(B)    Consecutive Loss Adjuster Reviews. The Company shall conduct an inspection of at least:

(i)    15 percent of the eligible livestock insurance contracts on which the same adjuster has signed a claim for indemnity in three consecutive claim years for their Company; and

(ii)    15 percent of any additional eligible livestock insurance contracts, identified by FCIC, on which the same adjuster has signed a claim for indemnity in three consecutive claim years between multiple AIPs.

11

DLF028

(C)  $200,000 Indemnity Reviews. The Company shall identify and conduct an inspection on any eligible livestock insurance contract with an indemnity of $200,000 or more.

(D)  Simplified Claims Inspection. If the Company elects to use the Simplified Claims Process approved by FCIC, the Company must conduct inspections in accordance with procedures.

## SECTION IV.  REPORTING SUSPECTED MISREPRESENTATION, FRAUD, WASTE, AND ABUSE

In all cases where the Company or its affiliates reasonably suspects misrepresentation, fraud, waste, or abuse, the Company shall:

(a)  Immediately report such cases to FCIC;

(b)  Not take any action until the Company and FCIC have agreed to the appropriate course, except as necessary to preserve the timely adjustment of the claim or as otherwise authorized by FCIC procedures;

(c)  Take any action required by FCIC and, upon completion, forward all information and documents in the possession of the Company regarding the required action to the appropriate FCIC compliance office for the area; and

(d)  If the Company does not find adequate evidence to support a conclusion that a misrepresentation, fraud or waste and abuse has occurred, maintain all documents, in accordance with section IV(f) of the Agreement, relating to the suspected misrepresentation, fraud, waste, or abuse, and any actions taken.

12

**DLF029**

# EXHIBIT S

**Document Center Arden Hills**

| | |
|---|---|
| **From:** | Cameron, Deanna <DCAMERON@PROAG.COM> |
| **Sent:** | Friday, August 14, 2020 11:47 AM |
| **To:** | frankmendonsa@gmail.com;mendonsafarms@gmail.com |
| **Cc:** | Cardwell, Adam |
| **Subject:** | [EXTERNAL] FM Jerseys: DRP Policy #2020-06-987-5000271 - Milk |

Good Morning Frank and Kristin,

I hope you both are doing well.

I'm looking for verifiable documentation for your tax i.d. on the above-referenced entity for my high dollar review on your policy. It appears I will need a copy of the IRS document that was issued to you for your EIN (Employer Identification Number, also known as Federal Tax Identification Number). This way we will be able to correct the entity type in the system, if applicable.

Please let me know if you have any questions or concerns.

Thank you kindly for your help,

**DEANNA CAMERON**
Compliance Lead Reviewer, ProAg®
2025 S.Hughes Street, Suite 200
Amarillo, TX 79109
Office (800) 366-2767
Cell (559) 577-2489
www.ProAg.com

*ProAg® is an equal opportunity provider.*

A member of the Tokio Marine HCC group of companies. Tokio Marine HCC is the marketing name used to describe the affiliated companies under the common ownership of HCC Insurance Holdings, Inc. ProAg's products are underwritten by Producers Agriculture Insurance Company and Producers Lloyds Insurance Company. For more information about ProAg, please visit http://www.proag.com. This email message (including any attachments) contains confidential information and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient or have otherwise received this email in error, please contact the sender by reply email and permanently destroy all copies of the original message and any attachments.

Warning: This email originated from outside of Land O'Lakes. DO NOT click on links or open attachments unless you recognize the sender and know the content is safe.

1

# EXHIBIT T



16011 College Boulevard
Suite 210
Lenexa, KS 66219
T: (800) 366-2767
P: (913) 307-9988

September 9, 2020

FM Jersey
c/o Frank Mendonsa
16777 South I Dr
Tulare, CA 93274

Policy Number:          06-987-5000271
Claim Number:           30000466 and 30000762
County/State:      Tulare/CA
Crop/Policy Type/Year:          Milk/Dairy Revenue Protection/2020

Dear Mr. Mendonsa:

On behalf of Producers Agriculture Insurance Company ("ProAg"), I am writing you regarding the 2020 Dairy Revenue Protection ("DRP") insurance policy ("Policy") applied for by you for FM Jersey on December 31, 2019 and the Quarterly Coverage Endorsement ("QCE") submitted on December 12, 2019. This letter serves as notification to you of our determination concerning your policy. This letter also outlines your rights under the policy should you disagree with our determination.

By way of background, the above-referenced dairy revenue insurance policy was issued to you pursuant to the Federal Crop Insurance Act ("FCIA"). The policy  is reinsured by the United States Department of Agriculture, Federal Crop Insurance Corporation ("FCIC") pursuant to a Livestock Price Reinsurance Agreement ("LPRA") between ProAg and FCIC. All aspects of the federal crop insurance program are governed exclusively by the FCIA and the rules and regulations promulgated thereunder by the Risk Management Agency ("RMA") which has administrative oversight responsibilities for the federal crop insurance program. Everyone who participates in this program – whether as an insurance company that issues and services the policy, an insurance agent who sells a policy, or a farmer who purchases and is covered by a policy – is obligated to abide by and adhere to the FCIA, the applicable policy provisions and the rules. Neither ProAg nor its employees, agents, and/or adjusters can alter, vary, amend, or otherwise modify the terms and conditions of insurance policies issued under the federal crop insurance program, or the regulations, practices, and procedures of the RMA.

Additionally, pursuant to the FCIA, the LPRA, and 7 C.F.R. Part 400, Subpart P, and Section 16 of the policy provisions, all state or local laws that are inconsistent with the LPRA, the terms of the federal crop insurance policies, or the regulations promulgated by RMA, are preempted by federal law and do not apply.

**Named Insured Misreported**. Your DRP policy was subject to review due to a quarterly claim that had potential to exceed $200,000 requiring a review of policy and claim documents. The 2020 application submitted and signed by you certified that FM Dairy was a corporation. In the verification process, we were not able to verify FM Jersey was an active corporation. Additionally, the name of FM Jersey and the Tax Identification Number ("TIN") provided did not clear the TIN verification process through the IRS. We determined from our conversation with you on

**GROW WITH CONFIDENCE**

ProAg is an equal opportunity provider and employer. I A member of the Tokio Marine HCC group of companies.

**DLF131**

August 27, 2020, that the entity with share in the milk production is Frank Mendonsa DBA FM Jersey, a sole proprietor.

**Lack of Timely Signed Application.** Section 2(a) of the "Life of Policy, Cancellation, and Termination" provisions requires a timely application to be completed by you and received by us not later than the sales closing date. Excerpts of Sections 1 and 2 of the Policy are provided below for your reference.

*"2. Life of Policy, Cancellation, and Termination*

*(a) The application must be completed by you and received by us not later than the sales closing date. If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop.*

\*\*\*

*(d) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us. In accordance with section 20, FCIC may change the coverage provided from year to year.*

*(e) With respect to your application for insurance:*

*(4) You must include:*

*(i) Your election of plan of insurance; state; county; the crop 'milk'; and any other material information required on the application to insure your milk; and*

*(ii) All information required in section 2(e)(4)(i) or your application will not be accepted and no coverage will be provided;"*

*"Section 1. Definitions.*

***Application*** *- The form required to be completed by you, containing all the information required in section 2, and accepted by us before insurance coverage will commence. Only one application is required per state and all the milk produced within a state is covered under this policy. A separate application is required to insure milk produced in another state.*

***Sales closing date*** *- The sales closing date is each day, in the specified sales timeframe, during which coverage is available for purchase.*

***Sales period*** *- The period of time that begins when the coverage prices and rates are validated and ends at 9:00 AM Central time of the following business day in which you can purchase quarterly endorsements.*

***Sales period begin date*** *- A date contained in the actuarial documents citing the first date coverage for a specific quarterly insurance period becomes available to be offered for the crop year.*

***Sales period end date*** *- A date contained in the actuarial documents citing the last date coverage for a specified quarterly insurance period will be available to be offered for the crop year."*

The sales period for the Class Price Option 831 for Jan – March/Yr2 – Quarter 1 802 is from July 1, 2019 through December 15, 2019. Your application was originally sent to you November 26, 2019 for signature via DocuSign. You indicated your desire to purchase the Quarterly Coverage Endorsement on December 12, 2019. However, you did not sign the initial insurance coverage application until December 31, 2019 which was after the December 15, 2019 sales period end date deadline for Class Price Option 831 Jan – March/Yr2 – Qtr. 1. In other words, by the time your application was signed, the sales period for the particular endorsement you applied for had already ended. As noted in the definition of "Application" shown above, it must be completed, which includes the applicant's signature, and accepted by us "before insurance coverage will commence". Thus, you cannot apply for an endorsement

800.366.2767 | PROAG.COM | @PROAGINS

**GROW WITH CONFIDENCE**

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

DLF132

initiating coverage for a particular quarter, without the policy first being in place under which coverage is sought. Section 2(a) of your policy requires application not later than the sales closing date. Section 2(e)(4)(ii) previously referenced prohibits insurance coverage for the Jan – March/Yr2 – Qtr. 1 period because the application was not timely signed prior to the application for such coverage and the sales period end date for such coverage.

The sales period for Class Price Option 831 for Apr – June/Yr2 – Quarter 2 803 is from July 1, 2019 through March 15, 2020. While the signature date on the application of December 31, 2019 is timely for insuring the Apr – June/Yr2 _ Quarter 2 timeframe, the request for coverage applied for by way of the Quarterly Coverage Endorsement signed on December 12, 2019 is invalid. As noted in 2(d) above and the definition of application as noted above; the policy is contingent on acceptance of the initial application to be in effect. Specific quarterly coverage cannot be applied for prior to the Policy being in effect which was not until the application had been executed and accepted by us. As such the Quarterly Insurance Periods selected for Jul – Sep/Yr2 _ Quarter 3 804 and Oct – Dec/Yr2 Quarter 4 805 are also invalid for the 2020 Crop Year.

As a result of the application date being later than the Quarterly Coverage Endorsement application date, there is no valid coverage under the DRP policy. The previously indemnified amount of $13,898 which was applied to premium for the Jan – March/Yr2 -Quarter 1 period must also be denied.

Originally, premium and fees totaled $167,968. The indemnity payment of $13,898 had been applied to your premium balance. This has been revised through the denial of the indemnity. Our records indicate to date we have received a premium payment of $30,099. Those funds were applied to the premium total of $167,968. With the denial of coverage, the premium earned for 2020 is now zero. A premium refund check for prior payments totaling $30,099 is enclosed.

**Your Policy Rights** ProAg based our determinations on the information made available to us or discovered by us in fulfilling our obligations under RMA procedure. If any of that information is incorrect or there is additional information that should have been taken into consideration, please let us know. Should you not agree with the determinations made with respect to your claim, the federal policy requires mediation and/or arbitration of such disputes. Specifically, Section 19(a) of the federal policy provides in part, "If you and we fail to agree on any determinations made by us [ProAg] except those specified in specified in section 19(d) [FCIC determination], the disagreement may be resolved through mediation in accordance with section 19(g). If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association ("AAA"). If the dispute in any way involves a policy or procedure interpretation you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC. Any interpretation by FCIC will be binding in any mediation or arbitration." I refer your attention to Section 19 of the enclosed policy provisions for a more thorough explanation and analysis of the federal policy's mediation/arbitration requirements. Additionally, RMA has provided guidance concerning the arbitration process in its Manager's Bulletins Nos.: MGR-12-003.1 and MGR-17-018, which can be found by accessing the RMA website at www.rma.usda.gov/bulletins/managers/

By this letter, ProAg does not waive or relinquish any other defenses or basis for coverage or claim denial which may be available to it under the terms of the federal crop insurance policy. Nor does ProAg waive or relinquish any rights, benefits, or defenses available to it under the FCIA and attendant federal regulations; RMA policies, procedures, or directives; or any other provisions of either applicable federal or state law.

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

DLF133

FM Jersey                                                                                    September 9, 2020
Re: Dairy Revenue Protection                                                                         Page 4 of 4

We regret a more favorable outcome regarding your policy and claim could not be reached under the governing
policy and procedure given the determined facts. Should you have questions or additional information regarding
your policy or claim please respond in writing to the address on the letterhead.

Sincerely,

Vikki J Blettner    Digitally signed by Vikki J
                    Blettner
                    Date: 2020.09.09 13:49:51 -07'00'

Vikki Blettner
National Underwriting Manager

Enclosures: DRP Provisions
            Premium Refund Check

Copy: Land O' Lakes Insurance Solutions LLC – Adam Cardwell Agent
      File

800.366.2767 | PROAG.COM | @PROAGINS          **GROW WITH CONFIDENCE**

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

**DLF134**



Producers Ag Insurance Group, Inc
16011 College Blvd
Suite 210
Lenexa, KS 66219

LAND O' LAKES INSURANCE SOLUTIONS LLC
4001 LEXINGTON AVE
ARDEN HILLS, MN 55126

Agency Name / Address:
LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00)
4001 LEXINGTON AVE
ARDEN HILLS, MN 55126

Processing Region Address:
2025 South Hughes, Suite 200
Amarillo, TX 79109

| Agent Name: | ADAM CARDWELL | Payment Type: | Livestock Premium Refund | Check Number: | 200024227 |
|---|---|---|---|---|---|
| Insured: | FM Jerseys | Draft Date: | 9/9/2020 | Batch Number: | 42008 |
| RY-Policy Number: | 2020-987-06-5000271 | Claim Number: | N/A | Amount: | $30,099.00 |



TO VERIFY AUTHENTICITY, SEE REVERSE SIDE FOR DESCRIPTION OF SECURITY FEATURES

ProAg
16011 College Blvd
Suite 210
Lenexa, KS 66219

JPMorgan Chase Bank, N.A.

Dallas TX 75201

32-61
1110

Date: 9/9/2020

Thirty Thousand Ninety-Nine and zero/100

$30,099.00

PAY TO THE ORDER OF:
FM JERSEYS
18777 SOUTH I DR
TULARE, CA 93274



Authorized Representative

⑈"O 2000 24 227"⑈  ⑆⑈ 1110006 14⑈  180 13 387 2⑈"        **DLF135**

# EXHIBIT U



16011 College Boulevard
Suite 210
Lenexa, KS 66219
T: (800) 366-2767
P: (913) 307-9988

FM Jerseys
16777 South I Dr
Tulare, CA 93274


October 20, 2020


RE: Dairy Revenue Protection (DRP) Loss Update
DRP Policy Number: 5000271

Dear FM Jerseys:

Producers Ag Insurance Group, Inc is notifying you that your coverage under your 2020 DRP Policy 5000271; Milk - Jul - Sep/Yr2 - Qtr3 Class Price Option 12/12/2019 has ended. According to our records, your policy may have had a loss.

Enclosed is the Notice of Probable Loss / Milk Production Worksheet. Please complete all necessary sections, sign, and return the completed reports to Producers Ag Insurance Group, Inc within 60 days of receiving this letter. Additional required documentation includes the milk marketing records for each month of the applicable quarter. These records shall show; (1) The name, address, Grade A identifier assigned by a duly constituted regulatory agency, and payroll number or similar identifier of the producer; (2) The daily and total pounds, and the month and dates such milk was received from that producer; and if component pricing was elected, (3) The total pounds of butterfat and protein contained in the producer's milk.

The signed claim paperwork and supporting documentation can be scanned and emailed to proaglivestockclaims@proag.com . It can also be faxed or mailed to our office.

If you have any questions, please contact your agent. Thank you for your business and we look forward to serving you in the future.

Sincerely,
ProAg Claims Processing Dept.

CC: File
LAND O' LAKES INSURANCE SOLUTIONS LLC (273545-00) - ADAM CARDWELL



**GROW WITH CONFIDENCE**

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

**DLF145**

**PRO AG**

# Dairy Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (806) 366-2767
Fax: (806) 306-3355
Print Date: 10/20/2020

| Insured's Name, Mailing and / or Street Address and Other Contact Information | Agency Name and Agent Contact Information | Crop Year | Claim Number | Policy Number |
|---|---|---|---|---|
| FM Jerseys | LAND O'LAKES INSURANCE SOLUTIONS LLC (273545-00) | 2020 | 30000933 | 06-987-5000271 |
| 16777 South I Dr | ADAM CARDWELL (10525) | | State | |
| Tulare, CA 93274 | 4801 LEXINGTON AVE | | California (06) | |
| | ARDEN HILLS, MN 55126 | | County | |
| Phone: (559) 804-4607 Office | Phone: (651) 262-3545 Agency (651) 253-8912 Agent | | Tulare (107) | |
| Email: frankmendone@gmail.com | Email: ARCARDWELL@LANDOLAKES.COM | | Date Notice of Probable Loss Issued | |
| ID Type and Number: EIN XX-XXX4386 | | | 10/20/2020 | |
| Person Type: Corporation | | | | |
| Spouse's Name: | Signature Authorization(s)*: NONE | | Assignment of Indemnity? ☐ Yes ☐ No | |
| Spouse's ID Type and Number: | | | Transfer of Right to Indemnity? ☐ Yes ☐ No | |

## Crop Information

| Crop | Plan | Quarterly Insurance Period (Practice) | Pricing Option (Type) | Coverage Level | Declared Milk Production | Protection Factor | Yield Adjustment Factor | Declared Share | Expected Milk Production per Cow | Actual Milk Production per Cow |
|---|---|---|---|---|---|---|---|---|---|---|
| Milk (0830) | DRP (83) | Jul - Sep/Yr2 - Qtr3 (804) | Class (831) | 95% | 10,000,000 | 1.50 | 1.04 | 1.000 | 5,650 | 5,895 |

## Indemnity Calculation

| Expected Revenue Guarantee | | | Actual Milk Revenue | | | Total | | | Probable Indemnity |
|---|---|---|---|---|---|---|---|---|---|
| $1,709,050 | - | | $1,541,280 | = | | $167,770 | × | | $251,655 |

## Milk Production Worksheet Information

The milk marketing records for the applicable quarter must be submitted with the milk production worksheet which shall show: (1) The name, address, Grade A identifier assigned by a duly constituted regulatory agency, and payroll number or similar identifier of the producer; (2) The daily and total pounds, and the month and dates such milk was received from that producer; and if component pricing option elected, (3) The total pounds of butterfat and protein contained in the producer's milk.

| Declared Butterfat Test | Declared Protein Test | Average Butterfat Test | Average Protein Test |
|---|---|---|---|
| 0.00 | 0.00 | | |

| Provide the Effective Date and the Pounds of Covered Milk Production for all Quarterly Coverage Endorsements providing coverage for the quarter with the probable loss. | | Provide the total pounds of Milk sold for each month in the quarter and if the Type 832 Component Pricing Option was elected, provide the Total Average Butterfat Test and Average Protein Test. | | |
|---|---|---|---|---|
| **Effective Date** | **Pounds of Covered Milk Production** | **Month** | **Pounds of Milk Sold** | |
| 12/12/2019 | 10,000,000 | | | |
| | | | | |
| | | | | |
| | | | Total | |

BFR = Beginning Farmer / Rancher    *Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the Insured

939 (Rev. 02-2019)    See Last Page of Dairy Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet of Required Statements    Page 1 of 3

DLF146



2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (866) 366-3038
Print Date: 10/20/2020

# Dairy Revenue Protection (DRP) Notice of
# Probable Loss and Milk Production Worksheet

| Insured's Name | Agency and Agent Name | Crop Year | Claim Number | Policy Number |
|---|---|---|---|---|
| FM Jerseys | LAND O'LAKES INSURANCE SOLUTIONS LLC (273545-00)<br>ADAM CARDWELL (16526) | 2020 | 3000933 | 06-987-5000271 |

## Collection of Information and Data (Privacy Act) Statement

### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on the documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for the AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIP's contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide the true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### Non-Discrimination Statement

In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

To File a Program Complaint - If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at https://www.ascr.usda.gov/ad-3027 usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

Persons with Disabilities - Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

## Producers Ag Insurance Group Privacy Notice

The Producers Ag Insurance Group (ProAg Group) is committed to respecting the individual privacy of our policyholders and their significant beneficial interest owners (Customers). We collect nonpublic personal information about Customers from information we receive from them such as information provided on applications or other forms, which may include name, address and social security numbers and from third parties such as consumer reporting agency. To serve our Customers and to service our business our employees have access to Customers personal information in the course of doing their jobs and we may share or disclose non-public personal information about the Customers to affiliates within the ProAg Group or with non affiliated third parties where a written permission or we have a contractual relationship such as agencies within the United States Department of Agriculture, with your insurance agent and other insurance companies or with banks where a written permission to transfer such information has been granted by the policyholder. We may also share non-public personal information with affiliates and with non-affiliated third parties as permitted by law. The ProAg Group will not sell or share your personal information with anyone for purposes unrelated to our business functions without our offering to the Customer the opportunity to 'opt-out' or 'opt-in' as required by law.

## Certification Statement

I am an agent, employee, or contractor affiliated with Federal crop insurance program?    ☐ Yes ☐ No

BFR = Beginning Farmer / Rancher          *Signature Authorization = Power of Attorney (POA), Grantee and / or Authorized Representative that have been authorized to sign for the Insured

939 (Rev. 02-2019)                        See Last Page of Diary Revenue Protection (DRP) Notice of Probable Loss and Milk Production Worksheet of Required Statements

Page 2 of 3

DLF147

# PRO AG

## Dairy Revenue Protection (DRP) Notice of
## Probable Loss and Milk Production Worksheet

2025 S. Hughes Street
Amarillo, TX 79109
Phone: (800) 366-2767
Fax: (866) 306-3038
Print Date: 10/20/2020

| Insured's Printed Name | Insured's Signature | Date |
|---|---|---|
| FM Jerseys | | |
| AIP Verifier's Printed Name | AIP Verifier's Signature | Date |

939 (Rev. 02-2019)

This form and all supporting documentation must be returned to the address shown above or via email at ProAgLivestockClaims@proag.com.

Page 3 of 3

**DLF148**